ORIGINAL

LABATON SUCHAROW LLP
Jonathan M. Plasse (*pro hac vice*)
Richard T. Joffe (*pro hac vice*)
Jesse Strauss (*pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP
David Kessler (*pro hac vice*)
Sharan Nirmul (*pro hac vice*)
Lauren Wagner Pederson (*pro hac vice*)
Richard A. Russo, Jr. (*pro hac vice*)
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Lead Plaintiff State-Boston Retirement System and the Class*

Mark Labaton (No. 159555)
KREINDLER & KREINDER LLP
707 Wilshire Boulevard, Suite 4100
Los Angeles, California 90017
Telephone: (213) 622-6469
Facsimile: (213) 622-6019
Mlabaton@kreindler.com

*Local Counsel*

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

NOV 24 2008

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

RECEIVED BUT NOT FILED
NOV 24 2008
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| JOEL STRATTE-McCLURE, STATE-BOSTON RETIREMENT SYSTEM and, FJÄRDE AP-FONDEN, Individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> MORGAN STANLEY, a Delaware corporation, JOHN J. MACK, ZOE CRUZ, DAVID SIDWELL, THOMAS COLM KELLEHER, THOMAS V. DAULA, and GARY G. LYNCH, <br><br> Defendants. | Case No.: CV08-963 AG (FFMx) <br><br> <u>CLASS ACTION</u> <br><br> Honorable Andrew J. Guilford <br><br> <u>**AMENDED CLASS ACTION COMPLAINT**</u> |

Amended Class Action Complaint
Case No. CV08-963AG (FFMx)

I. SUMMARY OF CLAIMS ....................................................................................... 1

II. JURISDICTION AND VENUE ............................................................................. 11

III. PARTIES ............................................................................................................... 12

    A. PLAINTIFFS ............................................................................................. 12

    B. DEFENDANTS ......................................................................................... 12

        1. Defendant Morgan Stanley ............................................................ 12

        2. Individual Defendants .................................................................... 13

IV. CONTROL PERSON ALLEGATIONS/GROUP PLEADING ............................ 16

V. CONFIDENTIAL WITNESSES .......................................................................... 18

VI. SUBSTANTIVE FACTUAL ALLEGATIONS .................................................... 19

    A. The  Return of John Mack to Morgan Stanley ........................................ 20

    B. Mack Implements an Aggressive Risk Focused Business Plan ............... 23

    C. The Institutional Securities Group Reports Record Results as a Result of
       the Additional Risk Taking ...................................................................... 25

    D. Defendants Assure Investors That Morgan's Risk-Taking is "Disciplined" ......... 27

    E. Undisclosed to the Investing Public, Morgan's Proprietary Trading Group
       Makes a Multi-Billion Dollar Bet on the Movement of U.S. Subprime
       Securities ................................................................................................. 29

        1. The Residential Mortgage Backed Securities, Collateralized Debt
          Obligations and Credit Defaults Swaps Behind the Proprietary
          Trading Group's Bet ..................................................................... 30

        2. The Proprietary Trading Group's Massive Bet on the Price
          Movements on CDSs referencing CDOs ...................................... 32

        3. Generally Accepted Accounting Principles Required that the
          Proprietary Trading Group's Trading Position Be Valued at "Fair
          Value" on Morgan Stanley's Balance Sheet ............................... 33

        4. The ABX Index Was an Observable Market Input That Impacted
          the Fair Value of the Assets Underlying the Proprietary Trading
          Group's Trade ............................................................................... 35

        5. The Declines in the ABX Index Were Linked to the Declines in the
          U.S. Subprime Markets ................................................................ 40

VII. DEFENDANT'S FRAUDULENT SCHEME TO CONCEAL KNOWN LOSSES
    CAUSED BY THE PROPRIETARY TRADING GROUP'S SUBPRIME BET
    AND OTHER SUBPRIME POSITIONS HELD BY THE COMPANY ......................... 43

| | A. | Defendants Disclaim Any Exposure to the Declines in the Subprime Market .................................................................................... 43 |
|---|----|---|
| | B. | The SEC's Request for Greater Disclosure of the Company's Exposure to Subprime is Undisclosed and Ignored ..................... 45 |
| | C. | Contrary to the Defendants' Lack of Representations to the Market About Morgan's Exposures to Subprime, Defendants Had Sounded the Alarm Internally About Massive Subprime Losses ........................... 47 |
| | D. | The Defendants Actively Conceal the Losses Resulting From the Proprietary Trading Group's Subprime Positions ................... 49 |
| | E. | Morgan Has a Pattern of Abusing Fair Valuation Methodology to Manage Earnings ............................................................................... 55 |
| | F. | A Known Breakdown of Morgan's Internal Risk Controls Contributed Significantly to the Company's Subprime Losses ................. 56 |
| | | 1. Contrary to the Company's Representations, Morgan's Risk Controls Were Wholly Deficient ................................. 56 |
| | | 2. The Company's Risk Control Failures Were Compounded By Known Deficiencies in the Company's Ability to Value Its Positions .......................................................................... 60 |
| VIII. | | DEFENDANTS' MATERIALLY UNTRUE STATEMENTS AND OMISSIONS ........ 61 |
| | A. | Morgan Stanley Reports a Blockbuster Beginning to Fiscal 2007 in Pre-Class Period Statements that Impacted the Total Mix of Information During the Class Period ................................................. 61 |
| | B. | At the Beginning of the Class Period Defendants Continue to Report Record Earnings for Morgan Stanley in Second Quarter 2007 ....... 62 |
| | C. | Defendants Manipulate Morgan Stanley's Reported Financial Results for Third Quarter 2007 ....................................................... 69 |
| IX. | | PARTIAL DISCLOSURES AND ADDITIONAL FALSE STATEMENTS ................. 77 |
| X. | | MORGAN STANLEY'S ACCOUNTING VIOLATED GAAP AND SEC DISCLOSURE REQUIREMENTS .................................................. 88 |
| | A. | Morgan Stanley's Financial Statements Failed to Comply with GAAP .............. 88 |
| | B. | Morgan Stanley Violated GAAP in Valuing Certain Subprime Positions .......... 95 |
| | C. | Defendants Failed to Recognize Observable Inputs for Valuation of the CDS Positions ............................................................... 96 |
| | D. | Defendants Failed to Value Assets and Liabilities Based on Current Market Conditions ....................................................... 100 |
| | E. | Morgan Stanley Violated GAAP in Failing to Disclose Adequately its Subprime Positions ......................................................... 102 |

F.     Failure to Comply With Other GAAP Disclosure Requirements ....................... 103

G.     Defendants Failed to Maintain Adequate Disclosure Controls and Procedures and Internal Controls over Financial Reporting ............................... 106

XI.    ADDITIONAL SCIENTER ALLEGATIONS ............................................... 108

    A.     General Allegations of Scienter ........................................................... 108

    B.     John Mack ................................................................................. 112

    C.     David Sidwell ............................................................................ 116

    D.     Zoe Cruz ................................................................................... 123

    E.     Tom Daula ................................................................................. 125

    F.     Colm Kelleher ............................................................................ 126

XII.   LOSS CAUSATION ............................................................................... 129

    A.     The Events Leading Up to and The Company's Initial Revelations About Its Subprime Exposure on November 7, 2007 ................................... 130

    B.     Firings and Demotions, and Final Disclosure of the Company's True Financial Condition ...................................................................... 133

XIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: THE FRAUD ON THE MARKET DOCTRINE ....................................................................... 134

XIV.  INAPPICABILITY OF SAFE HARBOR ................................................. 135

XV.   CLASS ACTION ALLEGATIONS ......................................................... 136

XVI.  COUNTS ............................................................................................. 138

XVI.  PRAYER FOR RELIEF ........................................................................ 141

XVII. JURY DEMAND ................................................................................... 142

Lead Plaintiff, State Boston Retirement System ("SBRS" or "Lead Plaintiff"), and named plaintiff, Fjärde AP-Fonden ("AP4"), individually and on behalf of all other persons and entities who purchased or otherwise acquired common stock issued by Morgan Stanley (hereinafter "Morgan" or the "Company") and traded on the New York Stock Exchange ("NYSE") from June 20, 2007 to December 19, 2007, inclusive (the "Class Period"), by their undersigned attorneys, for their Consolidated Securities Class Action Complaint (the "Complaint"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on their investigation (made by and through their attorneys), which investigation included, among other things, a review and analysis of: (1) public documents pertaining to Morgan and the Individual Defendants, as defined herein; (2) Morgan's filings with the Securities and Exchange Commission ("SEC"); (3) press releases published by Morgan; (4) analyst reports concerning the Company; (5) pleadings in other litigations where Morgan is a party; (6) interviews with, *inter alia*, former Morgan employees; and (7) newspaper and magazine articles (and other media coverage including web logs or "blogs") regarding Morgan, its business or any Individual Defendant. Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control. Plaintiffs believe that substantial further evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I.  **SUMMARY OF CLAIMS**

1.  On November 7, 2007, following rumors that had circulated the financial markets for a number of days, Morgan stunned its investors by confirming their worst fears. Contrary to what it had been telling the markets since the beginning of the Class Period-- namely, that the Company had little U.S. subprime exposure and to the extent that that it did, these exposures were fully hedged -- the Company revealed that it stood to lose billions of dollars from undisclosed aggressive trading bets that it had made on U.S. subprime securities. However, even at this point in time, the Company still continued to conceal critical information from the marketplace as it had yet to disclose that this problem stemmed from severe risk control deficiencies, that these losses should have been recognized in the Company's previous financial quarter, and that senior officers in the

1   Company knew about the failure to disclose (i) the Company's subprime exposure; (ii) the risk

2   control deficiencies; and (iii) the losses resulting from Company's subprime exposure, as early as

3   June 2007.

4        2.      It was not until December 19, 2007 that the full extent of the losses sustained by the

5   Company would be revealed. On that date, Morgan announced a staggering $9.4 billion loss on

6   mortgage-related instruments for the quarter-ended November 30, 2007, $7.8 billion of which

7   related to its previously undisclosed subprime-related positions. For the first time in its history,

8   Morgan reported a quarterly loss, and of stunning proportions.

9        3.      The Company's principal U.S. subprime exposure was the result of a risky trading

10   strategy, embarked upon by a proprietary trading group (hereafter, the "Proprietary Trading

11   Group"), which was established and empowered by Morgan's senior management to act as

12   Morgan's internal hedge fund and to make riskier bets using the Company's capital than the

13   Company had in the past, in order to generate higher returns.

14        4.      The Proprietary Trading Group, established in April 2006 within the Company's

15   Institutional Securities Group (sometimes, referred to herein as "ISG") grew out of a larger strategy

16   employed by CEO John Mack to increase by multiples, risk taking by the ISG that was designed to

17   improve Morgan's performance relative to its investment banking peers. Mack's perception was

18   that his predecessor and nemesis, Robert Purcell had been too averse to risk and that, as a result,

19   Morgan's reputation and profits had languished.

20        5.      Deciding on a "radical shakeup" of Morgan, Mack placed Zoe Cruz in charge of his

21   risk-taking strategy, as his Co-President and Head of the ISG. According to Mack, Cruz "shared his

22   healthy appetite for risk taking." Cruz, reportedly, was a controversial selection and was not well

23   received by many within the ISG, being seen as an opportunist rather than a sound trader.

