1    At 100, the only payment made by the protection buyer to the protection seller is the Coupon Rate.

2    If the Index drops below 100, however, it means that purchasing CDS protection is becoming more

3    expensive because protection sellers are demanding an additional premium payment. The amount

4    of the additional premium is expressed by the amount by which the Index drops below 100.

5         139.    By way of example, as of February 23, 2007, the ABX-HE-BBB 06-1 was trading at

6    88.5, an 11.5% discount from its 100 par value. This means that, as of this date, protection sellers

7    were demanding an 11.5% up-front fee from protection buyers in addition to the above-referenced

8    coupon payment. In the $100 million example above, this would translate into an up-front fee of

9    $11.5 million, in addition to the $1.54 million coupon payment that will be made over the life of the

10   contract.

11        140.    By tracking the level of additional premiums required by protection sellers, the level

12   of the ABX Index indicates market sentiment as to the likelihood that certain assets backed by

13   subprime mortgages will experience future losses. The larger the upfront premium required by the

14   protection sellers—reflected by the amount the price is below par—the more likely the market

15   believes that such assets will experience future losses. Thus, the ABX Index reflected the value of

16   CDSs referencing MBSs, as the subprime crisis unfolded throughout 2006 and 2007. As a result,

17   industry experts utilized the ABX Index to assess the value of subprime-backed MBSs and CDOs.

18   On July 19, 2007, Bloomberg.com stated that the "ABX Indexes have been watched by investors in

19   everything from U.S. treasuries to foreign stock as a way to track the collapse of the subprime

20   market." Further, on July 10, 2007, Deutsche Bank issued a report stating that "the ABS CDO

21   market was shaken in the wake of the recent ABX index collapse." In fact, during the period from

22   2006 through 2007, Defendants knew or recklessly disregarded that the ABX Index was even more

23   probative of the market value of U.S. subprime-related CDSs, since CDSs are the precise

24   instruments tracked by the Index.

25        141.    As set forth in the chart below, the value of the ABX.HE.BBB 06-1 series declined

26   sharply during 2007, evidencing the declining value of subprime-related CDSs due to the increased

27   risk of having to reimburse protection buyers for losses suffered on the MBS positions:

28



142.  During Morgan's third quarter, June 1, 2007 through August 31, 2007, the ABX BBB.06-1 Index, declined 32.8 % from 94.5 to 63.5.  This dramatic drop is illustrated on the chart below:



143.   In Morgan's fourth quarter, September 1, 2007 through November 30, 2007, the ABX BBB.06-1 Index fell another 50% from 66.0 to 33.0, as illustrated below:



144.   In fact, Morgan itself has repeatedly acknowledged that the proper measure of value for its CDSs is, first and foremost, the ABX Index.  During the November 7, 2007 conference call, Defendant Kelleher stated that the decline in fair value of its CDS positions was "*due to* the sharp decrease in the BBB ABX price indices."   Similarly, the chart attached to the Company's November 7, 2007 press release stated that in valuing their subprime mortgage-related positions, the Company took into consideration "the continued deterioration in market data, *as reflected by* the sharp decline in the ABX indices."  (Emphases added).

145. The AICPA Center for Audit Quality has stated in a white paper titled "Measurements of Fair Value in Illiquid (or Less Liquid) Markets," that the ABX Index is a suitable Level 2 input to value *bonds* backed by subprime mortgage loans under SFAS No. 157. As a consequence of the above-described trading position entered by the Proprietary Trading Group on Morgan's behalf, Morgan owned actual CDSs referencing subprime mortgage-backed securities, the identical instruments tracked by the ABX Index. Thus, if the Index is a suitable valuation input

for valuing bonds backed by subprime loans, it is the absolute basis for valuing CDSs referencing subprime loans, such as the ones in which Morgan's Proprietary Trading Group had invested.

146.   Furthermore, another authoritative body, the Bank for International Settlements, a commercial banking standards setting entity, holds that the ABX Index values are so controlling, that "to obtain estimates of mark-to-market losses for subprime MBS, ABX prices, by rating and vintage, can simply be applied to outstanding volumes of these securities."   Additionally, the industry standard in tracking and valuing subprime-related CDSs is the ABX index.  As Citigroup CFO Gary Crittendon stated, "the best way to get an outside perspective on [CDS values] is to look at the ABX Indices."

### 5.   The Declines in the ABX Index Were Linked to the Declines in the U.S. Subprime Markets

147.   During the Class period, as discussed below, the Defendants knew and/or recklessly disregarded that the decline in the ABX Index was directly correlated to the decline in value of CDSs referencing subprime mortgage-backed securities, the same assets Morgan held on its books.

148.   Beginning in 2006, massive amounts of new construction and the after-effects of the surge in home purchases over the previous decade began to drive U.S. housing price appreciation rates down.  Eventually, housing prices started to fall.  This occurred at a time when interest rates were high and just as many ARM "teaser" rates were set to expire.  These market conditions created a perfect storm for U.S. mortgagors, particularly those who received subprime mortgages.

149.   The expiration of the "teaser" rates meant that the monthly mortgage payments for many mortgagors became adjustable, and higher interest rates ensured that those monthly payments would increase dramatically.  Further, higher interest rates precluded borrowers from refinancing, and falling home prices left those borrowers with little, if any, equity in their homes.  As a result, default and foreclosure rates rose precipitously as an increasing number of borrowers became unable to meet their mortgage obligations.  By way of example, data published by RealtyTrac in January 2008 showed that the 215,749 foreclosure filings reported in December 2007 was nearly double the number of foreclosures reported just a year earlier.

150.   The financial conditions plaguing the broader mortgage market were particularly

1  troublesome for subprime mortgagors who over-extended themselves when purchasing their home

2  during the housing boom.  In December 2006, the Center for Responsible Lending released a report

3  predicting that a staggering 20% of all subprime loans issued during 2005 and 2006 would enter

4  into foreclosure, amounting to 2.2 million homes and approximately $164 billion in value.

5  Further, between the fourth quarter of 2006 and the fourth quarter of 2007, the subprime mortgage

6  delinquency rate increased nearly 48%, rising from 11.70% to a staggering 17.31% during the year.

7       151.    The rapidly deteriorating credit quality of subprime mortgages issued during the

8  housing boom had a devastating effect not only on subprime borrowers, but also on the subprime

9  originators that made these high-risk loans.  As subprime default rates began to rise and losses

10  mounted, investor demand for securities backed by subprime mortgage collateral declined.  As a

11  result, investment banks became less willing to purchase mortgage assets from subprime

12  originators, leaving many of those lenders with a host of risky mortgage assets on their balance

13  sheets and without major sources of financing.  Accordingly, many mortgage lenders were forced

14  to suspend operations and/or seek bankruptcy protection during this time period.

15       152.    For example, on February 7, 2007 New Century Financial Corporation, the

16  country's  second largest subprime originator, announced it needed to restate results due to

17  increased losses on defaulted subprime mortgage loans.  The following day, HSBC Holdings PLC,

18  one of the world's largest banks and non-prime lenders, announced an increase of approximately

19  $10.6 billion in bad debt charges for 2006 due to increased troubles in the subprime mortgages

20  market. Further, subprime mortgage lender Fremont General Corporation ceased issuing subprime

21  mortgages on March 2, 2007. Shortly thereafter, another subprime originator, People's Choice

22  Home Loan, Inc., filed for bankruptcy protection.

23       153.    On March 31, 2007, as the subprime crisis continued to worsen, New Century was

24  forced to file for bankruptcy protection after many of its lenders ceased doing business with New

25  Century.

26       154.    Eventually, the subprime mortgage crisis naturally extended beyond subprime

27  borrowers and mortgage lenders, and reached the secondary mortgage market participants.

28  Because the market values of MBSs and CDOs referencing residential mortgages are dependent

1  upon the individual mortgagors' ability to repay their home loans, the increase in mortgage defaults

2  negatively impacted the value of mortgage-backed securities and CDOs, particularly those backed

3  by subprime-mortgage collateral.

4      155.    As stated above, as mortgage losses mounted, investors began to shy away from

5  securities backed by subprime mortgage collateral.  This left the investment banks like Morgan,

6  which had voraciously purchased and securitized mortgage assets during the real estate boom,

7  holding billions of dollars in illiquid subprime mortgages and MBSs on their books.  As defaults

8  mounted, Defendants knew or recklessly disregarded that the fair value of these assets declined

9  markedly, yet failed to disclose these positions to investors.  Likewise, the value of CDSs

10  referencing subprime mortgage-backed securities similarly declined, as it became more likely that

11  protection sellers would be obligated to make payments to their counterparties.  As a result,

12  investment and commercial banks including, *inter alia*, Citigroup, Merrill Lynch, and UBS

13  recognized billions of dollars in losses associated with these assets.

14      156.    Further, on July 17, 2007, despite receiving a $3.2 billion bailout, two subprime

15  hedge funds run by the Bear Stearns Companies Inc., the Enhanced Leverage Fund and the High-

16  Grade Fund, that invested in CDOs linked to U.S. subprime securities, informed investors that there

17  was "effectively no value left for the investors in the Enhanced Leverage Fund and very little value

18  left for the investors in the High-Grade Fund." Ultimately, both the Enhanced Leverage Fund and

19  the High-Grade Fund collapsed on July 31, 2007.  As creditors attempted to liquidate the Bear

20  Stearns' holdings in the open market they were faced with virtually no liquidity and no willing

21  buyers of these assets.  As a result of this very public failure of a subprime-linked hedge fund, a

22  massive re-pricing of subprime mortgage-backed securities occurred, causing numerous investment

23  banks and hedge funds with subprime exposure to significantly reduce the value of their subprime

24  portfolios in the third quarter of 2007.

25      157.    Morgan was not among these banks that disclosed losses due to subprime mortgage-

26  related exposure during the period.  In fact, the shareholders and investors had been led to believe

27  that Morgan had minimal subprime exposure.

28

1  **VII.  DEFENDANT'S FRAUDULENT SCHEME TO CONCEAL KNOWN LOSSES
       CAUSED BY THE PROPRIETARY TRADING GROUP'S SUBPRIME BET AND
2      OTHER SUBPRIME POSITIONS HELD BY THE COMPANY**

3       158.  Although, as set forth above, a sharp decline in the subprime mortgage market would

4  leave the Company exposed to billions of dollars in potential subprime-related losses, Defendants

5  failed to disclose the existence of the Company's subprime positions, and the immense risk

6  associated with holding such investments, during the Class Period.

7       159.  Throughout the first two quarters of 2007, default rates in subprime mortgages had

8  risen to unprecedented levels, drastically reducing the market value of lower-rated subprime

9  mortgage-backed securities. Further, as rising defaults eroded the credit protection that had been

10 afforded to higher-rated AA and AAA securities, they too became more susceptible to reductions in

11 value. As such, Defendants knew or recklessly disregarded that Morgan had become increasingly

12 exposed to massive subprime-related losses by virtue of the extremely concentrated subprime

13 investment made by the Proprietary Trading Group.