24        6.      Cruz and Mack, embracing a business plan that depended upon greater risk-taking in

25   the ISG, ratcheted up the group's profits in 2005 and 2006, increasing the ISG's profits by 182%

26   during this period, and securing record bonuses for themselves. In 2006, Mack earned $40 million

27   in bonuses, a record on Wall Street at the time, while Cruz pocketed $30 million. Other traders

28   within the ISG also took home record bonuses.

Amended Class Action Complaint                 - 2 -
Case No. CV08-963AG (FFMx)

7.     With this additional tolerance and directive for greater risk came the need for sound risk control policies. In light of this new strategy, investors frequently asked Mack and Morgan's senior executives what measures Morgan was taking to ensure sound risk management. In response to these questions, Mack and the other Defendants named herein repeatedly assured investors, both leading up to and during the Class Period, that the ISG's spectacular success under Zoe Cruz was the result of "effective, disciplined risk taking" and that Cruz and her team were able to "manage a tremendous amount of risk in a smart and disciplined way." At a shareholder meeting on April 21, 2007, Mack informed shareholders, in response to a question of Morgan's risk taking, "I am comfortable with the risk...I think we probably have one of the best overall risk managers in Tom Daula, who oversees all firm risk, and also Zoe growing up on the sales and trading side, mainly trading side risk management, it's a very strong combination. So I'm comfortable with it."

8.     What Mack did not tell investors was that after his return to Morgan in 2005, as part of his radical shake-up of the Company, he had decided that Tom Daula, the Company's Chief Risk Officer, should no longer report to him, but rather to Zoe Cruz. This remarkable decision entrusted the ultimate supervision of risk control to the person whose department was assuming the risks! More significantly, this dramatic departure from established practice in the industry was not disclosed to investors. This undisclosed change in reporting structure would prove to be another fateful decision contributing to the massive losses investors in Morgan common stock suffered during the Class Period.

9.     On June 20, 2007, the first day of the Class Period, Morgan reported stellar results for its Second Quarter 2007. These results were principally due to the spectacular returns reported by the ISG and, more specifically, an undisclosed subprime bet on a subprime-related security trade in the First Quarter of 2007 that worked out well for the Company. These results elated analysts and Morgan's investors because, for the rest of the U.S. investment banking industry, there were storm clouds on the horizon due to increasing troubles in the U.S. housing markets and subprime mortgages, and the fact that Morgan could turn in such good results without any negative exposure to subprime boded well for continued successful results.

10.    For several months prior to that time, companies whose businesses involved or were

related to investments in U.S. subprime mortgages were facing unprecedented financial turmoil. Indeed, major subprime lenders had declared bankruptcy and investors that had invested in the complex instruments—including residential mortgage backed securities ("RMBS"), collateralized debt obligations ("CDOs") and credit default swaps ("CDS") – which were each dependent upon the success of U.S. subprime mortgages -- were facing huge losses. Indeed, within days of Morgan releasing its extremely positive second quarter 2007 results, Bear Stearns agreed to provide a $3.2 billion bailout to two separate multi-billion dollar hedge funds with significant subprime investments.

11.    As a consequence of this turmoil in the industry, and because Morgan itself had acquired Saxon Capital, a major U.S. subprime originator in 2006, investors and analysts further inquired of the Company as to its subprime exposure. The response from Defendants was emphatic; there was nothing to worry about as Morgan had wisely taken a "net short" position on U.S. subprime and purportedly stood to profit from the decline in the U.S. subprime market. Morgan's financial disclosures were silent as to any subprime exposure on the Company's balance sheet.

12.    Defendants' affirmative public statements, coupled with the absence of disclosures regarding the Company's positioning with respect to the U.S. subprime market, caused analysts, investors and ratings agencies to believe that the Company's subprime mortgage-related exposure was controlled and that Morgan was well-positioned, compared to its peers, to escape from the mortgage market meltdown relatively unscathed. For example, on March 21, 2007, Keefe, Bruyette & Woods analyst Lauren Smith raised her 2007 earnings estimate for the Company to $8.12 from $7.20. In doing so, Smith stated she believed the Company would "more than stand up to the perils we are witnessing in the sub prime mortgage market." Smith also pointed out that "[m]anagement noted they feel very confident in how they are positioned and their exposures to the sub prime mortgage markets." This was the total mix of information provided to the investing public leading up to the commencement of the Class Period.

13.    Indeed, during the thick of the subprime crisis, on July 31, 2007, S&P actually upgraded Morgan from A+ to AA- and wrote, "While we recognize that recent capital markets

turmoil—precipitated by market issues in the subprime mortgage and leveraged corporate finance sector—could herald a period of much less favorable market conditions, we believe that structural improvements in Morgan's competitive position leave the firm especially well-positioned to withstand market volatility compared to industry peers."

14. In reality, however, the Company had enormous exposure to the turmoil in the U.S. subprime market by virtue of an undisclosed multi-billion dollar trade that the Proprietary Trading Group had made prior to the Class Period that was entirely dependent on the success or failure of subprime-related securities. This exposure, and its potential for massive losses for Morgan and its investors, would become well known to senior executives at the Company, including Zoe Cruz, by no later than May 2007.

15. The background of this multi-billion dollar trade begins in December 2006 when traders in the Proprietary Trading Group took on a series of trading positions in subprime mortgage derivatives which the Company secretly held on its balance sheet throughout the Class Period. The undisclosed strategy involved taking a net short position within the subprime mortgage market by purchasing CDSs -- essentially insurance policies triggered by the default of securities -- on lower-rated mortgage backed securities issued by CDOs.

16. In acquiring this short position through the acquisition of CDSs, Morgan had to make periodic premium payments to the CDS counterparty in exchange for this insurance protection. To offset the cost of the periodic premium payments due to the CDS counterparty, Morgan sold CDSs (*i.e*, sold insurance) on approximately $13.2 billion of so-called "super senior" tranches—the higher rated tranches--of so-called "mezzanine" CDOs, which entitled Morgan to receive periodic payments, which it used to finance the short position. The Defendants knew or recklessly disregarded that while the CDS positions that they had insured were highly rated by credit rating agencies, the majority of the underlying collateral consisted of BBB-rated mortgage backed securities linked to U.S. subprime mortgages.

17. In implementing this trading strategy, Morgan, through its Proprietary Trading Group, was effectively betting that mortgage defaults would be significant enough to impair the lower equity tranches of mortgage-backed securities, but not large enough to impair the value of super

1   senior tranches of the same or similar securities. If Morgan was correct in its strategy, the
2   Company would profit from its short position while retaining the full value of its long position. If
3   the defaults were higher than expected, however, the Company risked becoming vulnerable to the
4   deteriorating mortgage market, as the gains realized on the short position would be completely
5   wiped out by losses suffered on Morgan's $13.2 billion long position. As discussed in great detail
6   below, the securities fraud alleged herein results not from this poorly executed trading strategy, but
7   rather from the falsity of Defendants' statements throughout the Class Period regarding Morgan's
8   exposure to the U.S. subprime market and its failure timely to write down positions and record
9   losses from such exposure.

10      18.     The fair value of the Proprietary Trading Group's $13.2 billion notional position, as
11  Defendants would ultimately concede, was tied to the movement of an index called the ABX Index,
12  which tracked the cost of insuring various tranches of residential mortgage backed securities. In
13  particular, the fair value of the position was tied to the movement of the ABX Index for the BBB
14  06-1 vintage, the ABX index that tracked the cost of insuring BBB rated mortgage backed
15  securities originated in the second half of 2005. These were the exact CDSs that Morgan had sold.

16      19.     In the second quarter of 2007, mortgage defaults primarily affected the lowest
17  tranches of the CDO structures and Morgan reported stellar results that were largely dependent
18  upon its undisclosed positioning within the subprime market during this time. However, even then,
19  there were significant warning signs within the market suggesting that the losses would eventually
20  cut into the market value of the higher-rated BBB and AAA tranches and the Proprietary Trading
21  Group's trade. As described below, this risk caught the attention of Zoe Cruz prior to the
22  beginning of the Class Period.

23      20.     According to an article published in May 2008 which appeared in *New York*
24  *Magazine*, Zoe Cruz revealed that beginning in May of 2007, she became worried that the
25  magnitude of the subprime mortgage fallout could negatively impact the value of the Proprietary
26  Trading Group's position and other subprime related trades within the ISG. As a result, Cruz said
27  that she began to require her department to unwind billions of dollars in subprime mortgage-related
28  positions and informed her personal clients that they should avoid taking on mortgage-related

Amended Class Action Complaint                                           - 6 -
Case No. CV08-963AG (FFMx)

1    positions in light of the subprime market's impending collapse.

2        21.    Cruz also stated in the interview that in May 2007 she ordered Defendant Thomas

3    Daula, the Company's Chief Risk Officer, to run "stress tests" on the CDSs acquired by Proprietary

4    Trading Group to calculate the amount of money the Company would lose based on various levels

5    of deterioration within the subprime mortgage market. As mentioned above and described in

6    greater detail herein, while the investing public was led to believe that Daula was reporting directly

7    to Mack, in fact, he reported directly to Cruz.