14      160.  Nevertheless, as set forth below, during its conference calls and in its quarterly SEC

15 filings for First Quarter 2007 and Second Quarter 2007, despite requests by analysts for disclosure

16 concerning the Company's exposure to the U.S. subprime market, the Company failed to provide

17 investors with any degree of transparency regarding the nature and extent of Morgan's subprime

18 exposure during this time period, even though the Proprietary Trading Group had exposed the

19 Company to billions of dollars in losses related to movements in the value of subprime securities.

20 Nor did the Company reveal that it also held other subprime assets on its balance sheet. Instead,

21 the Company repeatedly informed investors that while it possessed certain subprime-related assets,

22 it was "well-positioned" to withstand a deterioration of the subprime market and was adequately

23 hedged against subprime so as to not suffer any losses.

24      **A.    Defendants Disclaim Any Exposure to the Declines in the Subprime Market**

25      161.  At a time when the U.S. subprime loan market seemed like a sinking ship - its

26 casualties increasing at an unprecedented pace – Morgan appeared to be not only impervious to the

27 growing crisis, but also swimming in profits from Defendants' self-described "well-balanced"

28 risks. While reporting earnings for First Quarter 2007, on March 21, 2007, Defendant Sidwell

Amended Class Action Complaint                                              - 43 -
Case No. CV08-963AG (FFMx)

1    expressly acknowledged that subprime had been a key focus in the market during early March
2    2007, and he stated that the Company managed its risk through a variety of hedging strategies and
3    proprietary risk positions that had "significantly contributed" to Morgan's record results.
4    Defendant Sidwell further reported that the Company had decreased risk exposure during the latter
5    part of the First Quarter 2007 to balance Morgan's level of risk with Defendants' view of potential
6    market changes.  In response to analysts' questions, Sidwell acknowledged that its acquisition of
7    Saxon Capital, and increased participation in mortgage origination had provided "key insights" into
8    understanding where investment opportunities were and where the markets were heading.

9        162.  While Sidwell disclosed during the March 21, 2007 conference call that Morgan
10   participated in numerous aspects of the subprime mortgage market, including both originations and
11   proprietary trading, he stated that subprime concerns would be a "reasonably limited event," and
12   even attributed the Company's record first quarter performance, in part, to its subprime trading
13   strategies.  Defendant Sidwell stated, in relevant part:

14       In fixed income sales and trading, $3.6 billion in revenues was our best quarter ever,
         up 57%, driven by broad-based strength across credit products, interest rate, and
15       currency products and commodities... Looking at the results by product area, credit
         products rose 110% to a new record, *with the largest increase in securitized*
16       *products driven by favorable positioning in the sub-prime mortgage market*, strong
         customer flows, and robust growth in our Global commercial mortgage business.
17       (Emphasis added).

18       163.  When analysts and investors questioned whether the Company was truly well-
19   positioned and requested further details regarding its subprime mortgage exposure, however,
20   Defendants refused to provide the market with additional transparency, stating during the March
21   21, 2007 conference call that they "don't really want to address specifically how [Morgan is]
22   positioned [in the mortgage market]."

23       164.  The Defendants continued to downplay and conceal Morgan's risks to subprime-
24   related losses in the second quarter of 2007 despite the rapidly deteriorating credit quality of
25   subprime-related mortgages and the market-wide fear that companies with subprime exposure
26   would be forced to recognize massive losses.

27       165.  On June 20, 2007, during the Company's second quarter conference call, Sidwell
28   again discussed the subprime market with analysts and investors, but he did not disclose Morgan's

Amended Class Action Complaint                                          - 44 -
Case No. CV08-963AG (FFMx)

1   exposure to any decline in the value of U.S. subprime mortgage securities. Instead, Sidwell merely

2   assured the analysts and investors on the call that the Company "certainly did not lose money in

3   [the subprime mortgage] business" during the second quarter.

4       166. Defendants' optimistic statements regarding the Company's subprime mortgage

5   exposures during the first half of 2007 caused analysts, investors and ratings agencies to believe

6   that the Company's subprime mortgage-related exposure was controlled, and that Morgan was

7   well-positioned, especially compared to its peers, to escape from the mortgage market meltdown

8   relatively unscathed. For example, on March 21, 2007, Keefe, Bruyette & Woods analyst Lauren

9   Smith raised her 2007 earnings estimate for the Company to $8.12 from $7.20 per share. In so

10  doing, Smith stated she believed the Company would "more than stand up to the perils we are

11  witnessing in the sub prime mortgage market." Smith also pointed out that "[m]anagement noted

12  they feel very confident in how they are positioned and their exposures to the sub prime mortgage

13  markets."

14      167. Likewise, on July 30, 2007, S&P upgraded Morgan's credit rating from A+ to AA-.

15  While S&P was undeniably aware of the rapid reduction in the value of subprime-related securities

16  during the first half of 2007, it noted that "Morgan Stanley's exposure to the U.S. subprime

17  mortgage sector and leveraged corporate finance sector is under control." S&P further justified the

18  upgrade by stating that Morgan's "strong competitive position leaves it better able to withstand

19  market volatility in comparison to its peers."

20      **B.    The SEC's Request for Greater Disclosure of the Company's Exposure to
              Subprime is Undisclosed and Ignored**

21

22      168. As conditions within the subprime market worsened, the Company's lack of any

23  discussion of subprime exposure in its financial statements caught the attention of the SEC. In an

24  August 30, 2007 letter from John Hartz, SEC Senior Assistant Chief Accountant, to David Sidwell,

25  the SEC complained about the Company's failure to provide investors transparency regarding the

26  Company's subprime-related positions as reported in the Company's 2006 Form 10-K on February

27  13, 2007 and First Quarter 2007 10-Q. This letter, and the subsequent correspondence between

28  Morgan and the SEC, would only be disclosed well after the end of the Class Period, when the SEC

1  made the correspondence public.  The SEC stated, in part:

2        We note from the disclosures on page 4, 127 and 162 that you originate, trade, make
          markets and take proprietary positions in, and act as principal with respect to,
3        mortgage related and real estate loan products. We further note on page 4 that in
          December 2006 you acquired Saxon Capital, a servicer and originator of
4        subprime residential mortgage loans. We also note that you provide financing to
          customers for residential real estate loan products. It is unclear from your document
5        the exposure you have to subprime loans.

6                                               ***

7        Based on your current public disclosures, it is possible that more clarity about your
          exposure to any subprime loans could be helpful. Regardless of the materiality of
8        your exposure, we respectfully request that you provide us with supplemental
          information about your involvement in sub-prime loans.

9        169.  Specifically, the SEC asked the Company to quantify, *inter alia*, its "portfolio of

10  subprime residential mortgages," and to "breakout the portfolio to show the underlying reason for

11  the subprime definition, in other words, subject to payment increase, high LTV ratio, interest only,

12  negative amortizing, and so on."  The Commission further requested that the Company quantify

13  "the principal amount and nature of any retained securitized interests in subprime residential

14  mortgages," its "investments in any securities backed by subprime mortgages," "current

15  delinquencies in retained securitized subprime residential mortgages," and "any write-

16  offs/impairments related to retained interests in subprime residential mortgages."

17        170.  In the August 30, 2007 letter, the SEC requested that the Company provide this

18  information "as of the end of [Morgan's] last full fiscal year and as of the most recent date

19  practicable."  The Company's fiscal third quarter of 2007 ended the following day, on August 31,

20  2007.

21        171.  Despite this explicit instruction from the SEC, the Defendants did not increase

22  Morgan's level of disclosures relating to the Company's exposure to the U.S. market in the

23  Company's earnings release published on September 19, 2007, or in the Form 10-Q filed on

24  October 10, 2007 for the third quarter 2007, ended August 31, 2007. While the Third Quarter Form

25  10-Q contained limited references to "subprime," it did not come close to setting forth Morgan's

26  known exposure to losses in connection with subprime.  To wit, the disclosures in Morgan's Third

27  Quarter Form 10-Q referring to "subprime" were as follows:

28

Total sales and trading revenues decreased 16% in the quarter ended August 31, 2007 from the comparable period of fiscal 2006. Sales and trading revenues were adversely affected by the difficult market conditions that existed during the quarter ended August 31, 2007. The credit markets deteriorated considerably over the course of the quarter with increased volatility, significant spread widening, lower levels of liquidity and reduced price transparency. These factors affected the leveraged lending markets, the effectiveness of hedging strategies, **subprime** mortgage markets, including the market for collateralized debt obligations, and other structured credit product markets. This credit environment significantly impacted the Company's corporate lending and credit sales and trading activities. In addition, such conditions contributed to increased volatility and deleveraging in the equity markets, which affected the Company's quantitative trading strategies.

***

Lower revenues from the Company's residential and commercial mortgage loan activities also contributed to the decline in credit product revenues, reflecting the difficult market conditions referred to above, as well as continued concerns in the **sub-prime** mortgage loan sector."

"Concerns about the impact of **sub-prime** loans caused the broader credit markets to deteriorate considerably over the course of the quarter, with increased volatility, significant spread widening and lower levels of liquidity and price transparency."

[Emphases added].

172.   In each instance, the term "subprime" was used to describe adverse conditions in the broader marketplace. None of the references in the Third Quarter 2007 10-Q links the troubles within the broader subprime market to the actual assets and liabilities held on the Company's books, particularly those assets and liabilities involved in the Proprietary Trading Group's massive trading positions, nor do they otherwise provide any transparency regarding the Company's subprime related exposures.

173.   What the market participants did not, and could not, know was that at this time, the Company's balance sheet was littered with billions of dollars in high-risk net assets with direct exposure to the crumbling U.S. subprime market, assets that would eventually cause the Company to write down a staggering $9.4 billion at the end of the Class Period.

C.   **Contrary to the Defendants' Lack of Representations to the Market About Morgan's Exposures to Subprime, Defendants Had Sounded the Alarm Internally About Massive Subprime Losses**

174.   According to an interview Zoe Cruz gave to *New York Magazine* that was published on May 5, 2008, beginning in May 2007, she "started to worry" that the subprime mortgage market was primed for disaster.

175. Knowing that a devaluation of RMBSs would cause the Company to suffer major losses, Cruz acknowledged that she began overseeing the unwinding of billions of dollars in mortgage-related investments that Morgan's ISG held as investments. Cruz also began informing certain Morgan clients that they should avoid taking on mortgage-related positions in light of the subprime market's impending collapse.