8        22.    On July 4, 2007, more than a month later and with the value of the CDSs continuing

9    to decline, according to Cruz's account of events, Daula informed Cruz that the Company was

10   potentially exposed to $3.5 billion in losses from the Proprietary Trading Group's CDS positions.

11   According to the article, although Daula purportedly told Cruz that a loss of this magnitude was

12   unlikely, Cruz claims to have told Daula, as well as Neal Shear, a well-known trader that ran Cruz's

13   fixed income division, "I don't care what your view of probability is. Cut the position." According

14   to Cruz, despite her orders, no action was taken and the $13.2 billion CDS position was not

15   liquidated. In addition, the exposure resulting from the position remained undisclosed to investors

16   and the public.

17       23.    A dramatically different account is offered by Daula in an article published by the

18   *Financial Times* in December 2007, which states that by August 2007, it was Daula himself who

19   had warned senior executives at Morgan that there were "no proper pricing models for such trades,

20   that positions were not being properly measured, and that the history traders used in their models

21   was not a reliable guide."

22       24.    Despite this acknowledged attention from Morgan's Co-President and Chief Risk

23   Officer from May 2007 through August 2007 of the possibility of massive losses as a consequence

24   of the Company's subprime exposures, the Defendants made several statements and/or omitted

25   material information from other statements that was intended to and effective at keeping investors

26   in the dark. In this respect, less than one week *after* Cruz says she unsuccessfully directed Daula

27   and Shear to cut the Proprietary Trading Group's $13.2 billion CDS position, on July 10, 2007, the

28   Company filed its second quarter 2007 quarterly report and it was absolutely devoid of any mention

1 | of the Company's exposure to subprime losses.

2 | 25. Internally, however, there was extensive hand-wringing, finger pointing and intense

3 | pressure. During Morgan's third quarter of 2007, June 1, 2007 through August 31, 2007, the ABX

4 | Index that served as the underlying basis for the fair value of the Proprietary Trading Group's $13.2

5 | billion CDS position, had fallen 32.8%. Such a drop should have required Morgan to take losses on

6 | the long position of at least $4.4 billion.

7 | 26. However, taking such an enormous loss was out of the question because it would

8 | have decimated the Company's credit ratings and caused Morgan to miss analysts' earnings

9 | estimates by a mile. In fact, on July 30, 2007, based on the Company's misrepresentations about its

10 | lack of exposure to subprime, as described above, Standard & Poor's actually upgraded the

11 | Company's debt ratings and raised its outlook from "stable" to "positive," meaning that no

12 | additional rating reviews were expected in the next two years.

13 | 27. Instead of acknowledging this drastic drop in fair value due to massive subprime

14 | exposure, the Defendants resorted to accounting chicanery. Rather than reflect the $4.4 billion loss

15 | that would be required by applying a fair value analysis based on the movements in the ABX Index

16 | as required by GAAP, the Defendants applied a more subjective valuation methodology to these

17 | assets in order to write down the position by only $1.9 billon, or by 14.4%, a far cry from the

18 | 32.8% write-down required by the decline in the ABX Index. The Company then reported earnings

19 | of $1.38 per share, which just barely met the lowest range of analysts' estimates for the quarter.

20 | 28. During Morgan's September 19, 2007 conference call announcing its earnings for the

21 | third quarter 2007, the Company did not disclose the $1.9 billion loss in ISG and failed to say

22 | anything about Morgan's massive subprime exposure. Later, in a chart accompanying its press

23 | release issued on November 7, 2007, Morgan would imply that, for purposes of its third quarter

24 | results, it had taken a fair value loss on its CDS position of $1.9 billion. However, no such

25 | disclosure was made in the third quarter 10-Q or earnings release, and, in any event, while

26 | disclosing the $1.9 billion loss in the ISG, omitted any suggestion that this loss was just the tip of a

27 | subprime iceberg that was melting quickly.

28 | 29. Even more remarkable about the Defendants' deafening silence about Morgan's

1 | exposure to these subprime positions, and other exposures that it held on its balance sheet, was the

2 | fact that just three weeks earlier, Morgan had secretly received a letter from the SEC imploring the

3 | Company to be more transparent in its disclosures *about its exposure to the U.S. subprime market.*

4 | 30.  In this respect, the SEC, commenting on the Company's 2006 Form 10-K, filed with

5 | the SEC on February 13, 2007 and first quarter 10-Q, filed with the SEC on April 6, 2007,

6 | informed Morgan:

7 | It is unclear from your document the exposure you have to subprime loans. Based on
your current public disclosures, it is possible that more clarity about your exposure to

8 | any subprime loans could be helpful.  Regardless of the materiality of your
exposures, we respectfully request that you provide us with supplemental

9 | information about your involvement in sub-prime loans.

10 | 31.  No such additional disclosure was forthcoming in the Third Quarter 10-Q filed

11 | weeks after Morgan received the SEC's letter and, as investors would learn in the ensuing weeks,

12 | Morgan's exposure to subprime was not just material, it was massive.

13 | 32.  This correspondence, and the series of exchanges between Morgan and the SEC that

14 | followed, were not available to the investing public until well into 2008, when the SEC had made

15 | the correspondence publicly available.

16 | 33.  While Defendants were remaining silent on the losses the Company was suffering

17 | from the Proprietary Trading Group's position and the Company's huge exposure to subprime, the

18 | Company began to point fingers at members of the Proprietary Trading Group who had made the

19 | trades in the first place.  In October 2007, seeing the writing on the wall, several members of the

20 | Proprietary Trading Group left the Company.  Howie Hubler, the managing director of the

21 | Proprietary Trading Group, was quietly fired on November 2, 2007.

22 | 34.  However, these developments were not lost on the analyst community.  Within days

23 | of Hubler's firing, rumors began circulating in the analyst community about large losses at Morgan

24 | due to a massive subprime trade gone awry.  On the morning of November 7, 2007, the *Wall Street*

25 | *Journal* published an article pointing to analysts reports published the day before which contended,

26 | based on "educated guesses" that Morgan would take a massive hit.

27 | 35.  On the evening of November 7, 2007, Morgan changed its public stance.  Stunning

28 | investors, Morgan announced that, contrary to its previous disclosures and assurances, the

1  Company did have extensive exposures to U.S. subprime securities and that, as of the end of the

2  third quarter, it had approximately $10.4 billion in *net* exposure to subprime. The Company

3  attributed much of this exposure to the trading position held by the Proprietary Trading Group, and

4  admitted that losses in the amount of $3.7 billion due to movements in the ABX Index since the

5  end of the third quarter (August 31, 2007) were being recorded by the Company.

6        36.   This disclosure, while material in and of itself, only partially revealed the problems

7  Morgan still faced. In this respect, Defendants already knew or recklessly disregarded that the

8  belatedly-announced write-downs were entirely insufficient based upon the true movements in the

9  ABX Index and, in fact, the Company would be forced to take larger write-downs in the fourth

10  quarter.

11        37.   When asked by one analyst from Merrill Lynch where these subprime positions could

12  be found in Morgan's previous financial statements (*i.e.* earlier in the Class Period), Morgan's new

13  CFO, Defendant Colm Kelleher, admitted that there had been no identifiable specific disclosure of

14  the positions. Instead, unidentifiable portions of the positions were spread out "all over the place."

15        38.   On November 29, 2007, Morgan Stanley fired Zoe Cruz along with other senior

16  executives within the ISG.

17        39.   The complete disclosure of Morgan Stanley's losses due to its trading in subprime

18  securities would not be revealed until December 19, 2007. On that date, Morgan announced its

19  earnings for the fourth quarter and fiscal year ended November 30, 2007. In that filing, Morgan

20  announced that its total write-down of U.S. subprime and other mortgage related exposures was

21  approximately $9.4 billion for Morgan's fourth quarter 2007, of which $7.8 billion primarily

22  resulted from the trading activities first alluded to in Morgan's November 7, 2007 announcement.

23  John Mack said on the earnings conference call on that day, "the results we announced today are

24  embarrassing for me, for our firm, this loss was the result of an error in judgment that occurred on

25  one desk, in our Fixed Income area, and also a failure to manage that risk appropriately. Make no

26  mistake, we've held people accountable. We're moving aggressively to make the necessary

27  changes."

28        40.   The massive write-downs in the fourth quarter of 2007 were the result of known

1  deficiencies in the Company's risk controls, known failures in the Company's protocols for
2  accounting for the Company's trading positions, and a concerted cover-up of these failures by
3  Defendants' intentionally concealing the Company's losses and exposures when senior executives
4  uncovered them during the Class Period. Once again, however, the securities claims are not based
5  upon the failures themselves, but rather, Defendants' disclosures concerning the purported risk
6  controls in place, the purported protocols in place for accounting for the trading positions of the
7  Proprietary Trading Group, the fabrications issued by Defendants when confronted with questions
8  by analysts and investors, and misrepresented financial statements that understated known losses
9  about Morgan's subprime exposure.

10      41.   As a consequence of the Defendants' knowing and reckless material
11  misrepresentations and omissions in Morgan's financial reporting during the Class Period, the price
12  of Morgan's common stock traded on the New York stock exchange was artificially inflated, and as
13  the truth about Morgan's subprime exposures, the losses as a consequence thereof and the truth
14  about the Company's lack of risk controls were revealed, Morgan's investors lost billions of dollars
15  as this inflation was corrected. Plaintiffs, therefore, bring this action to recover their losses.

16  **II.   JURISDICTION AND VENUE**

17      42.   This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of
18  1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17
19  C.F.R. § 240.10b-5.

20      43.   This Court has subject-matter jurisdiction over this action pursuant to Section 27 of
21  the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

22      44.   Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28
23  U.S.C. § 1391.   Many of the acts and practices complained of herein, including the
24  misrepresentations and schemes alleged herein, occurred in part in this District.

25      45.   In connection with the acts, transactions and conduct alleged herein, Defendants,
26  directly or indirectly, used the means and instrumentalities of interstate commerce, including, but
27  not limited to, the United States' mail, interstate telephone communications and the facilities of a
28  national securities exchange and market.