176. Because she feared that the Company would be left exposed to a downturn in the subprime mortgage market, in May 2007, before the class period began, according to Cruz's accounting in the *New York Magazine* article, she ordered Defendant Daula, the Company's Chief Risk Officer, to run "stress tests" on the subprime CDSs acquired by the Proprietary Trading Group. Cruz stated that the stress tests were designed to calculate the amount of money the Company would lose based on various levels of deterioration within the mortgage market.

177. On June 20, 2007, no less than three weeks after Cruz contends she became extremely concerned about the future of the U.S. subprime mortgage market, as evidenced by her ordering of the stress tests on the CDS acquired by the Proprietary Trading Group, Defendants held a conference call for analysts and investors to discuss the Company's earnings for the second quarter of 2007. Once again, Defendants neglected to address the Company's subprime-related exposures during the Company's Second Quarter 2007 earnings conference call. Rather, Defendant Sidwell said, on the call, "[c]oncerns early in the quarter about whether markets in the sub prime market were going to spread dissipated."

178. On July 4, 2007, Daula purportedly informed Cruz that the Company could conceivably lose $3.5 billion on the Proprietary Trading Group's CDS positions. It is not known why it took an entire month to complete this stress test, according to Cruz's account in the *New York Magazine* article. Although Daula told Cruz that such a loss was unlikely, she told Daula and Neal Shear, "I don't care what your view of probability is. Cut the position." Despite Cruz's purported orders, however, no action was taken, and the position was not eliminated at that time.

179. Moreover, on July 10, 2007, six days after Daula told Cruz that the Company could lose $3.5 billion dollars on Hubler's subprime-related positions alone, the Company filed its Form 10-Q for the second quarter of 2007. The Second Quarter 2007 10-Q does not provide investors

with any additional transparency regarding the Company's subprime-related holdings.  In fact, the Company's 181-page quarterly filing does not even contain the word "subprime," even though Defendants knew U.S. subprime markets were in a free fall and that the Proprietary Trading Group's "bet the wrong way" could potentially generate a $3.5 billion loss for the Company and its investors.

### D.   The Defendants Actively Conceal the Losses Resulting From the Proprietary Trading Group's Subprime Positions

180.   By the close of the third quarter 2007, the Defendants were acutely aware of the impact of the deteriorating fair value of the Proprietary Trading Group's CDS position and the impact its write down to fair value would have on the Company's financial statements.   Given the Company's adamant position taken through the first and second quarters of 2007 that it was managing its risk in a disciplined way and actually stood to benefit from the decline in subprime securities, due to favorable hedges it had taken (*see* ¶¶ 161-167, 227-236), reporting a massive loss as a consequence of a bad bet on subprime securities was out of the question.

181.   Indeed, the Company, as set forth above, earned a one-notch credit upgrade from Standard & Poor's from A+ to AA-.   In issuing the upgrade, S&P noted, "While we recognize that recent capital markets turmoil—precipitated by market issues in the subprime mortgage and leveraged corporate finance sector—could herald a period of much less favorable market conditions, we believe that structural improvements in Morgan Stanley's competitive position leave the firm especially well-positioned to withstand market volatility compared to industry peers."

182.   Defendants knew that a credit downgrade would have had a devastating effect on Morgan's capital position.   As disclosed by the Company in its third quarter 2007 quarterly filing, a one-notch downgrade by the rating agencies would have required the Company to post an additional $588 million to counterparties to shore up its obligations.

183.   As discussed above, in ¶¶ 122-126, the Proprietary Trading Group, as is now known but was undisclosed to investors during the Class Period, took a $13.2 billion long position on CDSs referencing the mezzanine or BBB rated tranches of CDOs.   In other words, the Company agreed to assume $13.2 billion of potential exposure to defaults in CDOs, in exchange for premium

payments. This long position was taken to finance the earlier acquisition of a short position on lower-rated subprime securities, the notional value of which has still yet to be disclosed by the Company. The Company acquired protection against default in the form of CDSs on lower level tranches of CDOs also underpinned by subprime securities. The fair market value of the $13.2 billion long position in CDSs was inherently linked to the movement of the ABX Index BBB 06-1, as was admitted by the Company towards the end of the Class Period.

184.    Prior to May 31, 2007, as can be seen by the chart at ¶ 141, the ABX Index against which the CDS position was being valued had slowly declined 5.5 percent so that at the end of the second quarter 2007, the BBB 06-1 vintage stood at 94.5. Between May 31, 2007 and August 31, 2007, however, during Morgan's 2007 third quarter, the ABX Index for BBB. 06-1 vintage declined 32.8%. Moreover, during the same period, each of the other ABX Indices for CDSs backed by mezzanine collateral experienced percentage declines that were as large, or even larger, than the decline in the BBB 06-1 series. Such a severe decline required Morgan to write down the Proprietary Trading Group's position, consistent with the requirements of SFAS No. 157, by at least $4.4 billion, or 32.8% of its $13.2 billion position. This loss could not be tolerated. Indeed, Zoe Cruz, reportedly had informed Morgan's Board of Directors in August 2007 that, "We're going to be the best house in a deteriorating neighborhood."

185.  To avoid recognizing the $4.4 billion in losses that should have been recorded in Third Quarter 2007, the Company did not value its CDSs based on the ABX Index. Instead, Defendants began wrongfully to use unobservable Level 3 inputs to contrive "fair values" for billions of dollars in assets and liabilities despite the fact that the ABX Index, which was considered a reliable Level 2 input for valuing subprime-related CDSs, provided the Company with a continuous supply of observable market data throughout the Class Period.

186.  Because they involve the use of internal models and allow companies to exercise managerial judgment in arriving at an asset's fair value, Level 3 inputs are considered to be the most subjective and least reliable valuation inputs. For this reason, SFAS 157 states that, regardless of the category in which an asset is placed for disclosure purposes, the "valuation techniques used to measure fair value shall maximize the use of observable inputs and minimize the

1    use of unobservable inputs." SFAS 157 ¶ 21. In addition, SFAS 157 ¶ C86 states that "the

2    reporting entity must not ignore information about market participant assumptions that is available

3    within reasonable cost-benefit constraints."

4        187. As discussed above, SFAS No. 157 establishes a "fair value hierarchy" which

5    prioritizes the various types of inputs that financial institutions should use to determine the fair

6    value of its trading positions. These inputs are divided into three levels: Level 1, Level 2 and

7    Level 3. As stated by the Company in its Third Quarter 2007 Form 10-Q, Level 1 inputs "utilize

8    quoted prices (unadjusted) in active markets for identical assets or liabilities that the Company has

9    the ability to access." These are, for obvious reasons, the most objective valuation inputs. Level 2

10   inputs, according to the Company, "utilize inputs other than quoted prices included in Level 1 that

11   are observable for the asset or liability" such as quoted prices for "similar "assets" or "inputs other

12   than quoted prices that are observable for that asset or liability, such as interest rates and yield

13   curves that are observable at commonly quoted intervals." Conversely, Level 3 inputs are

14   considered "unobservable inputs" such as "models" involving "judgment exercised by the

15   Company."

16       188. Just as inputs are categorized as belonging to one of the three levels in the valuation

17   hierarchy, so too the assets or liabilities for which values are derived from such inputs are also

18   categorized as belonging into one of the three levels. However, because multiple inputs may be

19   used to determine the value of an asset, and because the Levels of these inputs may vary, the

20   Company noted that "the level in the fair value hierarchy within which the fair value measurement

21   in its entirety falls is determined based on the lowest level input that is significant to the fair value

22   measurement in its entirety." Therefore, an asset or liability can be classified as Level 3 even if its

23   value is determined primarily using Level 2 inputs, provided that at least one significant Level 3

24   input was used in the valuation process.

25       189. During the third quarter 2007 earnings conference call, Defendant Sidwell stated that

26   "[g]iven the third quarter market dynamics, more instruments have become illiquid" and, as a

27   result, "the level of financial assets categorized in Level 3, which is the most illiquid category, have

28   increased." Sidwell said that while Level 3 assets constituted 5% of total assets and 2% of total

1  liabilities in the second quarter, he expected those percentages to increase to 8% and 3%,

2  respectively, in the third quarter. This amounts to an increase of approximately $35 billion in Level

3  3 assets and $11 billion in Level 3 liabilities over the Company's second quarter 2007 figures.

4      190. As can be now be determined based on the facts that have since come to light

5  following the Class Period, in examining the Company's disclosures in the third quarter of 2007,

6  the $35 billion increase in Level 3 assets and $11 billion increase in Level 3 liabilities during third

7  quarter 2007 must have included the subprime mortgage-related CDS positions held by the

8  Proprietary Trading Group.

9      191. Sidwell stated during the conference call that derivatives, "primarily complex

10  structured instruments," were a major component of the Company's Level 3 assets and liabilities.

11  First, Sidwell stated during the conference call that derivatives, "primarily complex structured

12  instruments," were a major component of the Company's Level 3 assets. Second, in describing

13  which instruments were included in Morgan's Level 3 assets, the Third Quarter 2007 10-Q

14  included, for the first time, "certain credit default swaps" and "instruments associated with the

15  Company's credit products and securitized products activities" in its listing of financial instruments

16  that were valued using Level 3 inputs. In prior reporting periods, the Company had never included

17  "credit default swaps" in its description of Level 3 assets. Moreover, the categorization of such

18  assets as Level 3 was repeated in the year-end 2007 10-K.

19      192. Defendants' reclassification of the Proprietary Trading Group's CDS positions to

20  Level 3 demonstrates that, during the third quarter of 2007, the Company began using unobservable

21  market data in order to value these positions for the first time. In doing so, Defendants were able to

22  secretly manage Morgan's earnings and soften the blow of the ABX Index's steep decline by taking

23  only $1.9 billion in write-downs (instead of $4.4 billion) and reporting earnings of $1.38 per share.

24      193. In this manner, Morgan was able to announce earnings precisely at the lowest end of

25  Wall Street estimates for the Company. According to *Businessweek.com*, 15 analysts had

26  established earnings estimates for Morgan for the third quarter. The consensus earnings estimate

27  was $1.54 per share. The high end of the range was $1.86 and the low end was $1.38. Had the

28  Company marked its assets and liabilities in line with observable market data, namely the ABX

1   Index, it would have taken an additional $2.5 billion in write-downs during the third quarter and

2   would have missed the low end of Wall Street's estimates by a country mile.

3          194.   It is clear that the reason the Company began using subjective Level 3 inputs to value

4   its positions was to avoid recognizing mark-to-market losses on its mortgage-related assets and

5   liabilities as required had the ABX Index properly been used as the observable input.  Thus, the

6   unnecessary introduction of Level 3 inputs into the Company's valuation methodologies during the

7   third quarter of 2007 was instrumental to Defendants' fraudulent conduct.