## III. PARTIES

### A. PLAINTIFFS

46.    Lead Plaintiff State-Boston Retirement System ("SBRS") is an institutional investor that provides retirement benefits for the employees of the City of Boston, Massachusetts. It has more than 34,000 active and retired members, representing 106 mandatory retirement systems, and more than $3.1 billion in assets. SBRS purchased approximately 135,000 shares of Morgan Stanley stock at artificially-inflated prices during the Class Period, as set forth in the certification that was previously filed in this litigation and is incorporated herein by reference, and suffered losses in an amount to be determined at trial.

47.    Plaintiff AP4, or the Fourth Swedish National Pension Fund, is based in Stockholm, Sweden and manages a portion of the pension assets of the citizens of Sweden. AP4 is part of the Swedish National Pension Fund ("AP Fund") system and was founded in 1974. With assets under management of approximately $32 billion and over four million members, AP4 is one of the largest institutional investors in Scandinavia and one of its most prominent pension funds. AP4 purchased 118,063 shares of Morgan Stanley stock at artificially-inflated prices during the Class Period, as set forth in the certification that is attached hereto as Schedule A, and suffered losses in an amount to be determined at trial.

48.    State Boston Retirement System and AP4 are hereinafter referred to collectively as "Plaintiffs."

### B. DEFENDANTS

#### 1. Defendant Morgan Stanley

49.    Defendant **Morgan Stanley** is a diversified financial services company incorporated in the state of Delaware and with its principal place of business and headquarters at 1585 Broadway, New York, New York. At all relevant times, Morgan's common stock traded on the New York Stock Exchange under ticker symbol "MS". Presently, the Company divides its operations into three primary business segments: Institutional Securities, Global Wealth Management and Asset Management. A fourth business group, Discover, which operated the Company's Discovery credit card operations was spun off during the Class Period, on June 30, 2007.

50.     As described in more detail below, during the Class Period, approximately 60% of the Company's net revenue was derived from the ISG.  The ISG engaged in capital raising; financial advisory services, including advice on mergers and acquisitions, restructurings, real estate and project finance; corporate lending; sales, trading, financing and market-making activities in equity securities and related products and fixed-income securities and related products, including foreign exchange and commodities; benchmark indices and risk management analytics; research; and investment activities.

51.     During the Class Period, Defendant Morgan, through its officers and directors, published periodic filings with the SEC and made public statements which, as alleged herein, were materially false and misleading when made, and/or omitted to state material information which served to artificially inflate the price of the Company's common stock.

## 2.     **Individual Defendants**

52.     Defendant **John J. Mack** ("Mack") is the Company's Chairman and Chief Executive Officer ("CEO").  Defendant Mack became the Company's CEO and Chairman of the Company's Board of Directors in June of 2005 and has remained in both positions throughout the Class Period.  During the Class Period, Defendant Mack participated in the issuance of, signed, and/or certified as accurate, the Company's SEC filings including, *inter alia,* the Company's Second and Third Quarter Form 10-Qs filed with the SEC on July 10, 2007 and October 10, 2007, respectively, which, as alleged herein, contained materially false and misleading statements when issued.  In addition, Defendant Mack was a member of the Company's Management Committee throughout the Class Period, participated in earnings conference calls and made statements in the Company's press releases, which were also, as alleged herein, materially false and misleading when made.

53.     Defendant **David Sidwell** ("Sidwell") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") from March 2004 through October 11, 2007.  Defendant Sidwell retired from his employment with Morgan on October 31, 2007.  During the Class Period, Defendant Sidwell was a Member of the Company's Management Committee, and participated in the issuance of, signed, and/or certified as accurate, the Company's Second and

1    Third Quarter Form 10-Qs filed with the SEC on July 10, 2007 and October 10, 2007, respectively,

2    which, as alleged herein, contained materially false and misleading statements when issued.  In

3    addition, throughout the Class Period, Defendant Sidwell made statements in the Company's press

4    releases and earnings conference calls, which, as alleged herein, were materially false and

5    misleading when made. Defendant Sidwell's conduct, statements and omissions caused the price of

6    Morgan Stanley's common stock to be artificially inflated during the Class Period. For fiscal year

7    2007, Defendant Sidwell was awarded total compensation of $14.6 million in salary, bonus and

8    other compensation.

9        54.    Defendant **Thomas Colm Kelleher** ("Kelleher") is the Company's current

10   Executive Vice President, Chief Financial Officer and the Co-Head of Strategic Planning, having

11   assumed those positions on October 11, 2007 from Defendant Sidwell. Defendant Kelleher joined

12   Morgan Stanley in December 2000 as the Head of Fixed Income Sales Europe becoming Co-head

13   of that department in May of 2004. In February of 2006 Kelleher was promoted to Head of Global

14   Capital Markets holding that position until October 11, 2007. During the Class Period, Defendant

15   Kelleher was a Member of the Company's Management Committee. During the Class Period,

16   Defendant Kelleher made statements in the Company's press releases and earnings conference calls,

17   which, as alleged herein, were materially false and misleading when made.  Defendant Kelleher

18   also participated in conference calls with analysts held on September 19, 2007, November 7, 2007,

19   and December 19, 2007. During these calls, Defendant Sidwell made numerous materially false

20   and misleading statements that, as alleged herein, Defendant Kelleher did not contradict or qualify.

21   Defendant Kelleher's conduct, statements and omissions caused the price of Morgan Stanley's

22   common stock to be artificially inflated during the Class Period. For fiscal year 2007, Defendant

23   Kelleher was awarded total compensation of $11.7 million in cash and incentives.

24       55.    Defendant **Zoe Cruz** ("Cruz") was the Company's Co-President and the executive

25   in charge of the ISG throughout most of the Class Period until she was fired on November 29, 2007.

26   Defendant Cruz joined Morgan Stanley in 1982 and rose to the Head of its Fixed Income Division

27   by September 2000, holding that position through March of 2005, when she was appointed Co-

28   President of the Company upon Mack's return to Morgan.  Cruz was also Director of Morgan

1   Stanley from March of 2005 through June of 2005, and was Acting President from July 2005
2   through February of 2006. Defendant Cruz, a control person of the Company, was a Member of
3   the Company's Management Committee, and participated in the issuance of the Company's Second
4   and Third Quarter Form 10-Qs filed with the SEC on July 10, 2007 and October 10, 2007,
5   respectively, which, as alleged herein, were materially false and misleading when issued. In
6   addition, Defendant Cruz participated in and/ or prepared information concerning the Company's
7   financial performance and operations which was set forth in financial reports which, as alleged
8   herein, were materially false and misleading when issued. Defendant Cruz's conduct, statements
9   and omissions caused the price of Morgan Stanley's common stock to be artificially inflated during
10  the Class Period.

11      56.     Defendant **Thomas V. Daula** ("Daula") was the Company's Chief Risk Officer
12  ("CRO") throughout the Class Period and remained so until announcing his retirement from Morgan
13  on February 22, 2008. Prior to being named Chief Risk Officer in April of 2005, Daula had been
14  the Company's Head of Market Risk. As Chief Risk Officer, Daula was responsible for developing
15  and implementing Morgan Stanley's risk controls and the disclosures concerning these controls in
16  Morgan Stanley's financial statements issued to the investing public during the Class Period.
17  Defendant Daula, a control person of the Company, was a Member of the Company's Management
18  Committee throughout the Class Period, and participated in the issuance of the Company's Second
19  and Third Quarter Form 10-Qs filed with the SEC on July 10, 2007 and October 10, 2007,
20  respectively, which, as alleged herein, were materially false and misleading when issued.
21  Defendant Daula's conduct, statements and omissions caused the price of Morgan Stanley's
22  common stock to be artificially inflated during the Class Period.

23      57.     Defendant **Gary G. Lynch** has served as the Company's Chief Legal Officer of
24  Morgan Stanley since October 18, 2005, General Counsel and a member of the Company's
25  Management Committee.    Defendant Lynch reported directly to Defendant Mack and was
26  responsible for the Company's regulatory filings with the SEC and for managing litigation matters
27  instituted by and against the Company.   Defendant Lynch sat on the Company's Management
28  Committee with Defendant Daula. During the Class Period, Defendant Lynch, a control person of

1 the Company, and participated in the issuance of the Company's Second and Third Quarter Form
2 10-Qs filed with the SEC on July 10, 2007 and October 10, 2007, respectively, which, as alleged
3 herein, were materially false and misleading when issued. Defendant Lynch's conduct, statements
4 and omissions caused the price of Morgan's common stock to be artificially inflated during the
5 Class Period. During fiscal year 2007, Defendant Lynch earned total compensation of over $11.87
6 million.

7 58. Hereinafter, Defendants Mack, Sidwell, Kelleher, Cruz, Lynch and Daula will be
8 collectively referred to as the "Individual Defendants."

9 **IV.  CONTROL PERSON ALLEGATIONS/GROUP PLEADING**

10 59. By virtue of the Individual Defendants' positions of management and control within
11 the Company, they had access to undisclosed adverse information about Morgan, its business,
12 operations, operational trends, finances, and present and future business prospects. The Individual
13 Defendants would ascertain such information through Morgan's internal corporate documents,
14 conversations and connections with each other and corporate officers, employees, attendance at
15 sales, management, and Board of Directors' meetings, including committees thereof, Management
16 Committee Meetings, and through reports and other information provided to them in connection with
17 their roles and duties as Morgan officers and/or directors.

18 60. It is appropriate to treat the Individual Defendants collectively as a group for
19 pleading purposes and to presume that the materially false, misleading and incomplete information
20 conveyed in the Company's public filings, press releases and public statements, as alleged herein was
21 the result of the collective actions of the Individual Defendants identified above. The Individual
22 Defendants, by virtue of their high-level positions within the Company, directly participated in the
23 management of the Company, were directly involved in the day-to-day operations of the Company at
24 the highest levels and were privy to confidential proprietary information concerning the Company, its
25 business, operations, prospects, growth, finances, and financial condition, as alleged herein.

26 61. The Individual Defendants were involved in drafting, producing, reviewing,
27 approving and/or disseminating the materially false and misleading statements and information
28 alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading

1 │ statements were being issued regarding the Company, and approved or ratified these statements, in
2 │ violation of securities laws.