8          195.   It was impossible for even those watching closely to notice that Morgan was

9   reclassifying assets and liabilities from Level 2 to Level 3, or even that the positions being

10  reclassified were subprime-related and the true reasons for any reclassification were concealed.  As

11  a result, Defendants were able to continue to conceal the Company's exposure to massive subprime

12  losses to meet Wall Street's expectations and to maintain its high credit ratings, thereby lowering

13  its cost of capital and continuing its issuance and trading of financial instruments without

14  disruption.

15         196.   That the Defendants should have recorded Third Quarter 2007 write-downs in line

16  with the deterioration of the relevant ABX Index is further made evident by the Company's own

17  admissions at the end of the Class Period.  When the Company finally revealed its losses associated

18  with the Proprietary Trading Group transaction in reporting $9.4 billion of write-downs on

19  December 19, 2007, Defendant Kelleher stated:

20             Our writedown, reflecting the impacts of November, increased to $7.8 billion from
               $3.7 billion as of October 31, while our total net exposure decreased to $1.8 billion
21             from $6 billion over the same period. Using consistent valuation methodology, the
               fair value of these positions declined from October 31 to November 30. Our
22             valuation of these positions takes into consideration observable trades to continue
               deterioration and market conditions, *the decline in the ABX indices,* and other
23             market developments including updated mortgage remittance and cumulative loss
               data. The decrease in the fair value of our subprime exposures has lead to our first
24             quarterly loss.

25             The trades we observed were those we executed in November as part of our effort to
               reduce our exposure. *The ABX deterioration in the class of super senior positions,*
26             *mainly the BBB 061 vintage [which] is w[h]ere almost [all of the] significant*
               *exposure rest[s] was approximately 24% during November, which relates to 2005*
27             *collateral.*  (Emphasis added).

28         197.   If, as the Company admitted, a 24% decline in the ABX Index during November

Amended Class Action Complaint                                                                    - 53 -
Case No. CV08-963AG (FFMx)

1  guided Morgan to take an additional **$4.1 billion write-down** to its subprime-related positions, then

2  a 32.8% drop in that same ABX Index during the Company's third quarter should similarly have

3  resulted in a massive write-down on these positions.

4        198.  Likewise, Morgan reiterated the fact that the ABX Index was the proper benchmark

5  for valuing the CDS position during the fourth quarter of 2007, even though the subprime CDS

6  markets were more distressed and illiquid in the fourth quarter than they were in the third quarter.

7        199.  Indeed, unlike write-downs in Third Quarter 2007, the Company's belated total losses

8  recognized for the six-months-ended November 30, 2007 closely tracked, on a percentage basis, the

9  deterioration in the ABX.HE.BBB 06-1 during the same period, as can be determined by the

10  Company's own disclosures of the total CDS position held by the Global Proprietary Group:

| Reporting Period | ABX Index BBB. 06-1 Decline | Morgan's Losses on the Proprietary Trading Group's CDS Position |
|---|---|---|
| 3Q 2007 | 32.8 % | $1.9 billion on a $13.2 billion notional position (14.4%) |
| 4Q 2007 | 50% | $7.1 billion on a $13.2 billion notional position (62.3%) |
| 3Q + 4Q 2007 | 65.1% | 68.2% |

      200.  The Company's total losses recognized on this CDS long position for the second half

of 2007 of 68.2% exceeded the 65.1% decline in the ABX Index during the second half of 2007.

Thus, while the Company avoided recognizing a net loss in the third quarter, it recorded a fourth

quarter loss in the financial statements which exceeded the quarterly decline in the ABX as a

"catch-up" in order to value the CDS positions at "fair value" as required by GAAP at year end.

      201.  As discussed below, Morgan's loss recorded in the fourth quarter was spurred by

information leaked into the marketplace in the first days of November 2007, shortly after the

Company fired Howie Hubler, the head of the Proprietary Trading Group on November 2, 2007.

Within days of Hubler being fired, rumors began to circulate within the analyst ranks that Morgan

was poised to take a $3-$6 billion write-down related to previously undisclosed subprime disclosures.   In effect, the Company, as discussed more fully below, was forced to come clean to its investors.

**E.    Morgan Has a Pattern of Abusing Fair Valuation Methodology to Manage Earnings**

202.   Morgan's manipulation of the fair value of its subprime assets and liabilities in the third quarter of 2007, to avoid taking a necessary write-down was not the first time Morgan deliberately overvalued its net assets and overstated its financial condition.

203.   In 2004, the SEC imposed a cease-and-desist order against the Company pursuant to Section 21(c) of the Exchange Act, finding that the Company had overvalued certain high-yield bonds by failing to properly value the bonds as of the current measurement date.

204.   Instead, the Company purportedly took a "longer view" as to their value, by discounting, or ignoring current market conditions.   According to the SEC's Accounting and Auditing Enforcement Release No. 2132 dated November 4, 2004, Morgan believed the market conditions rendered third-party price quotations unreliable. And while GAAP required Morgan to use its best efforts to determine the fair value of the bonds, the Company valued them by "taking a longer view of the market" and essentially put its subjective opinion about the value of the bonds ahead of prices quoted by external pricing sources.   By overvaluing those bonds, the SEC concluded that "Morgan Stanley's financial results for the fourth quarter of fiscal 2000, as reported on filings made with the Commission, were misstated and not in conformity with GAAP."

205.   Similarly, the SEC also found that the Company overvalued certain aircraft leasing assets subsequent to the September 11, 2001 terrorist attacks.  Morgan used a "base value" method that was not in compliance with GAAP to determine the value of certain impaired aircraft in its portfolio. As with the bond valuations, Morgan failed to consider the current market conditions to calculate fair value. As a result of overvaluing the aircraft assets, the SEC concluded that "Morgan Stanley's financial results for the fourth quarter of fiscal year 2001, third quarter of fiscal 2002 and the first quarter of fiscal 2003, as reported on filings made with the Commission, were misstated and not in conformity with GAAP."

**F.    A Known Breakdown of Morgan's Internal Risk Controls Contributed Significantly to the Company's Subprime Losses**

206.   As set forth above, as Mack's risk-enhanced business model was being implemented at Morgan, Defendants quelled analysts' and investors' fears by assuring them that the Company was assuming risk in a disciplined way and that all of its positions were being actively risk managed.    These risk measures purportedly included frequent communication between risk managers, traders, and the Board of Directors' Audit Committee, as well as an elaborate set of limits and independent review processes for new products and valuation models.

207.   In addition to these representations about Morgan's risk controls, the Company also represented to investors that it had internal control systems and valuation models in place to ensure the accuracy of its quarterly asset valuations.   For example, as set forth above, the Company assured investors that "reviews of the pricing model's theoretical soundness and appropriateness by Company personnel with relevant expertise who are independent from the trading desks" and that "groups independent from the trading divisions within the Financial Control and Market Risk Departments participate in the review and validation of the fair values generated from pricing models, as appropriate."

**1.    Contrary to the Company's Representations, Morgan's Risk Controls Were Wholly Deficient**

208.   As the subprime crisis unfolded, the Defendants pointed to Morgan's effective risk controls as having prevented the Company from taking on any catastrophic subprime risk.  These representations were a complete fabrication.

209.   On April 8, 2005, during Purcell's final days as CEO of the Company, *Forbes* reported that he promoted Thomas Daula to the position of Chief Risk Officer ("CRO"). According to the article, Daula reported directly to CEO Purcell.

210.   However, unbeknownst to investors, shortly after taking control of the Company, Mack changed a vital aspect of the risk reporting structure, creating a fundamental flaw in the system that put the leadership structure of the Institutional Securities Group—those whose bonuses were dependent on ISG's performance—to assume ultimate responsibility for the Company's risk controls.

211.  In October 2005, Mack, without any disclosure to investors, altered Daula's reporting line so that Daula reported directly to Cruz.  However, Cruz, who "shared [Mack's] healthy appetite for risk," was also in charge of the Institutional Securities Group, and oversaw the Company's fixed income trading operations.  This created an inherent undisclosed conflict of interest within the Company's risk management system, as the individual responsible for managing risk was now reporting directly to an individual who was compensated for taking on risk, a reporting structure that, in essence, placed the fox in charge of the proverbial henhouse.

212.  This reporting structure was also particularly dangerous for the Company because Cruz's appointment as the head of the Institutional Securities Group -- a position she attained under Purcell in 2005 -- was extremely controversial among the traders within the Company, and her authority and ability was openly questioned and challenged.

213.  In Cruz's very open battles with the former head of the Institutional Group, Vikram Pandit, while Cruz was head of Morgan's Fixed Income Group and Pandit's subordinate, Pandit reportedly told a colleague, in response to Cruz's concerns that the Company was not taking on more risk, "I'd be more than happy for Zoe to take on more risk, if I felt comfortable that she understood the risk she'd be taking."  Joe Hagan, Only the Men Survive; The Crash of Zoe Cruz, *New York Magazine*, May 5, 2008.  According to this same article, Cruz "was not taken at all seriously by her male colleagues: 'She'd give speeches, and the eyes would roll . . .' [and] the attitude towards attending meetings headed by Cruz was 'take the pain and move on.'"

214.  When Purcell appointed Cruz co-president of the Company, above Pandit, and elevated her to director, in response to the insurrection from Pandit and other senior managers in the Institutional Securities Group, she was branded a traitor.  When John Mack succeeded Purcell, and sought the return of executives, like Pandit, that had left ISG in protest over Purcell, reportedly Pandit and others demanded that Cruz be fired first.

215.  In effect, Mack had placed risk management of ISG under the authority of the very person – Cruz – who stood to benefit most from the inflated valuations of the positions held by ISG.

216.  Moreover, the risk reporting structure developed by Mack in 2005 violated

Amended Class Action Complaint                                                          - 57 -
Case No. CV08-963AG (FFMx)

conventional wisdom on Wall Street, which long considered the best practice to be for the CRO to report directly to the CEO. For example, in a 2001 article, James Lam of Risk Management stated that, to the extent the CRO reports to the CFO or Treasurer, and is therefore two or three levels below the CEO, the CRO's function becomes increasingly less productive. Further, a 2004 *Bank Accounting and Finance* article stressed that the CRO must have full and continuing support of the board and the CEO, and must report directly to the head of the corporation. Likewise, according to a senior credit officer and risk management specialist at Moody's Investors Service, "Moody's regards as best practice the appointment of a chief risk officer who reports directly to the chief executive officer and to the board." Even having the CRO report to the CFO would have been more standard practice than having the CRO report to Cruz, because at least the CFO is independent of the business division whose positions the CRO is supposed to evaluate.

217. Despite deviating significantly from the original reporting structure, which was considered best practice in the industry, the Company did not publicly disclose that Daula would begin reporting to Cruz in October 2005. Instead, throughout the Class Period, investors were led to believe that Daula was reporting directly to Mack. It was not until two years later, after recording $9.4 billion in mortgage-related write-downs, that Defendants publicly acknowledged the falsity of statements relating to the undisclosed change in reporting structure. The Company further confirmed that the reporting change was made in October of 2005 and that while the Audit Committee did not formally review the change, its members were aware of it.