3 │     62.    As officers, directors and controlling persons of a publicly-held company whose
4 │ common stock is registered with the SEC pursuant to the Exchange Act, and is traded on the NYSE,
5 │ and governed by the provisions of the federal securities laws, the Individual Defendants each had a
6 │ duty to promptly disseminate accurate and truthful information with respect to the Company's
7 │ financial condition and performance, growth, operations, financial statements, business, markets,
8 │ management, earnings and present and future business prospects, and to correct any previously
9 │ issued statements that had become materially misleading or untrue, so that the market price of the
10 │ Company's publicly-traded securities would be based upon truthful and accurate information. The
11 │ Individual Defendants' material misrepresentations and omissions during the Class Period violated
12 │ these specific requirements and obligations.

13 │     63.    The Individual Defendants, by virtue of their positions of control and authority as
14 │ officers and/or directors of the Company, were able to and did control the day-to-day trading and
15 │ attendant risks of the Company's largest business segment, ISG, and the content of the various SEC
16 │ filings, press releases and other public statements pertaining to the Company during the Class
17 │ Period. The Individual Defendants were provided with copies of the documents alleged herein to be
18 │ misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent
19 │ their issuance or cause them to be corrected. Accordingly, they are responsible for the accuracy of
20 │ the public reports and releases detailed herein.

21 │     64.    Each of the Defendants is liable as a participant in a scheme, plan and course of
22 │ conduct that operated as a fraud and deceit on Class Period purchasers of the Company's common
23 │ stock. Throughout the Class Period, Defendants disseminated materially false and misleading
24 │ statements and suppressed material adverse facts about Morgan's exposure to subprime securities,
25 │ and the quality of Morgan's risk and internal controls. Among other fraudulent conduct, the
26 │ Defendants concealed losses suffered by Morgan as a consequence of its exposure to subprime
27 │ securities and thereby artificially inflated the price of Company's common stock.

28 │

1 **V. CONFIDENTIAL WITNESSES**

2      65.     Confidential Witness #1 ("CW 1")[1] was an associate at Morgan in the Fixed Income

3 division's mortgage pass-through trading desk from July 5, 2005 until August 15, 2007. Generally,

4 CW 1 provided information regarding, *inter alia*, the Proprietary Trading Group.

5      66.     Confidential Witness #2 ("CW 2") worked as a junior employee within Morgan's

6 Fixed Income Group from late 2005 until February 2008. CW 2 provided information regarding,

7 *inter alia,* the Proprietary Trading Group run by Howard Hubler and the general organizational

8 structure of the Fixed Income Group.

9      67.     Confidential Witness #3 ("CW 3") worked in the securitized products group at

10 Morgan from July 2006 until April 2008. Specifically, CW 3 worked in a variety of positions as an

11 analyst, dealing primarily with mortgage-backed securities. CW 3 provided information regarding,

12 *inter alia*, the Proprietary Trading Group and the factors used by Morgan Stanley traders to value

13 their positions.

14      68.     Confidential Witness #4 ("CW 4") was a senior level, long-term, employee in

15 Morgan's fixed income division during the Class Period. During his/her tenure at Morgan, CW 4

16 had direct contact with Defendant Cruz. Prior to leaving Morgan in 2008, CW 4's responsibilities

17 included assessing risk exposures in connection with a variety of financial instruments.

18      69.     Confidential Witness #5 ("CW 5") held a variety of positions within Morgan

19 between 2002 and January of 2008. Most recently, CW 5 was employed as a Management

20 Reporting CFO in the equity division, where s/he oversaw two proprietary trading groups. CW 5

21 provided information regarding, *inter alia*, the general organizational structure of Morgan's

22 Institutional Securities Group, the manner in which proprietary trading groups operated within

23 Morgan, its risk management and valuation review policies, and the circumstances giving rise to

24

---

25 [1] In an effort to protect the identities of knowledgeable witnesses who have come forward on a
26 confidential basis, Plaintiffs have not pleaded all available information concerning job titles, locations, and starting and ending dates of employment when providing such information would be
27 tantamount to revealing the witness' identity. Plaintiffs will provide such information to the Court *in camera* if the Court so requests.

28

1   the Company's 2007 losses.

2   **VI.    SUBSTANTIVE FACTUAL ALLEGATIONS**

3          70.     This case is brought on behalf of investors in Morgan's common stock who relied on

4   the Defendants' misrepresentations and omissions in Morgan's public statements and SEC filings

5   concerning the Company's risk of loss associated with the collapse of securities linked to U.S.

6   subprime mortgages.  During the Class Period, Morgan secretly placed an extraordinary bet on

7   movements in the subprime market, and as a consequence, took on a massive risk, to the tune of

8   $13.2 billion, that if this position failed and the subprime market moved in a manner that was not

9   contemplated by the traders who assumed this position, the Company and its investors would suffer

10  an unprecedented loss.

11         71.     As set forth in detail below, Morgan's massive bet on subprime was in furtherance

12  of a business strategy put in place by Morgan's CEO, John Mack, to expand Morgan's risk taking

13  so as to better compete with Morgan's rival investment banks.  Critical to this strategy, as the

14  Defendants repeatedly assured investors, were sound risk control policies and effective internal

15  controls.  As set forth below, despite the Company's specific and direct assertions to the contrary,

16  Morgan's risk management policies and structure were unsound and its internal controls ineffective

17  and, together with the fraudulent conduct of the Defendants, directly contributed to the Company

18  artificially inflating its financial results during the Class Period.

19         72.     As a consequence of these ineffective risk management policies and poor internal

20  controls, and despite a massive subprime exposure held on Morgan's balance sheet, Morgan told

21  investors prior to and during the Class Period that it had little, if any, exposure to the downturn in

22  the U.S. subprime mortgage markets.   These statements had the effect of artificially inflating

23  Morgan's share price and securing favorable credit ratings by rating agencies.  In fact, however,

24  Morgan had billions of dollars in exposure to U.S. subprime securities, and the most significant of

25  these exposures was the single trading bet on subprime securities made by one of Morgan's most

26  prominent group of proprietary traders.

27         73.     At the start of the Class Period, when Morgan's senior executives realized that the

28  Company stood to lose billions because of this single trading bet, they schemed to conceal this

Amended Class Action Complaint                                              - 19 -
Case No. CV08-963AG (FFMx)

1    exposure through misleading disclosures and omissions and engaged in accounting chicanery to
2    avoid recognizing losses as required by GAAP. They also concealed the Company's other
3    exposures to U.S. subprime securities. Defendants hoped that the subprime market would turn
4    around so that Morgan could avoid having to report any losses relating to U.S. subprime securities,
5    prior to having to disclose these exposures. Instead, the U.S. subprime market worsened and for
6    the quarter-ended November 30, 2007, the Company was forced to take a $9.4 billion write-down
7    on its subprime exposures and report a $3.9 billion net loss, the largest in its history by far.

### A.    The Return of John Mack to Morgan Stanley

9    74.    Morgan's foray into the high-risk U.S. subprime mortgage market began after
10   Defendant Mack returned as the CEO of the Company in 2005 with the stated goal of increasing
11   the Company's risk taking.

12   75.    Defendant Mack joined Morgan as a bond trader in 1972, and had become President
13   of the firm in 1997 when it merged with Dean, Witter, Discover & Co. ("Dean Witter"). Dean
14   Witter CEO Philip Purcell headed up the merged company, known as Morgan Stanley Dean Witter.
15   Known as a risk-averse CEO, Purcell's reluctance to trade in sophisticated financial instruments
16   like rival investment banks caused a rift to form between the Dean Witter camp and the Morgan
17   Stanley camp, led by Defendant Mack.

18   76.    After a bitter dispute between the two sides, Purcell succeeded in ousting Mack in
19   2001. Upon leaving Morgan, Mack became the CEO of Credit Suisse First Boston and, later, Co-
20   CEO of Credit Suisse Group.

21   77.    At Morgan, Purcell remained unwilling to put the firm's capital at risk. Instead, his
22   business model generated most of its revenues from fee-based services such as mergers and
23   acquisitions. Purcell's vision for the Company brought many detractors within and outside the
24   Company to the point where, on March 3, 2005, eight former senior executives of Morgan, self
25   described as the "Group of Eight," who believed Purcell's vision for the Company was
26   compromising their retained ownership interests in the Company, began a very visible public battle
27   to unseat Purcell as CEO. The Group's efforts included, among other things, publishing a full page
28   advertisement in the Wall Street Journal criticizing Purcell's performance.

78.  Internally, senior executives, including the Chief Operating Officer and head of the Institutional Securities Group, Vikram Pandit, had aligned themselves with the Group of Eight, and also sought Purcell's ouster.

79.  Defendant Zoe Cruz, a twenty-four year veteran of Morgan, who was the head of Morgan's Fixed Income Group at the time, a division within ISG, cast her lot with Purcell. Cruz had joined Morgan in 1982 and had established a "reputation as a tough and savvy trader with quick and unwavering views on market positions." This reputation was described in a May 5, 2008 article in *New York Magazine* titled "Only the Men Survive, The Crash of Zoe Cruz." Under the tutelage and protection of John Mack, Cruz had risen to the head of Morgan's fixed income trading business, but when Mack was ousted in 2001, she declined to accompany him to Credit Suisse, citing her loyalty to Morgan.

80.  Under Purcell, however, Cruz skirmished with Pandit, her immediate superior and the head of Institutional Securities Group, and when Pandit and several other senior executives mounted an insurrection against Purcell, she refused to join them, deciding to align her fate with that of Purcell.

81.  In March 2005, facing internal dissent and outside criticism, Purcell honed his ranks and elevated a number of people he perceived to be loyal to him, while seeking to marginalize others. Among those he promoted was Zoe Cruz, who Purcell appointed Co-President of the Company on March 28, 2005 along with another long-time Morgan executive, Stephen Crawford. Crawford and Cruz were also appointed to the Company's board of directors a few weeks later. Another beneficiary of the management shuffle in March 2005 was Defendant Daula, who was elevated to Chief Risk Officer of the Company from head of Market Risk, and thereby began reporting directly to Purcell.

82.  The promotion of Cruz to a position senior to her former boss Pandit led to the exodus of several high-level executives in the company's investment bank division led by Pandit. These included Brian Leach, who advised Pandit on strategy and risk, John Havens, head of equities, Guru Ramaskrishnan, head of equity trading, and Vikram Gandhi, a co-head of financial institutions banking. In April 2005, the head of Morgan's investment bank, Joe Perella, also

1  announced his departure.