218. Although contradicting accounts of Class Period events have been proffered by the individuals involved, both versions of these contradictory stories make clear that risk control function at Morgan had completely broken down, rendering Defendants' Class Period reliable representations about the risks to which Morgan was exposed materially false and misleading. It is also clear from these accounts that Mack's undisclosed change to the risk reporting structure contributed significantly to the Company's risk management system's breakdown during the subprime mortgage crisis in 2007.

219. According to a December 21, 2007 article appearing in the *Financial Times*, due to the altered reporting structure, Daula would brief Cruz weekly on the Company's risk position.

1   According to this account of events, Daula understood the activities of the structured products

2   traders well, and by August of 2007, he claims to have vocalized his concerns about their activities.

3   Specifically, he warned executives that there were "no proper pricing models for such trades, that

4   positions were not being properly measured, and that the history traders used in their models was

5   not a reliable guide." Further, the *Wall Street Journal* reported that once concerns were raised

6   internally regarding the Company's potential subprime-related losses, Defendant Mack began

7   personally attending the weekly risk assessment meetings as well.

8       220.   The May 5, 2008 article appearing in *New York Magazine* paints a starkly different

9   portrait of the events culminating in Morgan's $9.4 billion mortgage-related write-down.

10  According to this account, Cruz became extremely concerned about the mortgage market beginning

11  in May 2007 after a random encounter with a real estate executive in California. Upon returning,

12  Cruz began attempting to extricate the Company from many mortgage-related positions, and asked

13  Daula to assess the Proprietary Trading Group's risk of loss in the event of a mortgage market

14  meltdown. When Daula told Cruz one month later, over the July 4th holiday, that Morgan could

15  lose approximately $3.5 billion under such circumstances, Cruz claims to have directed Daula and

16  Shear to "[c]ut the position." According to the article, Shear and Daula deny receiving that order,

17  while Cruz's allies contend that Daula and Shear "deferred to Howie [Hubler] instead of listening

18  to Zoe." By the time Shear and Daula purportedly heeded Cruz's advice, the article states that the

19  market had fallen and the Company could only unwind $1.8 billion of the position.

20      221.   Despite the discrepancies in these accounts, it is evident that from very early on or

21  even prior to the beginning of the Class Period, both Daula and Cruz had direct knowledge of the

22  risks associated with the Proprietary Trading Group's extremely risky trading strategy, that these

23  risks were correlated to movements in the markets for subprime securities, and that none of this

24  information had been disclosed to the market. Nevertheless, the Proprietary Trading Group's toxic

25  mortgage-related position remained concealed on the Company's books until long after the

26  mortgage market had begun its free fall.

27      222.   What is also clear from both of these accounts is that the Company's massive

28  exposure as a result of the Proprietary Trading Group's position and the Company's risk failures

1    were known to all of Morgan's senior executives by no later than July 2007 and, as alleged above,

2    were knowingly concealed from investors.

3         223.   Defendants' knowledge and appreciation of the risks associated with the Proprietary

4    Trading Group's CDS positions is further corroborated by CW 4, a senior level employee within

5    the Company's Fixed Income division.   CW 4 stated that during the summer of 2007, Anthony

6    Tufariello, the Global Head of the Securitized Products Group, and immediate supervisor of

7    Howard Hubler, convened a meeting of forty to fifty key, senior employees in the Fixed Income

8    Division.   Tufariello told the meeting participants that the meeting was convened at the explicit

9    direction of Zoe Cruz. According to CW 4, Tufariello informed the meeting participants, whom he

10   referred to collectively as a "super task force," that Morgan had a "large position" with exposure to

11   the subprime mortgage market, and that there was a need to develop "creative strategies" to sell the

12   "assets at risk."   CW 4 recalled that during the meeting, the discussion of the assets at risk included

13   references to CDSs, super senior CDO tranches and subprime mortgages.

14        224.   According to CW 4 shortly after this meeting, a senior member of the Company's

15   structuring and modeling group instructed Michael Jensen, a trader who worked in the Proprietary

16   Trading Group, to meet with a fixed income securities analyst to assess the Proprietary Trading

17   Group's subprime position.   Specifically, CW4 believes the individuals were tasked with

18   determining the "range of how bad things could get." According to CW4, he was told that this

19   weeklong assessment of the potential downside risk to the Company was prepared for Defendants

20   Cruz and Mack as part of a larger report analyzing the Proprietary Trading Group's positions.

21            **2.      The Company's Risk Control Failures Were Compounded By**
                 **Known Deficiencies in the Company's Ability to Value Its Positions**

22        225.   Throughout the Class Period, the Company represented to investors that it had

23   internal control systems and valuation models in place to ensure the accuracy of its quarterly asset

24   valuations. For example, as set forth above, the Company assured investors that "reviews of the

25   pricing model's theoretical soundness and appropriateness by Company personnel with relevant

26   expertise who are independent from the trading desks" and that "groups independent from the

27   trading divisions within the Financial Control and Market Risk Departments participate in the

28

1    review and validation of the fair values generated from pricing models, as appropriate."

2          226.  Notwithstanding these representations, significant internal control deficiencies existed

3    within the Company's valuation department during the Class Period, causing executives like CRO

4    Daula to question the Company's ability to accurately value its mortgage-related positions.  As

5    reported by the *Financial Times*, individuals familiar with the Company stated that by August of

6    2007, Daula "was very vocal in saying that there were no proper pricing models for [the Hubler]

7    trades, that positions were not being properly measured, and that the history traders used in their

8    models was not a reliable guide."

9    **VIII.   DEFENDANTS' MATERIALLY UNTRUE STATEMENTS AND OMISSIONS**

10

11         **A.     Morgan Stanley Reports a Blockbuster Beginning to Fiscal 2007 in Pre-
                    Class Period Statements that Impacted the Total Mix of Information
12                  During the Class Period**

13         227.  Morgan entered into the Second Quarter of fiscal 2007 (March 2007 through May

14    2007) with reported "record results across the board."  These results included record revenues, net

15    income and EPS for First Quarter of fiscal 2007, which largely had outperformed expectations

16    owing to what Defendants described as "disciplined and balanced" increased risk taking and strong

17    trading performance.  Significantly, Defendant Sidwell reported $3 billion in profit attributed to

18    record net revenues of $7.6 billion in Institutional Securities and that fixed income sales and trading

19    had contributed $3.6 billion in revenues, which he stated was the Company's best quarter ever and

20    was owed in large part to results from Morgan's credit products area and favorable positioning in

21    the sub-prime mortgage markets from an increase in securitized products.

22         228.  At a time when the subprime loan market was collapsing, Defendants knowingly

23    and recklessly presented Morgan as impervious to the growing crisis.  Morgan reported record

24    profits from Defendants' self-described well-balanced risks.  While reporting earnings for First

25    Quarter 2007, Defendant Sidwell expressly acknowledged that subprime had been a key focus in the

26    market during early March 2007, and he stated that the Company managed its risk through a variety

27    of hedging strategies and proprietary risk positions that had significantly contributed to Morgan's

28    record results.  Defendant Sidwell further reported that the Company had decreased risk exposure

1 | during the latter part of the First Quarter 2007 to balance Morgan's level of risk with Defendants'

2 | view of potential market changes. In response to analysts' questions, Sidwell acknowledged that its

3 | acquisition of Saxon and increased participation in mortgage origination had provided key insights

4 | into understanding where investment opportunities were and where the markets were heading.

5 |      229.    On April 11, 2007, Deutsche Bank initiated coverage on Morgan with a "Buy"

6 | rating and a 12-month price target of $101 per share. Analysts at Deutsche Bank noted that Morgan

7 | had taken more risk with trading and principal investments, while also stating that the Company

8 | was not "betting the bank" with its investments. The Deutsche Bank analysts reported that Morgan

9 | was "hedged properly" during difficulties in the subprime segment in February 2007. The research

10 | report further that Morgan's higher level of risk needed to be monitored and emphasized that the

11 | Company's CEO had emphasized "taking additional risk when there is a reasonable return." The

12 | analysts also reported that Morgan's head of risk management sat on the Company's management

13 | committee.

14 |      230.    Analysts at Deutsche Bank issued a research report on May 10, 2007, following

15 | their meeting the same day with CEO, defendant Mack. Reiterating their "Buy" rating on Morgan,

16 | the analysts reported that factors driving the Company's growth included "better capital

17 | allocation/optimization of the balance sheet" as mandated by the CFO, and "more principal

18 | activity" with a "gradual[] increase" in the amount of trading risk. The research report further

19 | stated that Morgan was looking to increase the degree of principal risk taking to try to bridge the

20 | gap in the Company's performance, which lagged behind "best-in-class Goldman Sachs."

21 |     **B.**    **At the Beginning of the Class Period Defendants Continue to Report Record Earnings for Morgan Stanley in Second Quarter 2007**

22

23 |      231.    At the beginning of the Class Period, on June 20, 2007, Morgan issued a press

24 | release and reported its financial results for Second Quarter of fiscal 2007 (March 2007 through

25 | May 2007). Defendants again reported record income from continuing operations of $2.6 billion

26 | for the three months ended May 31, 2007, which was an increase of 41% from the second quarter of

27 | 2006. Morgan also reported record net revenues of $11.5 billion for its fiscal Second Quarter 2007,

28 | which was an increase of 32% from the second quarter of 2006. The Company also reported record

1  net revenues of $7.4 billion for its Institutional Securities Group, which was a 39% increase over

2  second quarter 2006, and record pretax income in the amount of $3 billion.

3      232.    For the six months ended May 31, 2007, Defendants reported record income from

4  continuing operations of $5.1 billion, which was a 50% increase from the same period in 2006. Net

5  revenues for the six-month period ended May 31, 2007 were reported as a record $22.5 billion.

6  Institutional Securities reportedly contributed $5.8 billion of the Company's pre-tax income and

7  $14.5 billion of its net revenues for the six months ended May 31, 2007.

8      233.    Morgan also reported that fixed income sales and trading revenues increased 34

9  percent to $2.9 billion, which the earnings release touted was "the second-best quarter ever in this

10  business." The Company attributed increases in income from fixed income sales and trading to

11  strong results from credit products, with trading revenues driven by corporate credit and structured

12  products, although it reported "lower securitized products revenues, primarily in residential

13  mortgage securities."

14      234.    In the earnings release, Defendant Mack stated that "Morgan Stanley delivered

15  record revenues and earnings in the second quarter and first half of the year" and he further

16  emphasized that the Company was well on their way to "reaching [its] goal of doubling 2005

17  earnings over five years." Mack never disclosed that known trends and uncertainties surrounding

18  and arising from the subprime crisis, and specifically the Company's CDS positions entered into by

19  the Proprietary Trading Group, were quickly reversing from favorable positions that had

20  significantly contributed to the Company's record reported results for the first half of fiscal 2007.