2      83.    Given this hemorrhaging of senior executives and the outside pressure from the so-

3  called "Group of Eight," on June 13, 2005, Purcell was pushed out of the Company. Reportedly, in

4  agreeing to resign, Purcell attempted to influence the selection of the next CEO of the Company

5  and requested that none of the Group of Eight be considered for the position. He also negotiated a

6  severance package for Stephen Crawford worth $32 million.

7      84.    Cruz, however, declined to leave, and instead elected to stay on and see who the

8  successor of the Company would be. According to an interview with Cruz in *New York Magazine*,

9  she pushed the Board of Directors—reportedly through influence she had as one of the few female

10  power-brokers on Wall Street—to rehire John Mack. While the Group of Eight was opposed to

11  Mack being hired, the Board was concerned that rehiring any of the recently departed executives,

12  like Pandit, would interfere with Cruz's leadership position. On June 30, 2005, Morgan named

13  John Mack as the new CEO.

14      85.    As *New York Magazine* reported on May 5, 2008, of John Mack's return to Morgan

15  and Cruz's fate:

16      With Mack back, Cruz hoped that she might not simply survive but thrive. "Zoe was
    lobbying hard to be appointed the sole president," says a former insider, rather than
17      continue with the title of acting president.

18      As he explored what to do, Mack was barraged by Cruz's critics, who suggested that
    she had "developmental issues" as a manager, says a senior executive at Morgan
19      Stanley. She could be imperious, they claimed, refusing to consider other opinions.
    To allay concerns, he brought in a management coach to help smooth out some of
20      Cruz's rough edges. (Cruz's supporters say the coach was her idea, to help her team
    communicate better.) He also began meeting with Pandit and the other ousted
21      executives to discuss bringing them back into the fold. They told him they would
22      come, but only if Cruz were gone.

23      Mack refused the ultimatum. "John kept her on when everyone knew the ranks would
    have all come back," says a person close to Pandit. "They couldn't believe she'd
24      done what she'd done. John must have had his reasons." Cruz was kept on as co-
    president, with a new co-president, Robert Scully, to manage alongside her.
25

26      86.    With these deep schisms within the Institutional Securities Group, Mack retained

27  Cruz in the position of Co-President of the Company, and appointed her head of the Institutional

28

1 Securities Group. She was, however, removed from the Board of Directors. Mack, reportedly,

2 believed that Cruz "shared his healthy appetite for risk."

3      87.    While Cruz stood at the helm of the Institutional Securities Group, her lieutenants

4 were Neal Shear and Jerker Johansson who served as the Co-Heads of the Sales and Trading arm of

5 the ISG—the front office of ISG's trading operations.

6      88.    Neal Shear, a "celebrity trader" at Morgan, was the head of Fixed Income, within

7 the Sales and Trading division. In 2006, Neal Shear was the second highest compensated person in

8 the Company.

9      **B.**    **Mack Implements an Aggressive Risk Focused Business Plan**

10      89.    In the fall of 2005, Mack set out to revitalize Morgan's business plan. In Mack's

11 eyes, Purcell's aversion to risk had caused the Company to miss out on significant growth

12 opportunities. As recounted in an article by *Business Week* on June 21, 2006: "In a speech to

13 shareholders shortly after his arrival at the Company, Mack explained that the Company's main

14 problem wasn't its strategy or its business mix, as was widely believed, but its culture. It had

15 become soft and timid, missing out on growth opportunities in everything from private equity to

16 mortgages, junk bonds to equity derivatives." As a consequence, Mack, according to the article,

17 was "embarking on a radical shakeup of Morgan Stanley."

18      90.    In November 2005, Mack boldly announced to analysts and investors a five-year

19 plan to double the Company's 2005 pre-tax profits. Key in this business plan was aggressive

20 growth in the Institutional Securities Group, which was to be led by Defendant Cruz. *Fortune*

21 *Magazine*, in a March 15, 2006 titled "Is Mack on the Right Track?" described how the ISG was

22 perceived, among other Morgan's divisions, to be the reason why the Company was performing

23 below its peers:

24      Finally, there's Morgan's institutional securities arm. There are two sides to this
     business: the agency model and the principal model. Investment banking, mergers

25      and acquisitions, and securities underwriting are the agency side (or acting as an
     agent). It is a huge global franchise for Morgan Stanley that's in no danger of

26      expiring, but gradually this old school is becoming less profitable on Wall Street.
     UBS analyst Glenn Schorr writes of Morgan Stanley, "It's the institutional securities

27      segment that has been one of the main driving forces behind the company's subpar

28      ROE."

There is now a push at Morgan to expand the principal business (or acting as a principal in a transaction). The risks here are obvious: Do it right, you become Goldman; do it wrong, and you're in deep yogurt.

Controversial co-president Zoe Cruz ("There's nothing subtle about her," says one insider) and others like rising star Neal Shear, co-head of institutional sales and trading, are putting more of the firm's capital to work and ratcheting up its risk-reward profile. "The greater risk is not doing it," is how Mack puts it.

91.     In their quest for outsized returns, Cruz and Mack steered the Company into taking increased trading risks. As reported in a *Forbes Magazine* article titled "Upping the Ante," dated March 27, 2006, Morgan's business plan for growth in its Institutional Securities Group rested on an expansive approach to risk taking, and it was paying dividends:

Morgan Stanley was just the latest investment bank to trounce analyst expectations last week, with fiscal first-quarter earnings well above estimates in part because of a huge boost from trading for its clients and for the house account.

It's making life hell for analysts who obsess over these numbers and what they mean for big banks' bottom lines.

Wall Street can expect more risk-taking in trading this year. Take Morgan Stanley as an example. So-called value-at-risk in the fiscal first quarter was higher than average, said Chief Financial Officer David Sidwell during a conference call. This is a strategic goal. "Over time you'd expect us to be taking more risk, not just in commodities but across the other aspects of our fixed-income and equities business, consistent with the strategy," he said.

Zoe Cruz, Morgan Stanley's co-president, affirmed this view in comments to European investors, saying, "We must take more risk than we have been taking in the past."

*     *     *

Morgan's more aggressive stance on trading risk might have something to do with the world views of its top managers. John Mack, who joined as chief executive in June, is an ex-trader, as is Cruz. Both came up through the rough and tumble world of fixed-income. "Not taking enough risk is the biggest risk of all," says Cruz. A spokesman for Morgan Stanley also declined to comment but pointed to Cruz's comment: "The corner stone of our risk management strategy has always been that we are not going to take risk that will endanger the franchise ... but I feel there was a lot of room and there is still a lot of room to take more market risk."

92.     Expanding on this business plan, in April 2006, Morgan created the Proprietary Trading Group in an attempt to improve its reported income rating among the Company's investment banking competitors. The Company moved five traders from the its securitized products group to this new Proprietary Trading Group. Housed in the ISG, the Company structured the new group to operate like a hedge fund under the supervision of managing director Howard

1  Hubler. Hubler reported directly to Anthony Tufariello, the global head of securitized products.

2  As head of fixed income, Neal Shear held supervisory responsibility over the activities of Hubler's

3  group.

4       93.     According to an April 17, 2006 *Financial News* article, the Proprietary Trading

5  Group invested Morgan's own assets and focused primarily on trading opportunities in structured

6  products and secured asset classes in both cash and derivative markets, including mortgage-related

7  assets. While the Proprietary Trading Group operated within the ISG and was located on the 10th

8  floor of the Company's Manhattan headquarters, the desk's positions and strategies were kept

9  isolated from Morgan's other trading desks. According to CW 2, Morgan's internal regulations

10  required that a "Chinese Wall" be erected between the Proprietary Trading Group and other fixed

11  income traders in order to "keep the [proprietary] strategies and information separate."

12       94.     However, given the high importance of this trading group to the Institutional

13  Securities Group's bottom line, senior executives, including Tom Daula, Zoe Cruz and Neal Shear,

14  all kept close tabs on the Proprietary Trading Group's performance.

15      **C.**    **The Institutional Securities Group Reports Record Results as a Result of the Additional Risk Taking**

16

17       95.     Mack's focus on taking on more risk in ISG appeared to investors as paying

18  dividends. Throughout 2006, and through the first two quarters of 2007, ISG reported record

19  results:

20      &bull;    For the second quarter of 2006, ended May 31, 2006, Morgan reported, "Institutional Securities achieved record net revenues of $5.7 billion, up 71 percent from the same period last year, and record income before taxes of $2.3 billion, up 179 percent." These revenues accounted for 64% of Morgan's $8.9 billion of total revenue. As reported by the Company, "Fixed income delivered sales and trading revenues were $2.4 billion, up 95 percent increase from the same period last year and the second highest ever."

21

22

23

24      &bull;    For the third quarter of 2006, ended August 31, 2006, Morgan reported, "Institutional Securities delivered its best third quarter results ever, with net revenues of $5.0 billion and income before taxes of $2.0 billion, up 55 percent from last year."

25

26      &bull;    For the fourth quarter and year ended November 30, 2006, Morgan reported "Institutional Securities delivered its best full-year results ever, with record net revenues of $21.6 billion and record income before taxes of $8.2 billion, up 72 percent from last year."

27

28      &bull;    For the first quarter of 2007, ended February 28, 2007, Institutional Securities

achieved record net revenues of $7.6 billion, up 37 percent from last year. Pre-tax income rose 71 percent to a record $3.0 billion and return on average common equity was 40 percent.

96.     Morgan entered into the Second Quarter of fiscal 2007 (March 2007 through May 2007) with reported "record results across the board." These results included record revenues, net income and EPS for First Quarter of fiscal 2007, which largely had outperformed expectations owing to what Defendants described as "disciplined and balanced" increased risk taking and strong trading performance. Significantly, Defendant Sidwell reported that fixed income sales and trading had contributed $3.6 billion in revenues, which he stated was the Company's best quarter ever and was owed in large part to results from Morgan's credit products area and favorable positioning in the sub-prime mortgage markets.

97.     As can be seen on the graph below, the proportion of Morgan's reported revenues derived from the ISG (Trading and Principal Transactions) skyrocketed as compared to Morgan's other business divisions, following Mack's risk embracing initiatives:



**D. Defendants Assure Investors That Morgan's Risk-Taking is "Disciplined"**

98. Morgan's blockbuster financial results over the one-year period after Mack had implemented his new risk-embracing business model, raised questions among analysts and investors as to whether the Company was safely managing its risk. These inquiries were repeatedly met with assurances that the Company's risk taking was measured and disciplined.