21  Defendant Mack and others ignored current market conditions, including the fact that the ABX

22  Index benchmark used by Morgan to value its CDS positions had declined 12% by the time

23  Defendants reported results for fiscal Second Quarter 2007, and they failed to disclose that the

24  Company faced material risks and losses relating to the subprime crisis and its $13.2 billion long

25  CDS position.

26      235.    During the Second Quarter 2007 earnings conference call held on June 20, 2007,

27  Defendant Sidwell made statements regarding Morgan's positions in the subprime mortgage

28  market. Sidwell opened the call by claiming that "concerns early in the quarter about whether

Amended Class Action Complaint                                                           - 63 -
Case No. CV08-963AG (FFMx)

1    issues in the sub prime market were going to spread dissipated." He also emphasized that the

2    record results achieved in Second Quarter 2007 reflected the execution of Defendants' "strategic

3    growth plans and strong trading performance." After reporting record income from continuing

4    operations of $2.6 billion and record EPS of $2.45 for Second Quarter 2007, Sidwell emphasized

5    Morgan's reported results for the Institutional Securities business segment and stated that the

6    "strength and diversity of our franchise was evident in the quarter."

7          236.     Defendant Sidwell further stated on the Second Quarter 2007 earnings conference

8    call that results from credit products had declined 24% from First Quarter 2007, which had included

9    "record securitized products revenues driven by favorable positioning in the sub prime mortgage

10    market." An analyst from Lehman Brothers specifically asked Defendant Sidwell whether the

11    Company's favorable hedging position in the mortgage area from First Quarter 2007 could be

12    compared or characterized for Second Quarter 2007, and whether the Company was "down just

13    more as a function of sort of a decline in activity in the market in some marks or was there sort of

14    negative positioning, i.e., betting the wrong way?" Sidwell responded vaguely that Morgan had

15    really benefitted from market conditions in subprime in First Quarter 2007 and "spreads didn't

16    really move a whole lot during the second quarter, so there were lower opportunities" and "we

17    certainly did not lose money in this business."

18          237.     On June 20, 2007, Deutsche Bank issued a research report, with analysts reiterating

19    their "Buy" rating and reporting that Morgan's reported Second Quarter 2007 EPS of $2.45 per

20    share was above the consensus of $2.01 due, among other things, to "record institutional securities."

21          238.     During the three-month period from when Morgan reported its First Quarter 2007

22    earnings results in March 2007 and when it reported its Second Quarter 2007 results in June 2007,

23    the Company's stock price increased approximately 16% from a close of $75.02 per share on March

24    19, 2007, to a close of $87.32 per share on June 20, 2007.

25          239.     On June 21, 2007, analysts at KBW issued a research report on Morgan, reporting

26    that the Company has strong Second Quarter 2007 results and EPS well ahead of the analysts'

27    estimate. The report also stated that the Company's Institutional Securities Group was an "out

28    performer" and focused on reported net revenues of a "record" $11.5 billion, which "handily" beat

1   analysts' estimates of $9.5 billion and had risen 32% from the same period in 2006. The analysts

2   noted that fixed income sales and trading were down 16% for the quarter compared to first quarter

3   2007, but that they were up 34% year-over-year. Based on the Company's reported Second Quarter

4   performance, the KBW analysts raised 2007 earnings estimates for Morgan from $8.15 to $8.79

5   "given the stronger than expected results" and reiterated its "Outperform" rating, which is their

6   highest core rating. The analysts also noted favorably that Morgan's reported results were excellent

7   relative to the reported performance of its peer companies such as Lehman Brothers, Goldman

8   Sachs and Bear Stearns.

9       240.   Defendants' statements and reported results for the quarter and six months ended

10  May 31, 2007, were materially false and misleading when made and omitted to disclose material

11  facts necessary to make the statements made not misleading because they failed to disclose the

12  following materially adverse facts that Defendants knew and deliberately and recklessly

13  disregarded:

14      (a)   The ABX Index for BBB.06-1 was the standard benchmark, and was used by
              Morgan Stanley to value its CDS positions, and this index had declined
15            approximately 12% between December 2006 and June 20, 2007;

16      (b)   Defendants were aware from their acquisition of Saxon and increased participation in
              mortgage origination and participation in the market that the subprime market had
17            deteriorated substantially in Second Quarter 2007 as mortgage companies filed for
              bankruptcy protection and reported significant losses as a result of increasing
18            borrower defaults, and mortgage foreclosures had risen and were continuing to rise
              and home prices were falling;
19
20      (c)   Defendants were aware that liquidity in the CDO market had tightened and that risks
              of catastrophic material losses arising from the Proprietary Trading Group's long
              CDS position had increased and likely would materialize;
21
22      (d)   RMBS related to subprime borrowers had experienced significant downgrades from
              the Ratings Agencies, and rising defaults had triggered repurchase obligations in
              agreements used to create RMBS;
23
24      (e)   Defendants had failed to implement adequate internal controls and risk management
              for its proprietary trading;
25      (f)   Defendant Sidwell failed to disclose the Company's subprime exposure and falsely
              implied that Morgan Stanley would continue to profit from any additional declines in
26            the value of subprime mortgages; and
27      (g)   Defendants failed to disclose that Morgan Stanley had in fact "bet the wrong way" on
              its subprime CDS position and was no longer favorably positioned, but instead stood
28

1

2

to lose billions of dollars from a single trading strategy that could and ultimately did wipe out a material percentage of the Company's annual income.

3

4

5

6

7

8

241.     On June 30, 2007, Morgan effected its previously-announced spin-off of its Discover Financial business, which caused analysts to reassess earnings estimates for the post-spin-off $5.4 billion reduction to the Company's book value.  Deutsche Bank analysts estimated that Morgan Stanley's shares would trade at approximately $69 per share, and they lowered estimated 2007 EPS from $8.52 to $8.39.  On July 2, 2007, Morgan Stanley's stock closed at $71.33, which was higher than analysts had estimated for the Company, excluding Discover Financial.

9

10

11

12

13

242.     On July 10, 2007 Morgan filed its Form 10-Q with the SEC for Second Quarter 2007.  In the Company's Form 10-Q for Second Quarter 2007, Defendants repeated the record financial results reported in Morgan Stanley's earnings release and further delineated the value of the Company's assets, including derivative contracts, which were stated at $56.5 billion, and corporate and other debt, which was stated at $167.8 billion.

14

15

16

17

18

19

20

21

22

23

24

25

243.     Defendant Sidwell signed, and Defendants Mack and Sidwell certified, the Second Quarter Form 10-Q as required under the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"). Defendants Mack and Sidwell each certified that the Company's SEC filings did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.  They further certified that the financial statements, and other financial information included in the SEC filings, fairly presented in all material respects the financial condition, results of operations and cash flows of the Company.  The statements contained in both Mack and Sidwell's certifications were materially false and misleading when made because they failed to disclose materially adverse facts relating to the Company's growing catastrophic subprime exposure and related lack of appropriate and necessary risk controls, which were known to Defendants Mack, Sidwell and Cruz and recklessly disregarded by them.

26

27

28

244.     While the Wall Street investment banks and companies with exposure to the mounting subprime crisis watched their stock prices fall precipitously, Morgan Stanley's stock price held steady at $70.46 on July 10, 2007, and ticked up to $72.40 on July 12, 2007, in response to the

1    Company's positive reports.

2      245.    KBW analysts further reported based on information released in the Company's

3 Second Quarter 2007 10-Q that Morgan Stanley's results have "reflected a constructive operating

4 environment" and that it had the "right leadership to make investments" and that the Company's

5 "results over the past few quarters are crystal clear validation of the successful turnaround story at

6 Morgan Stanley." As a discrete mark of success, the analysts emphasized that the Company's ROE

7 in institutional securities had increased to 34% in the first half of fiscal 2007, as compared to 22%

8 in 2004 and 31% in 2006. They further reported that the Company was well able to manage the

9 increased risk from more principal activities.

10      246.    In the Form 10-Q for Second Quarter 2007 and continuing throughout the Class

11 Period, Defendants repeatedly represented that financial instruments used in trading were recorded

12 at "fair value" and that a substantial percentage of the fair value of the Company's financial

13 instruments used for trading were based on "observable market prices, observable market

14 parameters, or is derived from such prices or parameters." The Company also reported that it had

15 adopted SFAS No. 157 on December 1, 2006, and that its assets and liabilities recorded at fair value

16 "have been categorized based upon a fair value hierarchy in accordance with SFAS No. 157."

17      247.    Additionally, the Form 10-Q for the Second Quarter 2007 incorporated language

18 from the Company's 2006 10-K which stated that "Company Control Groups…are all independent

19 of the Company's business units."

20      248.    Moreover, in the Form 10-Q for Second Quarter 2007, Defendants falsely

21 represented material risks in Morgan Stanley's management and risk reporting structure and related

22 internal controls. In the Second Quarter 10-Q, the Company disclosed its control processes for

23 fairly valuing assets as required by GAAP as follows:

24         *Fair Value Control Processes.* The Company employs control
processes to validate the fair value of its financial instruments,
25         including those derived from pricing models. These control processes
are designed to assure that the values used for financial reporting are
26         based on observable market prices or market-based parameters
wherever possible. In the event that market prices or parameters are
27         not available, the control processes are designed to assure that the
valuation approach utilized is appropriate and consistently applied
28         and that the assumptions are reasonable. These control processes

include reviews of the pricing model's theoretical soundness and appropriateness by Company personnel with relevant expertise who are independent from the trading desks. Additionally, **groups independent from the trading divisions within the Financial Control and Market Risk Departments participate in the review and validation of the fair values generated from pricing models, as appropriate**. Where a pricing model is used to determine fair value, recently executed comparable transactions and other observable market data are considered for purposes of validating assumptions underlying the model. (Emphasis added).

249.    Defendants' statements regarding the Morgan Stanley's risk controls and processes were materially false and misleading when made and omitted to disclose material facts necessary to make the statements made not misleading because, as Defendant Mack admitted on December 19, 2007, the Company was negligent in implementing internal controls as appropriate and necessary to manage the increased level of risk Defendants had knowingly and deliberately created. Following the announcement of the Company's staggering $9.4 billion in write-downs, Defendant Mack admitted that, in conducting stress analyses of the Company's subprime positions, it is "fair to say that our risk management division did not stress those losses well."

250.    Morgan Stanley's internal controls and risk management were not what the Company purported them to be as Mack admitted in the Company's December 19, 2007 earnings call "in the past, the way it was run that risk monitoring and risk management reported in to the President of ISG [Institutional Securities Group]…I think the right reporting line is not to the business unit head or the division head, but someone totally independent who reports directly to me…."