99. A power point presentation by Tom Daula to investors in February 14, 2006, titled "Risk Management at Morgan Stanley An Overview," outlined the procedures that Morgan supposedly had in place to monitor trading risks. The "Risk Controls," identified by the report included:

> Mark to market discipline
> - Ensure revenues more closely track economics
> - Critical components
>   - Independent review by Controllers
>   - New Model Approval process
> Backtesting (i.e. the comparison of realized trading revenues against Value-at-Risk results)
> New product review processes
> Limits
> - Established at various levels throughout the Firm from trader to business and are defined in terms of risk sensitivities, concentrations and portfolio exposures
> - Generally set at levels to ensure that a material change in risk triggers a discussion between the trader or trading desk and management

100. Moreover, the report detailed an elaborate protocol for communicating risks to risk managers that included: "daily discussion with trading desks; daily comprehensive risk reports; weekly summary report and risk committee meetings; quarterly and annual reviews and regulatory reporting; [and] reporting to Audit Committee."

101. The successful implementation of such risk management protocols were reiterated by Defendants in their representations to investors. For example, during the March 21, 2007 earnings call, announcing the Company's record results for the first quarter of 2007, Defendant Mack attributed these results to the Institutional Securities Group, run by Zoe Cruz, and its "effective, disciplined risk taking." Likewise, at the Company's annual meeting in April 2007, Mack attributed the Company's exemplary performance to the Institutional Securities division's ability to "manage a tremendous amount of risk in a smart and disciplined way."

102. These assurances were also repeated by Mack in response to an inquiry from a shareholder at Morgan's April 21, 2007 Shareholder Meeting, asking whether Morgan was safely assuming risks in order to produce its reported record results. John Mack responded to the question:

> Well, number one, I think this firm has the capacity to take a lot more risk than it has in the past. So from that aspect, we're really using our talent in a more productive way than we have had in the past. I am comfortable with the risk...I think we probably have one of the best overall risk managers in Tom Daula, who oversees all firm risk, and also Zoe growing up on the sales and trading side, mainly trading side risk management, it's a very strong combination. So I'm comfortable with it.

103. During the Class Period, in the Company's quarterly reports filed with the SEC on Form 10-Q on July 10, 2007 and October 10, 2007, the Company made a series of additional representations regarding its risk reporting structure and risk management system. The Company asserted in these regulatory filings that its risk managers and valuation experts operated "independently" of the managers and traders who were taking on the risk. Specifically, Morgan stated that "reviews of the pricing model's theoretical soundness and appropriateness by Company personnel with relevant expertise who are independent from the trading desks" and that "groups independent from the trading divisions within the Financial Control and Market Risk Departments participate in the review and validation of the fair values generated from pricing models, as appropriate."

104. In addition, the Company's 2007 quarterly filings incorporated language from Morgan's 2006 Form 10-K which stated that "Company Control Groups...are all independent of the Company's business units."

105. Likewise, the Company also touted the purported effectiveness of its risk mitigation strategy as it specifically pertained to the Company's exposure to credit default swaps and other derivative contracts, noting in its Second Quarter 2007 10-Q that:

> Aggregate market risk limits have been established, and market risk measures are routinely monitored against these limits. The Company also manages its exposure to these derivative contracts through a variety of risk mitigation strategies, including, but not limited to, entering into offsetting economic hedge positions. The Company believes that the notional amounts of the derivative contracts generally overstate its exposure.

106. Defendants continually reaffirmed Morgan's effective risk management strategies in

1  conference calls with analysts and investors as well. During the Company's first quarter

2  conference call on March 21, 2007, Defendant Sidwell stated that the firm's increased risk-taking

3  endeavors were being managed "in a disciplined and balanced way."

4        107. Given Morgan's outstanding results and its assurances that these results were being

5  obtained through disciplined and effective risk controls, analysts and investors were highly

6  enthusiastic about the Company's prospects, as against its peers.

7        108. On April 11, 2007, Deutsche Bank initiated coverage on Morgan with a "Buy"

8  rating and a 12-month price target of $101 per share. Analysts at Deutsche Bank noted that

9  Morgan had taken more risk with trading and principal investments, while also stating that the

10 Company was not "betting the bank" with its investments. The Deutsche Bank analysts reported

11 that Morgan was "hedged properly" during difficulties in the subprime segment in February 2007.

12 The research report further stated that Morgan's higher level of risk needed to be monitored and

13 emphasized that the Company's CEO had emphasized "taking additional risk when there is a

14 reasonable return." The analysts also reported that Morgan's head of risk management sat on the

15 Company's management committee.

16       109. Analysts at Deutsche Bank issued a research report on May 10, 2007, following

17 their meeting the same day with CEO, defendant Mack. Reiterating their "Buy" rating on Morgan,

18 the analysts reported that factors driving the Company's growth included "better capital

19 allocation/optimization of the balance sheet" as mandated by the CFO, and "more principal

20 activity" with a "gradual[] increase" in the amount of trading risk. The research report further

21 stated that Morgan was looking to increase the degree of principal risk taking to try to bridge the

22 gap in the Company's performance, which lagged behind "best-in-class Goldman Sachs."

23       **E.**   **Undisclosed to the Investing Public, Morgan's Proprietary Trading Group Makes a Multi-Billion Dollar Bet on the Movement of U.S. Subprime Securities**

24

25       110. In December 2006, Morgan's Proprietary Trading Group, armed with information

26 from Morgan's acquisition of Saxon Capital, a subprime mortgage originator that Morgan had

27 acquired in August 2006 to build its mortgage backed securitization business, structured a large bet

28 on the movement of CDSs referencing tranches of CDOs as explained below, linked to subprime

1      RMBSs.

2      111.    To understand Morgan's bet necessitates a brief overview of the complex financial

3 instruments—CDSs, CDOs, and RMBSs—upon which this bet was made.

4              **1.**     **The Residential Mortgage Backed Securities, Collateralized Debt**

                     **Obligations and Credit Defaults Swaps Behind the Proprietary**

5                      **Trading Group's Bet**

6      112.    At the height of the real estate boom that peaked in 2005, investment banks were

7 among the largest purchasers of U.S. residential mortgages in the secondary market, due to the fact

8 that through a lucrative process known as securitization, firms like Morgan were able transform

9 individual mortgages into high-yielding bonds and other financial instruments, which could then be

10 sold to outside investors. The demand for these high-yield bonds, in turn, fueled a demand for

11 mortgages that could be pooled together and securitized. To satisfy this need for mortgages for

12 securitization, mortgage originators increasingly turned to less traditional, higher risk borrowers,

13 and thus created a swell of so-called subprime mortgages. Through various forms of financial

14 engineering, these subprime mortgages were turned into investment grade securities, and then sold

15 to a variety of investors, or, in turn, created into other financial instruments.

16      113.    Among the financial instruments that Morgan and other financial institutions created

17 from mortgages were RMBSs and CDOs. To create an RMBS, investment banks purchased a large

18 number of individual mortgages from bank and/or non-bank mortgage lenders. Once the bank

19 purchased a sufficient number of mortgage loans, it then pooled the mortgages together and sold

20 them to a "special purpose vehicle" ("SPV"), which is a separate, bankruptcy-remote legal entity

21 created in order to transfer the risk of the underlying mortgages off the originator's balance sheet.

22      114.    The SPV then divided the mortgage pool into "tranches," or slices, by prioritizing

23 payments and apportioning losses in connection with the underlying pool of mortgages. Once the

24 tranches were created, the underwriter then issued a series of bonds corresponding to each of the

25 tranches. Through the prioritized payment structure, the SPV was able to issue bonds with an array

26 of credit ratings, ranging from AAA to below-investment grade. Typically, the AAA rated bonds

27 received first priority on cash flows from the borrowers on the underlying mortgages but received a

28 lower yield on the investment, reflecting less reward for less presumed risk. Conversely, the below

1  investment-grade tranche holders received a higher return on their investment because they
2  absorbed the first losses in the event that the mortgages in the underlying pool defaulted. Under the
3  typical payment structure, the AAA rated RMBS bonds would only experience losses after all
4  tranches below it in the payment structure had been completely wiped out.

5       115.    Once a payment schedule was agreed upon and the ratings were assigned to the
6  various RMBS tranches, the SPV sold the resulting RMBS to investors. The SPV transferred
7  proceeds from the sale of the bonds to underwriters like Morgan in consideration for the underlying
8  collateral.

9       116.    As stated above, investment banks also used mortgages as the fundamental building
10  blocks in creating CDOs. In essence, CDOs are very similar to RMBSs. The main difference
11  between the two instruments is that while the underlying collateral of an RMBS consists of
12  mortgages, the underlying collateral of CDOs consists of RMBSs.

13       117.    In addition to RMBSs and CDOs, an extremely active market for credit default
14  swaps or CDSs referencing RMBSs and CDOs emerged during this time period. A CDS is a credit
15  derivative contract between two counterparties. The *buyer* makes periodic payments to the *seller*,
16  and in return receives a payoff if an underlying financial instrument defaults.

17       118.    CDS contracts have been compared to insurance. The "protection seller" provides
18  the "protection buyer" with insurance against the risk of loss in the referenced asset, while the
19  protection buyer agrees to provide the protection seller with regular premium payments. In the
20  event of default, the protection seller usually agrees to either (1) take possession of the referenced
21  asset at face value or (2) pay the protection buyer the difference between the bond's par value and
22  the recovery amount on the bond.

23       119.    The protection seller is, thus, taking a long position with respect to the referenced
24  asset, since the protection seller is betting that the default rate will be low and that the losses
25  suffered by the holder of the mortgage, RMBS or CDO position will be minimal. The protection
26  buyer is shorting the referenced asset in order to hedge against the risk of loss, since the protection
27  buyer is betting that the asset will experience at least some amount of losses.

28       120.    While this is how a CDS works in theory, in practice, however, because the

protection buyer of a CDS does not need to own the underlying security on which insurance is being bought, the buyer does not even have to suffer a loss from the default event. Thus, a CDS is often use as a speculative investment betting on the risks relating to the underlying bonds or securities on which the CDS is based by the buyer of the insurance.