251.    Zoe Cruz was the President of Morgan Stanley's Institutional Securities Group, and, therefore, she controlled risk monitoring and risk management with respect to the Company's Institutional Securities trading, and specifically its CDS positions.   At least by early July 2007, Cruz was aware that market influences impacting the Company's CDS positions had materially deteriorated and that Morgan Stanley stood to lose billion of dollars as a result of the Proprietary Trading Group's "guess the wrong way" on the CDS trade he had executed in late 2006.

252.    Defendants' statements and reported results for the quarter and six months ended May 31, 2007, as set forth in the Second Quarter 2007 From 10-Q were materially false and

1  misleading when made and omitted to disclose material facts necessary to make the statements

2  made not misleading because they failed to disclose materially adverse facts that Defendants knew

3  and deliberately and recklessly disregarded as set forth above in ¶ 240.  Defendants' statements

4  further were materially false and misleading because they knowingly and recklessly failed to

5  disclose the Company's massive subprime exposure and the deteriorating subprime market and

6  further decline in the ABX Index, which had declined approximately 17% between December 2006

7  and July 10, 2007 when the Second Quarter 2007 Form 10-Q was filed.

8            **C.**     <u>**Defendants Manipulate Morgan Stanley's Reported Financial Results for Third Quarter 2007**</u>

9

10         253.     On September 19, 2007, Morgan Stanley reported its financial results for Third

Quarter of fiscal 2007 (June 2007 through August 2007).  Defendants held an earnings conference

11  the same day and reported income from continuing operations of $1.5 billion for the three months

12  ended August 31, 2007, which was a decrease of 7% from the third quarter of 2006, and EPS from

13  continuing operations of $1.38.  Morgan Stanley also reported net revenues of $8.0 billion for its

14  fiscal Third Quarter 2007, which was an increase of 13% from the third quarter of 2006.   The

15  Company also reported net revenues of $5.0 billion for its Institutional Securities Group, which was

16  a 2% increase over third quarter 2006, although "down from the record second quarter." Pretax

17  income for the Institutional Securities Group in Third Quarter 2007 was reported at $1.5 billion,

18  which was down 22% from third quarter 2006.

19         254.     In addition, Morgan Stanley reported that fixed income sales and trading revenues in

20  the amount of $2.2 billion had decreased 3 percent from third quarter 2006. The Company attributed

21  the decrease to "significantly lower credit revenues as spread widening, lower liquidity and higher

22  volatility resulted in lower origination, securitization and trading results across most products."

23         255.     For the first nine months of fiscal 2007, Morgan Stanley reported income from

24  continuing operations of $6.2 billion, which was a 41% increase over the same period in 2006.

25  Defendants reported EPS from continuing operations at a record $5.79 and net revenues of a record

26  $28.5 billion, which was a 29% increase over the same period in 2006.

27         256.     In the earnings release, Defendant Mack stated that "Morgan Stanley's

28

1    diversification across businesses and regions helped us deliver ROE of 17.2% this quarter, despite

2    the impact of the severe market disruption on some areas of the Firm….Even with these turbulent

3    markets, Morgan Stanley still delivered strong performances across many core businesses….In

4    addition, we continued making progress in executing our growth plans….As always, the people of

5    Morgan Stanley remain intensely focused on helping our clients navigate the constantly changing

6    markets and seizing the opportunities they offer our clients and the Firm.  In the months ahead, we

7    will continue to leverage our diverse, global franchise to create value for our clients and

8    shareholders."

9        257.    On the earnings conference call for Third Quarter 2007, Defendant Sidwell falsely

10   stated that "[t]he disclosure provides our assets and liabilities that are recorded at fair value."

11   Defendant Kelleher also falsely stated that "our risk measurement systems performed very well."

12   During the call Sidwell also stated that "our valuation models are calibrated to the market on a

13   frequent basis.  The parameters and inputs are adjusted for assumptions about risk, and in all cases

14   if market data exists, that data will be used to price the assets or liabilities.  The valuation of these

15   instruments are reviewed by an independent valuation group outside of the business units, and

16   subject to the scrutiny of our auditors.  So we are confident that we have appropriately valued these

17   positions."

18       258.    In the third quarter earnings release and the September 19, conference call,

19   Defendants deliberately and recklessly failed to disclose that Morgan Stanley's assets and liabilities

20   related to its CDS positions were not recorded at fair value as required by GAAP.  By overstating

21   the Company's assets and understating liabilities, Defendants also knowingly and recklessly

22   overstated Morgan Stanley's income and EPS.  By continuing to report gains from its bearish

23   subprime CDO bet and failing to report losses from its bet the wrong way on its $13.2 billion long

24   CDS position, Defendants knowingly and recklessly presented an overall impression that was not

25   consistent with the business realities of the Company's financial position and operations.

26       259.    By the end of its Third Quarter 2007, Defendants knew and deliberately and

27   recklessly failed to disclose that Morgan Stanley was facing cataclysmic losses on its CDS

28   positions, which Zoe Cruz, according to her own account, had unsuccessfully ordered the

1    Proprietary Trading Group to eliminate in July 2007.

2         260.    Defendants knew and deliberately disregarded that the proper way to measure the

3    fair value of the Company's CDS positions was by reference to a key ABX index benchmark (BBB

4    06-1) and other ABX indices that Defendants had been using to value the Company's CDS

5    positions since the Proprietary Trading Group's initial trade. During Morgan Stanley's fiscal Third

6    Quarter 2007, the BBB 06-1 index reflected a 32.8% decline (from 94.5 on May 31, 2007; to 63.5

7    on August 31, 2007).

8         261.    Without any related disclosures, Defendants knowingly and recklessly failed to

9    record losses on Morgan Stanley's CDS positions commensurate with the decline in their

10   benchmark ABX index as required to state the assets and liabilities at fair value in accordance with

11   GAAP. Defendants should have recorded losses on Morgan Stanley's $13.2 billion CDS long

12   position by 32.8%, which amounts to a $4.4 billion loss on this position, at the end of fiscal Third

13   Quarter 2007.

14        262.    Defendants failed to fully recognize this loss in the Third Quarter of 2007, as

15   required by GAAP. Instead, Defendants deliberately manipulated Morgan Stanley's financial

16   statements by understating the losses on its CDS positions by $2.5 billion, recognizing only $1.9

17   billion of the $4.4 billion loss on the CDS long position. Defendants also recognized $1.1 billion in

18   losses on other subprime-related ABS CDO bond positions for the fiscal Third Quarter 2007, but

19   they deliberately did not disclose the nature or total gross amount ($3.0 billion) of recognized

20   subprime losses, or that Morgan Stanley had additional, potentially catastrophic, exposure to

21   subprime losses until November 7, 2007. Because of Defendants' failure to record losses on

22   Morgan's CDS positions to reflect their fair value at the end of Third Quarter 2007, the Company's

23   assets, trading revenue, income and earnings were materially overstated and liabilities understated,

24   and its risk and exposure to the unprecedented subprime crisis were knowingly concealed.  The

25   additional recorded losses on the $13.2 billion CDS position, if recognized, would have caused

26   Morgan Stanley to report a pre-tax loss of approximately ($300 million), instead of the falsely

27   reported pre-tax income of $2.3 billion for fiscal Third Quarter 2007.

28        263.    As set forth above, in the Third Quarter 2007, the Company reported EPS of $1.38

Amended Class Action Complaint                                                                          - 71 -
Case No. CV08-963AG (FFMx)

1    per share, in line with the low end of analysts' projections.  However, the Company failed the meet

2    the consensus estimate of $1.54 EPS per share.  On news of the Company's earnings and Third

3    Quarter 2007 performance, Morgan Stanley's stock price closed on September 19, 2007 at $67.03,

4    which was slightly down from the prior day's close of $68.51.

5         264.    During the September 19, 2007, conference call, Kelleher stated "we remain

6    exposed to risk exposures through a number of instruments [including] CDOs. . . We believe it will

7    take at least a quarter or two for the credit markets to return to a more normal extension of credit

8    and provision liquidity. . . ." He then added "we believe turbulent times like this are an opportunity

9    for Morgan Stanley to distinguish itself and outpace our peers."

10        265.    What Defendants failed to disclose is that Morgan Stanley had distinguished itself

11   from its Wall Street peers because Defendants had cooked the Company's books.  By quietly

12   ignoring significant observable Level 2 inputs and using subjective unobservable Level 3 inputs,

13   Defendants improperly disassociated the value of the Company's $13.2 billion long CDS position

14   from the decline in the ABX Index, and Morgan Stanley fraudulently avoided recognition of at least

15   $2.5 billion of losses in Third Quarter 2007.  Regarding the shift from Level 2 to Level 3 inputs,

16   Defendant Sidwell, during the earnings conference call, stated only that "Given the third quarter

17   market dynamics, more instruments have become illiquid, and as you expect, the level of financial

18   assets categorized in Level 3, which is the most illiquid category, have increased." He failed to

19   report that use of these inputs to value the assets and liabilities related to the CDS position was a

20   mechanism employed by Defendants to avoid recording them at fair value as required by GAAP.

21        266.    Defendants' statements and reported results for the Third Quarter and first nine

22   months ended August 31, 2007, were materially false and misleading when made and omitted to

23   disclose material facts necessary to make the statements made not misleading because they failed to

24   disclose the following materially adverse facts that Defendants knew and deliberately and recklessly

25   disregarded:

26        (a)    The ABX Index for BBB.06-1 was the benchmark used by Morgan Stanley to value
                 its CDS positions, and this index had declined 32.8% during Third Quarter 2007;

27

28        (b)    Defendants were aware from their acquisition of Saxon and increased participation in
                 mortgage origination and participation in the market that the subprime market had

Amended Class Action Complaint                                                    - 72 -
Case No. CV08-963AG (FFMx)

deteriorated substantially in Third Quarter 2007 as the Ratings Agencies substantially and dramatically downgraded RMBS and ABS CDOs as mortgage companies and mortgage insurers had filed for bankruptcy protection or ceased paying and borrower defaults and mortgage foreclosures continued to rise to epidemic levels;

(c)  Defendants were aware that liquidity in the CDO market had tightened and that risks of catastrophic material losses arising from the Proprietary Trading Group's $13.2 billion long CDS position had increased and likely would materialize;

(d)  RMBS related to subprime borrowers had experienced significant downgrades from the Ratings Agencies, and rising defaults had triggered repurchase obligations in agreements used to create RMBS;

(e)  Defendants had failed to implement adequate internal controls and risk management for its proprietary trading, and Morgan Stanley's risk measurement systems had not performed well;

(f)  Defendants Sidwell and Kelleher failed to disclose the Company's subprime exposure and falsely implied that Morgan Stanley would continue to profit from any additional declines in the value of subprime mortgages;

(g)  Defendants failed to disclose that the Company was no longer favorably positioned, but instead stood to lose billions of dollars from a single trading strategy that could and ultimately did wipe out a material percentage of the Company's annual income; and

(h)  Morgan Stanley's CDS positions were not recorded at fair value, and Defendants subjectively valued the CDS positions using Level 3 inputs and ignored observable Level 2 inputs to manipulate the Company's reported financial results and overstate income by $2.5 billion.