121. Additionally, investment banks like Morgan often would pool individual CDSs together, divide them into tranches, and sell bonds referencing those tranches to investors. These financial instruments were commonly referred to as synthetic CDOs.

### 2. The Proprietary Trading Group's Massive Bet on the Price Movements on CDSs referencing CDOs

122. The Proprietary Trading Group's massive bet involved taking on a short position in the subprime mortgage market by purchasing CDSs referencing the lowest-rated tranches of subprime based CDOs. Because defaults in the underlying CDO tranches would trigger payments to the Company under the CDSs, this position was designed to increase in value as the value of lower-rated CDO tranches declined.

123. In taking the short position, the Proprietary Trading Group was obligated to make periodic payments to its CDS counterparties. To offset the cash outlay associated with buying this position, Morgan purchased an economic hedge by taking a long position in certain interest-bearing mortgage-backed assets. Specifically, the Proprietary Trading Group's traders sold CDSs on approximately $13.2 billion worth of AAA rated, super senior synthetic CDOs backed by mezzanine (BBB+ or BBB-) collateral. Because the Company sold default protection on these mezzanine CDO tranches, it received periodic premium payments from its CDS counterparties, which it used to finance the short position. The long position on these super senior CDO tranches exposed the Company to $13.2 billion in potential losses in the event of a 100% default scenario on the underlying CDO tranches.

124. The essence of Morgan's Proprietary Trading Group's subprime-related position was not disclosed to the investors and the markets, until, as alleged herein, the Company was forced to disclose this position on November 7, 2007. The transaction was explained by the *Financial Times* in a November 8, 2007 article, following the Company's forced disclosure, as follows:

The [Morgan Stanley] traders had a good idea at the time. Back in December [2006] there were signs that serious problems were developing among U.S subprime mortgage borrowers, but the prices of securities based on such loans were holding up well. So they placed a big bet on a fall in those prices. To do so, they bought insurance against problems with the mortgage-backed securities in the form of credit default swaps. The value of these would rise if the outlook for the securities deteriorated.

To help fund this [short] bet, the traders also took on billions of dollars of exposure to the "super senior" tranches of collateralized debt obligations. These are instruments composed of mortgage-backed securities divided into slices with varying yields and risks. The top AAA-rated tranches were seen as being very safe, because any likely losses on the underlying securities would be absorbed by investors in the lower tranches. Nevertheless, the senior tranches offered a good yield which helped off the cost of the [short CDS] bet.

125. The Proprietary Trading Group's strategy exposed the Company and its investors to an excessive amount of undisclosed risk of losses and these positions began losing value mid- to late-2007 as the subprime mortgage market began to collapse.

126. In taking both long and short positions, Morgan was essentially betting that subprime mortgage defaults would be significant enough to impair the market value of lower tranches of CDOs which were built from subprime RMBSs, but not significant enough to impair the value of AAA rated, super senior tranches of the same or similar CDOs, also built from the same subprime RMBSs.

### 3. Generally Accepted Accounting Principles Required that the Proprietary Trading Group's Trading Position Be Valued at "Fair Value" on Morgan Stanley's Balance Sheet

127. Morgan's trading position held by the Proprietary Trading Group, described above in ¶¶ 122-126, involved both the purchase and sale of credit defaults swaps and the accounting for these positions were subject to specific accounting rules under generally accepted accounting principles ("GAAP"). As a publicly-traded company, Morgan was required to maintain and report its financial statements in accordance with GAAP.

128. On the first day of the Company's fiscal 2007, December 1, 2006, Morgan adopted a financial accounting standard known as SFAS No. 157, *Fair Value Measurements*, which established a framework, referred to as the "fair value hierarchy," for measuring "fair value" of the Company's trading positions, including the CDS held by the Proprietary Trading Group. SFAS No. 157 was issued by FASB in September 2006 to increase consistency and comparability in fair

value measurements. The application of SFAS No. 157 was described as follows by the Company in its Second Quarter Form 10-Q filed with the SEC on July 10, 2007:

> Effective December 1, 2006, the Company early adopted SFAS No. 157 and SFAS No. 159, which require disclosures about the Company's assets and liabilities that are measured at fair value.
>
> ***
>
> The Company's assets and liabilities at fair value have been categorized based upon a fair value hierarchy in accordance with SFAS No. 157. The levels of the fair value hierarchy are described below:
>
> - Level 1 inputs utilize quoted prices (unadjusted) in active markets for identical assets or liabilities that the Company has the ability to access. Financial assets and liabilities utilizing Level 1 inputs include active exchange-traded equity securities, listed derivatives, most U.S. Government and agency securities, and certain other sovereign government obligations.
>
> - Level 2 inputs utilize inputs other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly. Level 2 inputs include quoted prices for similar assets and liabilities in active markets, and inputs other than quoted prices that are observable for the asset or liability, such as interest rates and yield curves that are observable at commonly quoted intervals. Financial assets and liabilities utilizing Level 2 inputs include restricted stock, infrequently-traded corporate and municipal bonds, most over-the-counter derivatives and certain mortgage loans.
>
> - Level 3 inputs are unobservable inputs for the asset or liability, and include situations where there is little, if any, market activity for the asset or liability. Financial assets and liabilities utilizing Level 3 inputs include real estate funds, private equity investments, certain commercial mortgage whole loans and complex derivatives, including certain foreign exchange options and long dated options on gas and power.
>
> In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, the level in the fair value hierarchy within which the fair value measurement in its entirety falls has been determined based on the lowest level input that is significant to the fair value measurement in its entirety. The Company's assessment of the significance of a particular input to the fair value measurement in its entirety requires judgment, and considers factors specific to the asset or liability.

129. As indicated by Morgan, under SFAS No. 157, "fair value" is defined as the amount at which financial instruments could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale. In determining fair value, FASB No. 157 establishes a hierarchy that calls for the maximization of the use of "observable inputs" to value assets and liabilities and minimizes the use of "unobservable inputs" by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in

pricing the asset or liability developed based on market data obtained from sources independent of the Company.

130. Fair value accounting under SFAS No. 157 requires the adoption of strict internal controls to ensure that the assessment of fair value is done consistently and transparently. In Morgan's 2007 Second Quarter 10-Q, it described the internal controls the Company had purportedly adopted to ensure its compliance with SFAS No. 157:

> The Company employs control processes to validate the fair value of its financial instruments, including those derived from pricing models. These control processes are designed to assure that the values used for financial reporting are based on observable market prices or market−based parameters wherever possible. In the event that market prices or parameters are not available, the control processes are designed to assure that the valuation approach utilized is **appropriate and consistently applied and that the assumptions are reasonable**. These control processes include reviews of the pricing model's theoretical soundness and appropriateness **by Company personnel with relevant expertise who are independent from the trading desks**. Additionally, **groups independent from the trading divisions within the Financial Control and Market Risk Departments participate in the review and validation of the fair values generated from pricing models, as appropriate**. Where a pricing model is used to determine fair value, recently executed comparable transactions and other observable market data are considered for purposes of validating assumptions underlying the model. [Emphases added.]

### 4. The ABX Index Was an Observable Market Input That Impacted the Fair Value of the Assets Underlying the Proprietary Trading Group's Trade

131. The Proprietary Trading Group's trading position involved credit default swaps referencing the "super senior" tranches of so-called "mezzanine" rated CDOs, which were built on BBB rated U.S. subprime residential mortgage backed securities. At its core, therefore, the trading position was linked to the performance of U.S. subprime mortgages.

132. In January 2006, several investment banks that were market-makers in asset backed securities, including Morgan, collaborated with Markit, a financial information services company, to create an index known as the "ABX Index," whose sole purpose is to track the value of securities collateralized by U.S. subprime mortgages. During the Class Period, the ABX Index tracked the performance of 15 to 20 equally-weighted RMBS tranches backed by U.S. subprime mortgages by monitoring the pricing of CDSs referencing those RMBS tranches. The ABX Index was, and still is, used by market participants as a barometer for assessing the performance of subprime-related

1    securities in the marketplace.

2         133.    As noted above, the ABX Index tracked the cost of buying and selling CDS

3    protection on selected RMBS tranches. Each of the 15-20 RMBS tranches had a different rating,

4    from AAA to BBB- and was considered a representative sample of other MBS tranches backed by

5    subprime collateral with the same rating.

6         134.    The various series of the ABX Index are organized by vintage (*i.e.*, the year that the

7    underlying subprime collateral was issued). For example, the ABX Index 06-1 series tracks CDSs

8    referencing subprime RMBS tranches that were originated in the second half of 2005, while the 06-

9    2 series tracks CDSs referencing subprime MBS tranches that were originated in the first half of

10   2006. As the trend suggests, new indices are rolled out every six months. During the Class Period,

11   there was an ABX Index for every vintage (from 2006 onwards) and rating of subprime collateral

12   for which a significant amount of CDOs had been issued and were outstanding.

13        135.    As set forth in greater detail below, as investors would discover at the end of the

14   Class Period, the Proprietary Trading Group's trade, and specifically the value of the $13.2 billion

15   long position it assumed, was linked to the movement of the ABX.HE.BBB 06-1 series. A sample

16   table for this series, as of February 23, 2007, is set forth below:

| Index | Series | Version | Coupon Rate | RED ID | PRICE | |
|---|---|---|---|---|---|---|
| | | | | | Low | High |
| ABX-HE-BBB 06-1 | | 6 | 1 | 154 | 0A08AIAA4 | 88.50 | 101.20 |

19        136.    In the table above, "Series" refers to the type of loan ("HE" or Home Equity), the

20   bond's credit rating (e.g., BBB), and the vintage of the referenced MBS (e.g., 06-1).

21        137.    "Coupon Rate" sets the premium payment (measured in basis points) that a

22   protection buyer agrees to pay a protection seller over the life of the CDS. For example, assuming a

23   CDS notional value of $100 million, a Coupon Rate of 154 on the ABX-HE-BBB 06-1 means that

24   CDS protection on a BBB-rated RMBS tranche issued during the second half of 2005 would cost

25   roughly $1.54 million.

26        138.    "Price" is the cost of buying the CDS referencing a specific subprime RMBS. The

27   price is set to 100 on the day the particular Index is launched and equal to 100 cents on the dollar.

28