267.  On October 10, 2007, Morgan Stanley filed with the SEC its quarterly report on Form 10-Q for Third Quarter 2007. In the financial statements reported in this Form 10-Q, Defendants failed to properly record and report losses on the Company's CDS positions as required to state them at fair value in accordance with GAAP. In the Form 10-Q, Defendants falsely indicated that "[t]he Company's financial instruments owned and financial instruments sold, not yet purchased are recorded at fair value."

268.  Because Defendants knowingly and recklessly failed to record losses on Morgan Stanley's CDS positions to fair value in the Third Quarter as required by GAAP, the Form 10-Q overstates the Company's assets, trading revenues, net revenue, net income and income from the Institutional Securities business segment for Third Quarter 2007 and understates the Company's liabilities. Defendants deliberately manipulated Morgan Stanley's financial statements and shifted from Level 2 inputs to Level 3 inputs in valuing the CDS positions to overstate the value of these

1   positions by at least $2.5 billion.  As a result, the Company reported income of $2.3 billion for the

2   quarter, instead of the actual ($300 million) loss.

3          269.     Defendants not only concealed Morgan's unrecognized losses from its CDS

4   positions, but also they concealed the nature of the Company's recognized losses, as well as Morgan

5   Stanley's substantial exposure to the unprecedented subprime crisis.

6              In the Form 10-Q, the Company expressly reported that its financial
               statements are prepared in accordance with GAAP and stated that the
7              "Company believes that the estimates utilized in the preparation of the
               condensed consolidated financial statements are prudent and reasonable."
8              Defendants also made extensive "Fair Value Disclosures" and reported that
               the Company had adopted SFAS 157, which requires the Company's assets
9              and liabilities to be "measured at fair value."  The Company also described
               the "framework" for measuring fair value and how its assets and liabilities
10             "recorded at fair value have been categorized based upon the fair value
               hierarchy in accordance with SFAS No. 157."
11
          270.     Defendants failed to disclose that they had deliberately ignored observable inputs for
12
    the CDS positions.  It also was unclear from Morgan Stanley's disclosures that the Company had
13
    undertaken an excessive amount of risk from its subprime mortgage-related exposures.  The Form
14
    10-Q had scant references to its subprime-related exposure and failed to reflect that the Company
15
    recognized $3.0 billion in losses on its subprime-related CDS positions during Third Quarter 2007.
16
    Moreover, Defendants further failed to disclose that Morgan Stanley's proprietary trading desk had
17
    employed a subprime-related speculative trading strategy that exposed the Company to $10.4 billion
18
    in potential losses.
19
          271.     Under Regulation S-K, Morgan's Management Discussion and Analysis ("MD&A")
20
    was required to include a disclosure about "known trends or uncertainties" reasonably expected to
21
    have a materially unfavorable impact on income from continuing operations.  At least by August
22
    2007, Defendants were unable to reduce Morgan Stanley's subprime CDO-related exposure.  As of
23
    August 31, 2007, the ABX.HE.BBB 06-1 had declined to 63.50, and by the time the Company filed
24
    its Form 10-Q on October 10, 2007, this index had dropped to 61.00.  In the Form 10-Q, the
25
    Company should have disclosed that a write-down was necessary in the Third Quarter because of
26
    the dramatic downward turn in the value of the CDS positions as reflected by the decline in the
27
    ABX index, as well as market limitations on Defendants' ability to eliminate the subprime CDO-
28

Amended Class Action Complaint                                                          - 74 -
Case No. CV08-963AG (FFMx)

1    related positions.

2        272.    The limited references to the word "subprime" were buried in the Company's

3    MD&A disclosures. Notwithstanding the SEC's request on August 30, 2007, for Morgan Stanley to

4    provide more clarity regarding the Company's subprime exposure, Defendants limited their

5    disclosures to general market conditions, as follows:

6            Total sales and trading revenues decreased 16% in the quarter ended August
             31, 2007 from the comparable period of fiscal 2006. Sales and trading
7            revenues were adversely affected by the difficult market conditions that
             existed during the quarter ended August 31, 2007. The credit markets
8            deteriorated considerably over the course of the quarter with increased
             volatility, significant spread widening, lower levels of liquidity and reduced
9            price transparency. These factors affected the leveraged lending markets, the
             effectiveness of hedging strategies, **subprime** mortgage markets, including
10           the market for collateralized debt obligations, and other structured credit
             product markets. This credit environment significantly impacted the
11           Company's corporate lending and credit sales and trading activities. In
             addition, such conditions contributed to increased volatility and deleveraging
12           in the equity markets, which affected the Company's quantitative trading
             strategies. (emphasis added).

13
         273.    Defendants Mack and Sidwell certified the Company's financial statements and
14
     internal controls as required by the Sarbanes-Oxley Act of 2002, falsely representing, as follows:
15
             this report does not contain any untrue statement of a material fact or omit to
16           state a material fact necessary to make the statements made, in light of the
             circumstances under which such statements were made, not misleading with
17           respect to the period covered by this report; 3. Based on my knowledge, the
             financial statements, and other financial information included in this report,
18           fairly present in all material respects the financial condition, results of
             operations and cash flows of the registrant as of, and for, the periods
19           presented in this report...

20       274.    The Form 10-Q for the Third Quarter 2007 also contained false statements regarding

21   the independence of the Company's control groups from its business segments as set forth above in

22   ¶¶ 247 and 248.

23       275.    The Form 10-Q for Third Quarter 2007 also falsely stated in relevant part that

24   "disclosure controls and procedures were effective as of the end of the period covered by this

25   report." This statement was materially false and misleading because Morgan Stanley's disclosure

26   controls and procedures were not effective, and investors and shareholders could not have gleaned

27   from any reported information that the Defendants had engaged in ineffective risk controls that

28   caused $5.5 billion in recognized and unrecognized losses and created $10.4 billion in subprime-

1 | related exposures from undisclosed high-risk CDS positions.

2 |         276.    In the Third Quarter 2007 Form 10-Q, Defendants also disclosed that access to

3 | "global sources of financing" was imperative to Morgan Stanley's ability to conduct business

4 | because the Company relied on "external sources to finance a significant portion of its day-to-day

5 | operations."   The Company reported that the "cost and availability of unsecured financings

6 | generally are dependent on the Company's short-term and long-term credit ratings." After reporting

7 | that a one-notch downgrade by Moody's or S&P would trigger obligations to deliver $588 million

8 | in additional collateral to counterparties, Defendants emphasized in that in Third Quarter 2007,

9 | "[o]n July 30, 2007, Standard & Poor's upgraded the Company's commercial paper rating from

10 | A1+ and upgraded the Company's Senior debt rating from A+ to AA-." Defendants never reported

11 | that downgrades were imminent or that S&P and Moody's had downgraded numerous sub-prime

12 | RMBS and ABS CDOs during Third Quarter 2007, which Defendants knew or recklessly

13 | disregarded because Morgan Stanley's research analysts had issued a report on the downgrades in

14 | the CDO markets on July 16, 2007.

15 |         277.    Defendants' statements and reported results in the Form 10-Q for Third Quarter and

16 | first nine months ended August 31, 2007, were further materially false and misleading when made

17 | and omitted to disclose material facts necessary to make the statements made not misleading

18 | because they failed to disclose the following materially adverse facts that Defendants knew and

19 | deliberately and recklessly disregarded as set forth above in ¶¶ 258-262 and 265-266.

20 |         278.    Defendants' materially false and misleading statements and omissions in Morgan's

21 | Third Quarter 2007 Form 10-Q are further demonstrated by Defendant Kelleher's February 1, 2008

22 | letter to the SEC explaining the valuation of the Company's subprime positions.  As part of the

23 | SEC's ongoing inquiry into Morgan's subprime exposure and related disclosures, on January 3,

24 | 2008, the SEC requested additional information from Defendants regarding the MD&A disclosures

25 | in the Third Quarter 2007 10-Q, as follows:

26 |       We note in your Form 10–Q for August 31, 2007 you disclose in the MD&A that the
      US economy was experiencing signs of slowing during the third quarter 2007,
27 |       primarily reflecting difficult conditions in the residential real estate and credit
      markets and that concerns about the impact of subprime loans caused the broader
28 |

credit markets to deteriorate considerably over the quarter. In light of the economic slowing in the
residential real estate and credit markets and your impairment of trading portfolio that included real estate securities, tell us how you determined that there were no decreases in fair value of your US subprime related balance sheet exposures during the third quarter 2007.

279.   In Kelleher's response to the SEC, he stated the following:

The Company's primary exposure to the U.S. subprime market is associated with "super senior" credit default swaps that reference synthetic asset backed security ("ABS") collateralized debt obligations ("CDOs") that themselves hold or are referenced to "mezzanine" collateral with ratings of BBB+, BBB, or BBB−....One of the key proxies for the move in the fair value of the Company's super senior credit default swaps is the ABX BBB index....During the third quarter of 2007, the ABX BBB indices, on average, declined by 50%.

280.   Kelleher admitted that Defendants' relevant benchmark ABX indices for the $13.2 billion long CDS position had declined, on average, by **50%**, which further demonstrates that Defendants knowingly and recklessly ignored the "key proxies" for valuing this CDS position and reduced it by a mere 14% to manipulate Morgan's reported financial results for Third Quarter 2007. If Defendants had properly valued the $13.2 long CDS at fair value and recorded losses commensurate with the decline in the ABX indices, then the Company would have recorded at least ($2.5 billion) more in losses in Third Quarter 2007, which were not offset by gains on other U.S. subprime positions as Kelleher erroneously indicated to the SEC.

## IX.   PARTIAL DISCLOSURES AND ADDITIONAL FALSE STATEMENTS

281.   Amid the flurry of subprime write-downs by competing investment banks, Morgan Stanley presented itself as a Company that had deftly maneuvered through the subprime crisis and made the right bets, *i.e.*, against subprime.  These representations had allowed Morgan, as against its peer Wall Street banks, to secure higher credit ratings, including ratings upgrades on July 30, 2007 from Standard & Poor's, and to secure "Buy" recommendations on its stock from securities analysts.

282.   Defendants, however, were concealing a massive secret from shareholders and the investing public, which Morgan Stanley was finally forced to partially disclose on November 7, 2007.  Because of the deteriorating subprime markets, and the size of the high-risk proprietary trading positions entered by the Proprietary Trading Group and approved by Cruz and others,