1   Morgan Stanley had "bet the wrong way" and consequently had amassed a huge undisclosed

2   exposure to subprime assets in a CDS position that could not be unwound.  Speculation about

3   potential losses at Morgan due to undisclosed subprime exposure had filtered into the market

4   shortly after Hubler's firing but the nature or scope of these losses were largely unknown because

5   Defendants had intentionally buried or manipulated losses from the CDS positions and related

6   subprime exposures and trading losses in Morgan Stanley's financial reports and earnings releases.

7           283.    On the morning of November 7, 2007, the Wall Street Journal, in an article titled,

8   "Storm May Hit Morgan Stanley After Its Calm --- Write-Downs Projected By Two Analysts,"

9   reported that two analysts were projecting write-downs from Morgan Stanley purportedly based on

10  an "educated guess." According to the article:

> Of all the blue-chip Wall Street securities firms, Morgan Stanley seemed one of the least likely to get thumped by the subprime- mortgage crisis. The firm is a bit player in underwriting the securities known as collateralized-debt obligations that have rocked Merrill Lynch, Citigroup and others, ranking a distant No. 10. So why are some on Wall Street starting to sweat about Morgan Stanley's exposure to this business? Two analysts are projecting the firm may take a fourth-quarter write-down of $3 billion to $6 billion. The estimates by analysts David Trone of Fox-Pitt, Kelton and Mike Mayo of Deutsche Bank AG contributed to Morgan Stanley stock's falling $1.08, or 1.94%, yesterday in New York Stock Exchange trading to $54.51 a share. Mr. Trone projected the possible write-downs at $4 billion to $6 billion, Mr. Mayo $3 billion to $4 billion. While the firm may not have underwritten as many CDOs, which are securities backed by pools of assets such as mortgages, Morgan Stanley may have been involved in transactions with other firms that left it with exposure to CDO risks, market participants say. Such proprietary trading with the firm's own money already cost the firm $480 million on money-losing quantitative stock trading in the third quarter, with $390 million in losses occurring on a single day in August, according to regulatory filings.  Asked by a CNBC reporter Monday about possible fourth-quarter write-downs, Morgan Stanley Chief Executive John Mack indicated he expected numerous firms would report such hits because market prices have declined. But he wouldn't address specifics about Morgan Stanley.

        284.    On November 7, 2007, after the close of the U.S. markets, Morgan Stanley shocked

investors by announcing that the Company had massive exposures to U.S. subprime positions on its

balance sheet that would cause it to suffer billions in losses for the fourth quarter of 2007.  Vaguely

attributing these losses to "ABS-CDO related positions," Morgan Stanley issued a press release on

November 7, 2007, as follows:

> Morgan Stanley (NYSE: MS) today provided additional  information about the Firm's U.S. subprime related exposures, which have declined in value as a result of continued market deterioration since August 2007.

1   At the end of Morgan Stanley's fiscal third quarter on August 31, 2007, the Firm had
2   $12.3 billion in U.S. subprime related balance sheet exposures representing $10.4
    billion in net exposures, as indicated in the attached table. Net exposure as of
3   October 31, 2007 is $6.0 billion.  Net exposures are defined as potential loss to the
    firm in a 100 percent loss default scenario, with zero recovery.

4   Since that time, the fair value of these exposures has declined as a result of the
    continued deterioration in market data, as reflected by the sharp decline in the ABX
5   Indices, and other market developments, including updates to mortgage remittance
    data and cumulative loss forecasts. The declines in value are outlined in the attached
6   table as of August 31, 2007 and October 31, 2007.

7   As a result of these declines in value, Morgan Stanley's revenues for the two months
    ended October 31, 2007, were reduced by $3.7 billion (representing a decline of
8   approximately $2.5 billion in net income on an after-tax basis).  The actual impact on
    the Firm's fourth quarter financial results, which will include results for the month of
9   November, will depend on future market developments and could differ from the
    amounts noted.

10
    While these writedowns will negatively impact the fourth quarter results in the
11  Firm's fixed income business, Morgan Stanley expects to deliver solid results in each
    of its other businesses, including Investment Banking, Equities, Global Wealth
12  Management and Asset Management – subject to market conditions through the end
    of the year.

13
    Valuation of Subprime Exposures
14
    In determining the fair value of the Firm's ABSCDO-related exposures—which
15  represent the most senior tranches of the capital structure of subprime ABS CDOs—
    Morgan Stanley took into consideration observable data for relevant benchmark
16  instruments in synthetic subprime markets. Deterioration of value in the benchmark
    instruments as well as the market developments referred to earlier have led to
17  significant declines in the estimates of fair value.  These declines reflect increases in
    implied cumulative losses across this portfolio.  These loss levels are consistent with
18  the cumulative losses implied by ABX Indices in the range between 11-19 percent.
    At a severity rate of 50 percent, these levels of cumulative loss imply defaults in the
19  range of 40-50 percent of outstanding mortgages for 2005 and 2006 vintages.

20  In calculating the fair value of the Firm's U.S. subprime mortgage related exposures -
    including loans, total rate-of-return swaps, ABS bonds (including subprime
21  residuals) and ABS CDS - Morgan Stanley took into consideration observable
    transactions, the continued deterioration in market conditions, as reflected by the
22  sharp decline in the ABX Indices, and other market developments, including updated
    cumulative loss data. The fair value of the ABS Bonds declined significantly, which
23  was driven by increases in implied cumulative loss rates applied to subprime
    residuals at levels consistent with those implied by current market indicators.
24
    It is expected that market conditions will continue to evolve, and that the fair value of
25  these exposures will frequently change and could further deteriorate. Given these
    anticipated fluctuations, Morgan Stanley does not intend to update this information
26  until it announces its fourth quarter 2007 earnings in December 2007. Investors also
    should not expect the Company to provide information about the results of future
27  quarters in advance of scheduled quarterly earnings announcement dates.

28       285.    The earnings warning released by the Company on November 7, 2007 was

Amended Class Action Complaint                                                    - 79 -
Case No. CV08-963AG (FFMx)

followed-up by a Form 8-K filing with the SEC the next day on November 8, 2007, with the

following explanation:

> On November 7, 2007, Morgan Stanley ("the Company") issued a press release announcing significant declines since August 31, 2007 in the fair value of its U.S. subprime related exposures as a result of the continued deterioration in the market and other market developments. As of August 31, 2007, the Company had $12.3 billion in U.S. subprime related balance sheet exposures representing $10.4 billion in net exposures. Net exposure as of October 31, 2007 was $6.0 billion. Net exposures are defined as potential loss to the Company in a 100 percent loss default scenario, with zero recovery. As a result of the decline in the fair value of these exposures, the Company has determined that the reduction in revenues for the two months ended October 31, 2007 attributable to the decline was $3.7 billion (representing a decline of approximately $2.5 billion in net income on an after-tax basis). The impact on the Company's fourth quarter financial results from changes in the fair value of these exposures will depend on future market developments and could differ materially from the amounts noted. It is expected that market conditions will continue to evolve, and that the fair value of these exposures will frequently change and could further deteriorate.

286.    Contemporaneously with the release of its press releases on November 7, 2007, Defendant Kelleher, Morgan Stanley's recently appointed Chief Financial Officer convened analysts on a conference call to attempt to explain how Morgan had suddenly "discovered" these massive U.S. subprime exposures. During the call, Kelleher falsely stated that "as a result of the rigorous processes we have in place, **the [marks] we took back in August appropriately reflected fair value at that time.**" (Emphasis added). Kelleher, however, admitted to analysts that Morgan Stanley's subprime exposure could, in no way, be determined from the Company's previous financial disclosures. Asked by one analyst from Merrill Lynch, "Colm, if we had wanted to find these exposures in your second quarter Q and we looked at the VIE asset and maximum exposure to loss data on page 28 and 29 of the Q would have them within the mortgage and asset backed securitization of the structured transactions categories or am I kind of looking in the wrong place?" In response, Kelleher responded, "Well, no, I mean, it's all over the place." Kelleher could not identify anywhere in the previously filed Form 10-Qs in which investors could look to understand these exposures.

287.    In response to the initial rumors and then the press release regarding Morgan Stanley's subprime exposures and resulting losses, the Company's stock dropped approximately 8% from a close of $55.59 on November 5, 2007, to a close of $51.19 on November 7, 2007, which

1   was a 52-week low.

2       288.   On November 8, 2007, Moody's assigned a negative outlook to the senior debt

3   ratings of Morgan Stanley, stating: "The size of the writedown substantially exceeds Moody's prior

4   expectations given Morgan Stanley's limited role in CDO underwriting and conservative risk

5   culture, which should have naturally limited its long exposure. This also raises questions regarding

6   the effectiveness of Morgan Stanley's trading risk management, which has been viewed as an

7   important strength underpinning the Aa3 rating."

8       289.   Moody's further reported on November 8, 2007, that "Morgan Stanley must manage

9   a fine balance between its ability, given its capital and liquidity, to warehouse these positions and

10   the risks that holding this concentrated position would entail. A further write-down that reduces net

11   income by greater than $1 billion would be viewed by Moody's as an indication that risk appetite

12   was higher than anticipated, and would lead to further negative pressure on the rating."

13       290.   On November 9, 2007, the *Financial Times* reported on Morgan Stanley's multi-

14   billion-dollar subprime write-down as follows:

15         The [Morgan Stanley] traders had a good idea at the time. Back in December
16         [2006] there were signs that serious problems were developing among U.S
            subprime mortgage borrowers, but the prices of securities based on such
17         loans were holding up well. So they placed a big bet on a fall in those prices.
            To do so, they bought insurance against problems with the mortgage-backed
18         securities in the form of credit default swaps. The value of these would rise
            if the outlook for the securities deteriorated.

19         To help fund this bet, the [Morgan Stanley] traders also took on billions of
            dollars of exposure to the "super senior" tranches of collateralized debt
20         obligations. These are instruments composed of mortgage-backed securities
            divided into slices with varying yields and risks. The top AAA-rated
21         tranches were seen as being very safe, because any likely losses on the
            underlying securities would be absorbed by investors in the lower tranches.
22         Nevertheless, the senior trances offered a good yield which helped offset the
            cost of the bet.
23

24         The value of mortgage-backed securities fell so far it ate into the cushion
            under the super senior tranches and the started to fall. At one point in the
            summer, the impact on the CDO tranches started to outweigh the rise on the
25         CDS positions. "It went from a structurally short position to a structurally
            long position," said Colm Kelleher, Morgan Stanley's chief financial officer.
26

27       291.   The ABX index was falling precipitously as early as July 2007, which plainly

28   demonstrates that Kelleher's claim set forth above in ¶ 286 that Morgan Stanley's ABS positions

---

Amended Class Action Complaint                        - 81 -
Case No. CV08-963AG (FFMx)

1   were marked-to-market in August 2007 was materially false and misleading.   The partial

2   disclosures made by the Company on November 7 and 8, 2007, continued to mask the massive

3   subprime exposure that the Company's Proprietary Trading desk had created for Morgan Stanley.

4       292.   During the conference call on November 7, 2007, for the first time, Kelleher

5   disclosed that illiquidity in the market was limiting Defendants' ability to get out of positions in the

6   subprime class. He attributed the decline in the valuation of the subprime-related assets to a "sharp"

7   decline in the ABX indices, but he knowingly and recklessly continued to conceal the fact that this

8   same ABX index had declined in Third Quarter 2007 and that Defendants had deliberately failed to

9   value the CDS position at fair value at the end of Third Quarter.   To the contrary, Defendant

10   Kelleher falsely stated that the "marks we took back in August appropriately reflected fair value at

11   that time."

12       293.   On November 13, 2007, Defendants Cruz and Kelleher participated in a presentation

13   at the Merrill Lynch Banking and Financial Services Investor Conference.   Defendant Kelleher

14   fielded questions from investors regarding Morgan's recently-disclosed multi-billion-dollar losses,

15   and in emphasizing the need for full disclosure to reduce any uncertainty arising from fair value

16   accounting, he stated as follows:

17       Level 3 assets have always been there, it's just that we recapitalized them according
    to fair value. What you have to do is look at what makes up those balances and then

18       focus. I think what we did last week with the disclosure we made was to give you a
    lot of insight into what made up some of those balances in the derivatives part of our

19       disclosure at the end of 3Q. I think that's the only way you address this issue.

20               ***

21       I have consistently said the fact that we reduced our position proves to the robustness
    of the risk management model because we addressed that issue rather than rolling the

22       dice that some people do....On the second trade, we actually had a risk management
    model that told us what was happening because I think, as I explained last week, the

23       nature of the trade itself was changing because basically our [ ] money positions were
    rapidly becoming into the money, and our risk management systems were alerting us

24       to the fact what we thought was a structural short trade evolved into a flat trade,
    evolved into us being wrong, coinciding with a market where there was no liquidity

25       to get out. I think there were a few things we've learned from that trade in terms of
    looking back on it. And obviously, we will address those issues accordingly in our

26       risk management model and within the firm itself....I don't think that our risk
    management models upfront would have pointed out what was happening on these

27       trades. These were incredibly stressed markets...

28

294.    Kelleher's comments deliberately gave the false impression that Morgan's losses from the trade were fully disclosed and in the past. He also materially misrepresented the nature and timing of information from stress tests (ordered by Cruz) that were known to Defendants regarding the Company's high-risk bet on subprime and the fact that Defendants knew or recklessly disregarded that the Proprietary Trading Group had "bet the wrong way" on a $13.2 billion subprime CDS position. Kelleher also falsely stated that Defendants had not rolled the dice, when, according to several news reports, Defendants had opportunities to cut their positions, but they did not do so because they did not like price quotes that were being given by counterparties to unwind the CDS position. In fact, according to an article by John Macaskill in *IFR*, Risk Officers to the Fore, dated April 12, 2008, Defendants passed on opportunities to unwind the position during the Class Period that would have limited Morgan's losses to $1 billion. Kelleher also failed to acknowledge that Cruz was worried as early as May of 2007, while Daula claims he sounded alarms regarding debilitated systems and models by no later than August 2007.

295.    Defendants' statements in the November 7, 2007, press release and conference call were materially false and misleading when made and omitted to disclose material facts necessary to make the statements made not misleading because they failed to disclose the following materially adverse facts that Defendants knew and deliberately and recklessly disregarded:

(a)    Defendants were aware that liquidity in the CDO market had tightened and that risks of catastrophic material losses arising from the Proprietary Trading Group's CDS position had increased and further material losses likely would materialize in Fourth Quarter 2007;

(b)    Defendants had failed to implement adequate internal controls and risk management for its proprietary trading, and Morgan Stanley's risk measurement systems had not performed well;

(c)    Defendants failed to disclose adequately the Company's subprime exposure from unrecognized losses in Third Quarter 2007 and that additional mark-to-market losses were needed to catch up for losses unrecorded in the previous 11 months of fiscal 2007;

(d)    Defendants failed to disclose that the Company was positioned to record billions of dollars in more losses from a single trading strategy that could and ultimately did wipe out a material percentage of the Company's annual income and trigger ratings agency downgrades; and

(e)    Morgan Stanley's CDS positions were not recorded at fair value, and Defendants had ignored observable inputs from Level 2 and used subjective

1                  unobservable inputs from Level 3 to manipulate the Company's reported financial results and overstate income.

      296.    The true impact of Morgan Stanley's undisclosed high-risk trading in subprime-related securities was not revealed until December 19, 2007, when the Company released its earnings for the fourth quarter and fiscal year ended November 30, 2007. In the earnings release, Morgan Stanley finally disclosed that its total write-down of U.S. subprime, and other mortgage related exposures, for the fourth quarter was approximately $9.4 billion, of which $7.8 billion was attributed to the Proprietary Trading Desk's "bet the wrong way" on the subprime CDS positions. The earnings release disclosed, in pertinent part, the following:

> The additional $5.7 billion writedown of U.S. subprime, and other mortgage related exposures in November, and the $3.7 billion writedown as of October 31 (as announced on November 7), result in a total fourth quarter writedown of approximately $9.4 billion. In total, these writedowns reduced full year earnings per diluted share from continuing operations and the return on average common equity from continuing operations by approximately $5.80 and 19 percentage points, respectively.

> The loss from continuing operations for the fourth quarter was $3,588 million, or $3.61 per diluted share, compared with income from continuing operations of $1,982 million, or $1.87 per diluted share, in the fourth quarter of 2006. Net revenues were negative $450 million, compared with $7,849 million in last year's fourth quarter. Non-interest expenses of $5.4 billion increased 3 percent from last year. Net income for the year was $3,209 million, or $2.98 per diluted share, compared with $7,472 million, or $7.07 per diluted share, a year ago. The return on average common equity for the year was 8.9 percent compared with 23.5 percent a year ago. For the quarter, the net loss was $3,588 million, or $3.61 per diluted share, compared with net income of $2,206 million, or $2.08 per diluted share, in the fourth quarter of 2006.

                                            * * *

> **Actions to Address Disruption in Mortgage Securities Market and Build on Momentum Across Business**

> Morgan Stanley has taken a number of actions to address the disruption in the mortgage securities market and continue building on the momentum across most of its businesses, including:

> · Putting in place new senior leaders, including appointing Walid Chammah and James Gorman as Co-Presidents, naming Michael Petrick as Global Head of Sales and Trading and making a series of other management changes throughout the Institutional Securities business;

> · Further enhancing the Firm's risk management function by strengthening staffing and having it report directly to Chief Financial Officer, Colm

Kelleher, and creating a new, additional risk monitoring function within the trading business, which will report to Mr. Petrick; and

·    Consolidating all of the Firm's proprietary trading activities under common leadership, reporting to Mr. Petrick.

**Fourth Quarter Writedowns Reflects Continued Deterioration in the Mortgage Markets**

During the fourth quarter, the Firm recognized a total of $9.4 billion in mortgage related writedowns as a result of the continued deterioration and lack of liquidity in the market for subprime and other mortgage related securities since August 2007.  Of this total, $7.8 billion represents writedowns of the Firm's U.S. subprime trading positions (including the $3.7 billion writedown of subprime assets announced on November 7, based on valuations as of October 31.  As indicated at the time of that announcement, year-end valuations depended on subsequent market conditions.  Our valuation of this position as of November 30 takes into consideration a variety of inputs including observable trades, the continued deterioration in market conditions, the decline in the ABX Indices, other market developments, including mortgage remittances and updated cumulative loss data.  The Firm's remaining direct net U.S. subprime exposure is $1.8 billion at November 30, down from $10.4 billion at August 31.  The value of these positions remains subject to mark-to-market volatility.

297.    According to the fiscal year-end earnings release, Morgan Stanley's Institutional Securities business segment reported pre-tax income of $817 million for the full fiscal 2007 year, which was an 89% decrease from 2006.  The Company also reported that "Net revenues decreased 24 percent to $16.1 billion as record results in equity sales and trading, advisory and underwriting were more than offset by lower results in fixed income sales and trading," and that "Fixed income sales and trading revenues were $0.7 billion, down 93 percent from 2006 reflecting significant losses in credit products resulting from the mortgage related writedowns."  For Fourth Quarter 2007, the Company reported a pre-tax loss of ($6.5 billion) for the Institutional Securities business segment, which decreased from $2.2 billion of pre-tax income in the fourth quarter of 2006, and loss of $3.4 billion in net revenues, compared with net revenues of $5.5 billion in fourth quarter 2006.

298.    To offset the bleak financial report, Morgan Stanley highlighted an immediate $5 billion capital infusion and boldly announced that an approximate $5 billion investment from China Investment Corporation was going to "bolster" the Company's "strong" capital position.

299.    Defendant Mack stated on the earnings conference call held on December 19, 2007,

1    that "[t]he results we announced today are embarrassing for me, for our firm, this loss was the result

2    of an error in judgment that occurred on one desk, in our Fixed Income area, and also a failure to

3    manage that risk appropriately. Make no mistake, we've held people accountable. We're moving

4    aggressively to make the necessary changes."

5          300.    Defendant Kelleher also participated in the earnings conference call on December

6    19, 2007. Kelleher responded to questions from analysts regarding the Company's Level 3 assets

7    and liabilities, although he avoided describing what the biggest "component" was of Level 3.

8    Kelleher explained only that "obviously there was on very big mark that ran through Level 3, which

9    we've just announced."

10         301.    On the earnings conference call, William Tanona of Goldman Sachs, asked the

11   question that everyone was thinking: "Just if we could ask you a question on the risk again. I know

12   everybody has been dancing around it, but I guess my question would be more, help us understand

13   how this could happen that you could take this large of a loss[?] I mean, I would imagine that you

14   guys have position limits and risk limits as such. It just behooves me to think that you guys could

15   have one desk that could lose $8 billion."

16         302.    In response to this question, John Mack answered:

17         Bill, look, lets be clear. One, this trade was recognized and entered into our account.
           Two, it was entered [sic] our risk management system. It's very simple. It's very
18         painful, so I'm not being glib. When these guys stressed loss the scenario from
           putting on this risk position they did not vision in their stress losses that we could
19         have this degree of default, right? It is fair to say that our risk management division
           did not stress those losses as well. It's as simple as that. Think [sic] was a big fat tail
20         risk that caught us hard, right? That's what happened. Now, with hindsight, can you
           catch these things? We are not unique in being along [sic] these positions, right?
21         What is unique is that this was a trade that was put on as a proprietary trade and we
           have learned very expensive, and by the way, Bill, a humbling lesson, okay?"
22
23         303.    As is now known, Defendant Mack's testy response to the inquiry from the analyst

24   from Goldman Sachs was a complete fabrication. In fact, throughout the Class Period, Defendants

25   had knowingly and recklessly misrepresented to investors and shareholders the true nature of

26   Morgan Stanley's risks and internal controls and protocols. Defendants deliberately and recklessly

27   failed to disclose the Company's massive subprime exposure; failed to monitor and control risks

28   from Mack's directives to increase proprietary trading risks; and failed to disclose resulting losses

1   from the Proprietary Trading Group's high-risk subprime trades until Defendants could no longer

2   conceal the truth in December 2007.

3       304.    On December 19, 2007, Morgan Stanley's stock price increased to close at $50.58,

4   from the prior day's close of $48.07, as Defendants were able to soften the blow of the additional

5   material losses with news of China's $5 billion lifeline of capital.

6                              **Post-Class Period Disclosures**

7       305.    On December 21, 2007, *FinancialTimes*.com reported as follows:

8           Morgan Stanley is one of several leading Wall Street banks that are
            overhauling their risk management after announcing billions of dollars of
9           losses on subprime-related investments.

10          UBS (NYSE:UBS) , Citigroup (NYSE:C) and Merrill Lynch have all lost
            their chief executives and a number of other senior executives following the
11          writedowns.

12          John Mack, who has kept his job as Morgan Stanley's chief executive, last
            month ousted Zoe Cruz, co-president, who ran the group's securities
13          businesses. The latest review could influence Mr. Mack's ability to weather
            the storm.
14
            Mr Daula, who was appointed to his role in 2005, briefed Ms Cruz weekly on
15          the bank's risk position, according to people familiar with the matter,
            although one said Mr Daula never took his concerns directly to Mr Mack.
16
            The decision on Mr Daula's future will shed light on whether the blame for
17          the losses is seen to lie with the people responsible for monitoring risk or
            with more senior executives.
18
            By all accounts, Mr Daula had an impressive knowledge of the activities of
19          traders in the so-called structured product group, particularly those who
            placed the trades that went so badly wrong.
20
            By August, Mr Daula was very vocal in saying that there were no proper
21          pricing models for such trades, that positions were not being properly
            measured, and that the history traders used in their models was not a reliable
22          guide, these people say.

23          But by the time senior executives at Morgan Stanley say they realised how
            dangerous these positions were, it was impossible to cut them.
24
        306.    On January 29, 2008, Morgan Stanley filed its Annual Report on Form 10-K for
25
    fiscal 2007 with the SEC.   The Form 10-K provided additional disclosures regarding the
26
    classification of the Company's subprime-related assets, as follows:
27
            The Company's primary exposure to ABS CDOs is to synthetic CDOs that
28          hold or are referenced to collateral with ratings of BBB+, BBB or BBB-

---

Amended Class Action Complaint                                              - 87 -
Case No. CV08-963AG (FFMx)

("mezzanine CDOs"). The majority of the Company's writedowns in the fourth quarter related to super senior credit default swaps referencing such mezzanine CDOs that were entered into primarily by the Company's proprietary trading group. Under these credit default swap arrangements, the Company can be required to make payments in the event that securities in the referenced portfolios default or experience other credit events such as rating agency downgrades. (The characterization of these credit default swaps as "super senior" derives from their seniority in the capital structure of the synthetic CDO.) The Company also has exposure to ABS CDOs via other types of credit default swaps, direct investments in CDO securities, and retained interests in CDOs that the Company has underwritten. In determining the fair value of the Company's ABS CDO-related instruments the Company took into consideration prices observed from the execution of a limited number of transactions and data for relevant benchmark instruments in synthetic subprime markets. Despite the fact that actual defaults on swap obligations have not yet been realized, the fair value of such positions have experienced significant declines, as a result of a deterioration of value in the benchmark instruments as well as market developments.

307. The next day, on January 29, 2008, Morgan disclosed that it was responding to government subpoenas concerning "the origination, purchase, securitization and servicing of subprime and non-subprime residential mortgages and related issues."

## X.   MORGAN STANLEY'S ACCOUNTING VIOLATED GAAP AND SEC DISCLOSURE REQUIREMENTS

### A.   Morgan Stanley's Financial Statements Failed to Comply with GAAP

308. Generally Accepted Accounting Principles, *i.e.*, GAAP, are those principles recognized by the accounting profession and the SEC as the conventions, rules, and procedures necessary to define accepted accounting and reporting practices at a particular time. GAAP is promulgated in part by the American Institute of Certified Public Accountants ("AICPA") and consists of a hierarchy of authoritative literature established by the AICPA. The highest level in the hierarchy includes Financial Accounting Standards Board Statements of Financial Accounting Standards (SFAS), Financial Accounting Standards Board Interpretations (FIN), Accounting Principles Board Opinions (APB) and AICPA Accounting Research Bulletins (ARB).

309. The SEC requires that public companies prepare their financial statements in accordance with GAAP. As set forth in Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate, despite footnote or other disclosures." Regulation S-X requires that interim financial statements, such as these filed in Morgan Stanley's Form 10-Qs, must

1    also comply with GAAP, with the exception that interim financial statements need not include

2    disclosure which would be duplicative of disclosures accompanying annual financial statements.

3        310.    Management is responsible for preparing financial statements that conform to

4    GAAP. As noted by AICPA auditing standards ("AU"), § 110.02:

5            Financial   statements   are   management's   responsibility...
             [M]anagement is responsible for adopting sound accounting policies
6            and for establishing and maintaining internal controls that will,
             among other things, record, process, summarize, and report
7            transactions (as well as events and conditions) consistent with
             management's assertions embodied in the financial statements. The
8            entity's transactions and the related assets, liabilities and equity are
             within the direct knowledge and control of management... Thus, the
9            fair presentation of financial statements in conformity with Generally
             Accepted Accounting Principles is an implicit and integral part of
10           management's responsibility.

11       311.    As alleged elsewhere herein, prior to and throughout the Class Period Defendants

12   deliberately caused the Company increase its level of risk for proprietary trading, including trading

13   subprime mortgage-related securities and derivatives.

14       312.    Exercising the "trader's option" as encouraged by Defendant Mack, Morgan's

15   Proprietary Trading Group employed subprime-related speculative trading strategies on CDS

16   positions that exposed Morgan Stanley to an undisclosed excessive amount of risk. The positions

17   proved profitable during the first half of 2007, although not quantifiable from Morgan Stanley's

18   financial statements. During the second-half of 2007, things began to sour, as conditions in the

19   tumbling credit market, such as lack of liquidity, declining home values and increasing credit

20   delinquencies and defaults, caused the value of these speculative positions to drop significantly.

21       313.    Defendants failed to account properly for the mounting losses in the CDS positions

22   throughout the first nine months of the fiscal year ending August 31, 2007. The Company's

23   quarterly SEC filings and interim financial statements in Third 2007 not only failed to recognize

24   known losses related to the significant declines in the value of its subprime-related securities, but

25   the Company's Second and Third Quarter Form 10-Qs also failed to disclose Morgan Stanley's

26   exposure to these dangerously risky securities and potentially-massive related losses. In fact, the

27   Company's Third Quarter 2007 Form 10-Q filed on October 10, 2007 barely included the word

28   "subprime"; however, less than one month later, on November 7, 2007, the losses were so enormous

1    that Defendants were forced to file a Form 8-K announcing a $3.7 billion write-down related to the

2    Company's subprime exposures as of October 31, 2007.

3           314.   The Company's income and net earnings were materially overstated and liabilities

4    were materially understated as reported in the Company's Third Quarter 2007 earning release and

5    Form 10-Q financial statements.  Additionally, the Company's financial statements for the Second

6    and Third Quarters of 2007 lacked required disclosures and omitted material facts regarding the

7    Company's actual losses from, and future exposure to, subprime-related securities.  By the end of

8    November 30, 2007 fiscal year, Morgan recognized total net write-downs from this speculative and

9    undisclosed foray into the subprime market of approximately $7.8 billion.  Throughout the Class

10   Period, the Company had issued risk disclosures and ineffective internal control and procedures

11   over financial reporting, despite contrary certifications signed by Defendants Mack and Sidwell.  As

12   a publicly-traded company, Morgan Stanley was required to maintain books and records in

13   sufficient detail to reflect the transactions of the Company and therefore prepare financial

14   statements in accordance with GAAP.  Specifically, under the Exchange Act public companies

15   must:

16          (a)  make and keep books, records, and accounts, which, in reasonable detail,
                 accurately and fairly reflect the transactions and dispositions of the assets
17               of the issuer; and

18          (b)  devise and maintain a system of internal accounting controls sufficient to
                 provide reasonable assurances that i. transactions are executed in
19               accordance with management's general or specific authorization; ii.
                 transactions are recorded as necessary (i) to permit preparation of
20               financial statements in conformity with generally accepted accounting
                 principles or any other criteria applicable to such statements, and (ii) to
21               maintain accountability for assets....

22          315.   During the Class Period, Morgan's publicly-filed financial statements violated

23   numerous provisions of GAAP, including the following:

24          a.    The principle that financial reporting should provide information that is
                  useful to present and potential investors and creditors and other users in
25                making rational investment, credit and similar decisions, (FASB Statement of
                  Financial Accounting Concepts – "SFAC" No. 1);
26
            b.    The principle that financial reporting should provide information about the
27                economic resources of an enterprise, the claims to those resources, and the
                  effects of transactions, events, and circumstances that change resources and
28                claims to those resources, (SFAC No. 1);

Amended Class Action Complaint                                                          - 90 -
Case No. CV08-963AG (FFMx)

c.   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general, (SFAC No. 1);

d.   The principle that financial reporting should provide information about an enterprise's financial performance during a certain time period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance, (SFAC No. 1);

e.   The principle that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. (SFAC No. 2);

f.   The principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting, (SFAC No. 2);

g.   The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions, (SFAC No. 2);

h.   The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered, (SFAC No. 2);

i.   The principle that losses be accrued for when a loss contingency exists, (Statement of Financial Accounting Standards –"SFAS" No. 5);

j.   The principle that if no accrual is made for a loss contingency, then disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred, (SFAS No. 5);

k.   The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports, (Accounting Principles Board – "APB" Opinion No. 28);

l.   The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial, (APB Opinion No. 28);

m.   The principle that management should provide commentary relating to the effects of significant events upon the interim financial results. (APB Opinion No. 28); and

o.   The principle that disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the

methods of applying those principles that materially affect the financial statements, (APB Opinion No. 22).

316.    Defendants caused Morgan to violate the foregoing provisions of GAAP: (1) by failing to disclose the existence and risk exposure of its proprietary subprime positions in each of its interim financial statements during fiscal 2007; (2) by failing to maintain a proper risk management program that would have alerted management of its precarious exposure and inevitable losses relating to its proprietary subprime positions during 2007; and (3) by failing to maintain proper internal accounting controls, which resulted in the material misstatements to the Company's financial statements during fiscal 2007.

317.    Defendants similarly caused Morgan to violate SEC disclosure requirements. Under SEC regulations, management of a public company has a duty "to make full and prompt announcements of material facts regarding the company's financial condition." The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments."

318.    In Accounting Series Release 173, the SEC reiterated the duty of management to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

319.    The SEC also requires in every Form 10-Q filing in Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A), that the issuer furnish information required by Item 303 of Regulation S-K. The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosures enabling investors and other users to assess the financial condition and results of operations of the company, with particular emphasis on the company's prospects for the future. To further explain what must be included by Item 303 in MD&A, the SEC issued an interpretive release as follows:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the

company through the eyes of management by providing both a short and long term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials.

320.    The SEC also has stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

321.    SEC Staff Accounting Bulletin No. 101 ("SAB 101"), *Revenue Recognition in Financial Statements*, also reiterates the importance of MD&A in financial statements:

Management's Discussion & Analysis (MD&A) requires a discussion of liquidity, capital resources, results of operations and other information necessary of a registrant's financial condition, changes in financial condition and results of operations. This includes unusual or infrequent transactions, known trends, or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in Financial Reporting Release (FRR) 36 that **MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."**   (Emphasis added; footnotes omitted).

322.    In discussing results of operations, Item 303 of Regulation S-K requires the company to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The Instructions to Paragraph 303(a) further state, "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results."

323.    With respect to results of operations, the SEC guides management to:

- Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues

> or expenses that, in management's judgment, should be described in order to understand the results of operations; and

- Describe any known trends or uncertainties that have had or that management reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

324. Despite the SEC mandate that the MD&A discuss "unusual" transactions "that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue," Defendants failed to disclose the true nature of Morgan's subprime trading strategies and the resulting net exposure in its Class Period public filings.

325. Defendants' concealment of the magnitude of Morgan's subprime trading losses and net exposure on the Company's CDS positions was particularly significant for the investing public because it deprived them of the knowledge that the Company had suffered significant losses due to speculative subprime trading strategies and that the apparent illiquidity in the credit markets was preventing Morgan from mitigating future losses. It is for precisely this reason that the SEC in SAB 101, citing Financial Reporting Release No. 36 (promulgated by the SEC), explained that the MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."

326. Rather than complying with the spirit and intent of disclosure requirements set forth in the above regulations, Morgan's SEC filings reveal a deliberate manipulation of its disclosures relating its subprime trading strategies and exposures, failing to disclose (i) the level of losses incurred on a timely basis, and (ii) that the apparent illiquidity in the credit markets was preventing Morgan from mitigating significant future losses.

327. In addition, the SEC has indicated that companies should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K: (a) a disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management; and (b) is reasonably likely to have a material effect on the registrant's financial condition or results of

1   operations.

2        328.   The MD&A section of Morgan's SEC filings during the Class Period failed to

3   comply with these SEC regulations because:  (1) Defendants failed to disclose the proprietary

4   trading strategy that caused the Company to enter into large speculative subprime positions; (2)

5   Defendants did not disclose the fact that the Company had suffered significant losses due to these

6   speculative subprime trading positions; (3) the illiquidity in the credit markets was preventing MS

7   from effectively mitigating future losses on these speculative positions; and (4) Defendants Mack

8   and Sidwell certified to shareholders and investors that Morgan Stanley's internal financial

9   reporting and disclosure controls were adequate, when they were not.

10       329.   Each of Defendants' improper accounting practices, misrepresentations and

11  omissions standing alone, was a material breach of GAAP and/or SEC regulations.

12       **B.   Morgan Stanley Violated GAAP in Valuing Certain Subprime Positions**

13       330.   Defendants significantly overstated the value of assets with exposure to subprime-

14  related securities and similarly understated the value of its related liabilities in Morgan's public

15  filings during fiscal 2007.  These misstatements resulted in corresponding overstatements of trading

16  revenue, net revenue, income from continuing operations and net income in Morgan's Income

17  Statements during the Class Period.  In addition, the misstatements resulted in overstatements in

18  financial instruments owned, total assets, retained earnings, and total shareholders equity and

19  understatements in financial instruments sold, not yet purchased and total liabilities within

20  Morgan's consolidated financial statements.

21       331.   Defendants orchestrated this fraud to avoid valuing the CDS positions in accordance

22  with the relevant benchmark ABX Index, which was a significant Level 2 input that Defendants

23  typically used to value billions of dollars worth of subprime-related assets and liabilities, including

24  the $13.2 billion long CDS position.  To avoid recording losses in accordance with the ABX for the

25  third quarter of 2007, Defendants utilized self-serving subjective Level 3 valuation criteria to apply

26  artificially-high values to these assets and artificially-low values to these liabilities in order to

27  minimize material loss recognition.

28       332.   Other than certain subprime positions owned by the Company's subsidiary banks,

1   the majority of Morgan Stanley's subprime positions were identified in SEC filings as "trading

2   positions."

3       333.    Pursuant to SFAS No. 115, *Accounting for Investments in Certain Debt and Equity*

4   *Securities*, securities that are bought and held principally for the purpose of being sold in the near

5   term are to be classified as "trading securities." GAAP requires such trading securities to be carried

6   at fair value in the statement of financial condition and all mark-to-market (unrealized) gains and

7   losses on trading securities are recognized in the current period's income statement. Consequently,

8   Morgan Stanley was required to carry its CDS positions at "fair value" on its Statement of Financial

9   Position.

10      334.    Under SFAS No. 157, fair value is defined as "the price that would be received to

11  sell an asset or paid to transfer a liability in an orderly transaction between market participants." As

12  set forth above in Section VI.E.3, this statement establishes a hierarchy for inputs used in measuring

13  fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs

14  by requiring that the most observable inputs be used when available. Observable inputs are inputs

15  that market participants would use in pricing the asset or liability developed based on market data

16  obtained from sources independent of the Company.  Level 3 is the lowest level, is the least

17  desirable and least reliable as its uses assumptions developed by the reporting company to

18  determine fair value.  SFAS 157 also expands the disclosure requirements about fair value

19  measurements of Level 3 assets.

20      **C.    Defendants Failed to Recognize Observable Inputs for Valuation of the CDS**
            **Positions**

21
        335.    By changing the valuation inputs for the CDS positions from observable Level 2
22
    inputs to subjective Level 3 inputs, Defendants improperly valued Morgan's CDS positions and
23
    attempted to justify minimizing the losses related to the significant decline in value in them as of
24
    August 31, 2007. In so doing, Morgan violated SFAS No. 115 and SFAS No. 157.
25
        336.    Reporting the move of assets and liabilities from Level 2 to Level 3 was a
26
    mechanism Defendants employed to establish a rationale to avoid the recognition of losses tied to
27
    the collapsing subprime markets after Morgan's Proprietary Trading Group "bet the wrong way" on
28

1    massive subprime positions. As discussed below, significant observable inputs did exist for assets

2    and liabilities that were reclassified to Level 3. Defendants improperly ignored the ABX Index in

3    order to avoid the full recognition of the collapsing value of its CDS positions that was being

4    reflected by the Index's decline.

5         337.      According to the Form 10-K for fiscal year ending 2007, the largest write-downs

6    and exposure to the Company were CDSs referencing synthetic mezzanine CDOs. Under these

7    credit default swaps, the Company sold credit protection on a notional amount of $13.2 billion of

8    synthetic CDOs. The ABX Index was the most relevant observable input available to value these

9    CDSs. During the quarter ended August 31, 2007, Defendants ignored observable data available

10    from the ABX Index for valuation purposes in violation of GAAP. Specifically, Defendants

11    ignored the ABX Index because it was signaling plummeting values of subprime securities and

12    Defendants used unreasonable subjective valuation methodologies to avoid taking a loss on the long

13    CDS position.

14         338.      Defendants' unjustified manipulation of valuation for Morgan's CDS positions,

15    regardless of whether the assets and liabilities were classified at Level 2 or Level 3, was a violation

16    of SFAS No. 157. The AICPA Center for Audit Quality (CAQ) Alert # 2007-51 dated October 3,

17    2007, and the white paper analysis that supplemented it, "Measurements of Fair Value in Illiquid (or

18    Less Liquid) Markets," each discuss the existing guidance on measurement of fair value as

19    contemplated by SFAS No.157. This Alert and white paper reinforce the inappropriateness of the

20    changes in subprime valuation inputs selectively done by Morgan Stanley during the Third Quarter

21    of 2007. The following excerpts from the white paper confirm that Defendants' improper use of

22    valuation inputs and the rejection of significant observable data from the ABX Index, even where

23    there is increasing illiquidity, was inappropriate, and in violation of SFAS No. 157:

24            a.     It is important to distinguish between an imbalance between supply and
                 demand (e.g., fewer buyers than sellers thereby forcing prices down) and

25                  a "forced" or "distressed" transaction.

26            b.     The fact that transaction volume in a market is significantly lower than in
                 previous periods does not necessarily mean that these are forced or

27                  distressed sales.

28

c.  Persuasive evidence is required to establish that an observable transaction is a forced or distressed transaction. It is not appropriate to assume that all transactions in a relatively illiquid market are forced or distressed transactions.

d.  It would not be appropriate to disregard observable prices, even if that market is relatively thinner as compared to previous market volume. Even if the volume of observable transactions is not sufficient to conclude that the market is "active," such observable transactions would still constitute Level 2 inputs that must be considered in the measurement of fair value.

339.   The Form 8-K filed by Morgan on November 7, 2007, included the first description ever of the Company's subprime positions and included a reference to the valuation inputs used by Defendants in determining the fair value of its hemorrhaging subprime CDS position.

In determining the fair value of the Firm's ABS CDO-related exposures – which represent the most senior tranches of the capital structure of subprime ABS CDOs – Morgan Stanley took into consideration observable benchmark data for relevant benchmark instruments in synthetic subprime markets. Deterioration of value in the benchmark instruments as well as the market developments referred to earlier have led to significant declines in the estimates of fair value. These declines reflect increases in implied cumulative losses across this portfolio. These loss levels are consistent with the cumulative losses implied by ABX Indices in the range between 11-19 percent. At a severity rate of 50 percent, these levels of cumulative loss imply defaults in the range of 40-50 percent of outstanding mortgages for 2005 and 2006 vintages.

340.   The Company's disclosures expressly state that the subprime market is highly correlated to the ABX Index. The ABX Index reflects the willingness of investors to buy and sell credit protection in the form of credit defaults swaps on the basis of their view about the risk of the underlying subprime loans. The ABX has five separate indices based on the rating of the underlying subprime securities, ranging from AAA to BBB-. The index does not reflect the absolute fair value of the underlying bonds, but rather it offers a gauge of the demand for them. A decline in the ABX suggests that CDS protection costs have increased because the underlying bonds have become more risky and investors have less confidence in them.

341.   According to SFAS No. 157, "This statement emphasizes that fair value is a market-based measurement, not an entity-specific measurement. Therefore, a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability."

1    342.   The industry standard in tracking and valuing CDS transactions and values is the

2    independent ABX indices. According to Citigroup CFO, Gary Crittendon, in an interview regarding

3    the extent of subprime troubles, "the best way to kind of get an outside perspective on this is to look

4    at the ABX Indices." Nevertheless, in order to avoid recognizing the full extent of impairment that

5    was apparent from utilizing  this observable data (Level 2 inputs) and valuing the CDS positions

6    accordingly, Defendants instead used internally developed pricing models (Level 3 inputs) that gave

7    the impression of higher asset and lower liability values, and therefore lower loss recognition as of

8    August 31, 2007.

9    343.   SFAS No. 157, ¶ 21, states that "Valuation techniques used to measure fair value

10   shall maximize the use of observable inputs and minimize the use of unobservable inputs."

11   Defendants did exactly the opposite. Defendants deliberately and recklessly failed to maximize the

12   use of the ABX indices, which would have resulted in a direct correlation between the significant

13   drop in the indices and the Company's valuing of its CDS positions.  In so doing, Morgan failed to

14   reflect properly CDS positions at fair value and as a result violated both SFAS No. 115 and SFAS

15   No. 157.  Defendants disclosed the ABX Indices as one component of its pricing of its CDS

16   positions, but they did not use it as the direct observable input for pricing these positions, because

17   this would have forced the Company to take significantly higher write-downs as of August 31,

18   2007.

19   344.   The ABX Index reflects trading values for CDSs.  Consequently, there is a direct

20   correlation between these index values and the values of Morgan Stanley's CDS positions.  Clearly,

21   this index is a Level 2 observable input, and should have been used by MS in its valuation of its

22   CDS, regardless of whether the CDSs were classified at Level 2 or Level 3.

23   345.   This index is so indicative of subprime securities values such as CDS, that the

24   AICPA in a release dated October 3, 2007, stated that these indices are even suitable as a Level 2

25   input to value securities backed by subprime mortgage loans. Furthermore, a commercial banking

26   standards setting agency, the Bank for International Settlements, the entity that controls the CDS

27   market, as well holds that the ABX index values are so controlling, that "to obtain estimates of mark

28   to market losses for subprime MBS, ABX prices, by rating and vintage, can simply be applied to

1 | outstanding volumes of these securities."

2 |     346. ·    Nevertheless, despite the direct correlation to CDS values and the readily available

3 | ABX indices, Defendants deliberately and secretly ignored this data source. In the Form 10-K for

4 | fiscal 2007, the Company's description of its positions included:

5 |         The Company's primary exposure to ABS CDOs is to synthetic
6 |         CDOs that hold or are referenced to collateral with ratings of BBB+, BBB or BBB- ("mezzanine CDOs"). The majority of the Company's
7 |         write-downs in the fourth quarter related to super senior credit default swaps [CDS] referencing such mezzanine CDOs that were entered
8 |         into primarily by the Company's proprietary trading group. Under these credit default swap [CDS] arrangements, the Company can be
9 |         required to make payments in the event that securities in the referenced portfolios default or experience other credit events such as rating agency downgrades.

10

    **D.**    **Defendants Failed to Value Assets and Liabilities Based on Current Market**
11 |         **Conditions**

12 |     347.    The ABX Index for BBB.06-1 vintage, acknowledged by Kelleher as the vintage

13 | where Morgan Stanley's most significant exposure rests, showed a 32.8% decrease between the end

14 | of Second and Third Quarter 2007. During the same period, based on the limited information

15 | specific to its subprime positions disclosed by Morgan, the Company recognized only a 14.4%

16 | write-down on its Mezzanine CDS positions. For a $13.2 billion CDS long position, as disclosed by

17 | the Company, a 32.8% decrease in value would equate to a loss of $4.4 billion. This compares to a

18 | recognized loss of only $1.9 billion taken by Morgan Stanley on these positions. Had Defendants

19 | appropriately valued Morgan's CDS position in conformity with the Level 2 values reflected by the

20 | ABX index, then the write-downs in the Third Quarter 2007 would have been $2.5 billion higher.

21 |     348.    Morgan (while Mack was President and Chief Operating Office during his early

22 | days with the Company) has demonstrated the propensity to fraudulently value assets and overstate

23 | its earnings and financial condition in the past. In November 2004, the Company agreed to a cease

24 | and desist order in which the SEC found that the Morgan had overvalued certain high-yield bonds

25 | by failing to properly value the bonds as of the current measurement date. Instead, Morgan took a

26 | "longer view" as to their value, by discounting, or ignoring current market conditions, much as

27 | Defendants did in the Second and Third quarters of 2007 with respect to the ABX Index values.

28 | The SEC order stated that "Morgan Stanley believed that market conditions rendered third-party

price quotations unreliable." In such market conditions, GAAP required Morgan Stanley to use its best efforts to determine the fair value of the bonds, which is the price at which a willing buyer and a willing seller would enter into a current exchange. Instead of following GAAP to determine the fair value for those bonds, Morgan Stanley valued those bonds by "taking a longer view of the market" and essentially put its subjective opinion about the value of the bonds ahead of prices quoted by external pricing sources." By overvaluing those bonds, the SEC concluded that "Morgan Stanley's financial results for the fourth quarter of fiscal year 2000, as reported on filings made with the Commission, were misstated and not in conformity with GAAP."

349.    In this same order, the SEC also found that the Company similarly overvalued certain aircraft leasing assets during the slump period in that industry brought about by the September 11, 2001 terrorist attacks. MS used a contrived valuation method not in compliance with GAAP to determine the value of certain impaired aircraft in its portfolio. The Company used a "base value" method that estimated the value of aircraft "presuming a transaction between an equally willing and informed buyer and seller, neither under compulsion to buy or sell, and with supply and demand for the aircraft in reasonable balance." As with the high-yield bonds, Morgan failed to consider the current market conditions to calculate fair value. As a result of overvaluing the aircraft assets, the SEC concluded that "Morgan Stanley's financial results for the fourth quarter of fiscal year 2001, third quarter of fiscal 2002 and the first quarter of fiscal 2003, as reported on filings made with the Commission, were misstated and not in conformity with GAAP."

350.    Defendants ignored the current market conditions, changed valuation inputs from observable Level 2 inputs to unobservable Level 3 inputs to try to justify their failure to use the ABX Index, and employed an old manipulative strategy to take a "longer view" of the market. This was done in order to "manage earnings." According to *Businessweek.com*, 15 analysts had established earnings estimates for MS for the Third Quarter 2007. The Consensus earnings estimate was $1.54 per share. However, the high end of the range was $1.86 and the low end was $1.38. MS reported earnings of $1.38. It is apparent that MS contrived its valuation of its CDS positions in order to recognize only enough impairment to still meet the low end of earnings expectations.

351.    While the Third Quarter valuation is not consistent with the ABX, MS admitted that

1    the Fourth Quarter valuation was based on the ABX, despite worsening liquidity issues in the

2    market relative to the Third Quarter. The high correlation between the ABX index for the BBB.06-

3    1 and the Company's Mezzanine CDS positions was evidenced in the Company's results recorded

4    for the six months ended November 30, 2007. The six-month write-downs taken by the Company

5    on these positions reflected losses of 68.2%. This amount is actually in excess of the 65.1%

6    decrease in the index during the same period.

7    352.    After failing to recognize sufficient write-downs in the quarter ended August 31,

8    2007, the Company recorded write-downs in the fourth quarter ended November 30, 2007 that

9    exceeded the actual decrease in the respective ABX index during that quarterly period. It is

10   apparent that Morgan Stanley needed to get the recorded fair values in sync with the observable

11   ABX index for its year end financial statements, as these statements presumably would be subjected

12   to a much higher level of audit scrutiny than the quarterly (*i.e.* August 31, 2007) statements.

13   353.    The Company violated SFAS No. 115 and SFAS No. 157 by not valuing its CDS

14   positions based on current market conditions and the ABX Index as of August 31, 2007. Similar to

15   what the 2004 SEC order found, Morgan ignored current values, thereby foregoing requisite write-

16   downs, and instead valued financial instruments based upon a market turn-around in late 2007.

17   Well into 2008, the market has yet to turn around, and asset values have continued to plummet.

E.    **Morgan Stanley Violated GAAP in Failing to Disclose Adequately its**
18        **Subprime Positions**

19
     354.    As with their propensity to utilize disingenuous valuation methodologies to
20
     manipulate Morgan's reported results, Defendants also had a track record of inadequate disclosures
21
     to shareholders of their high risk subprime trading strategies and associated losses. This is evident
22
     from correspondence from the SEC admonishing Morgan Stanley for inadequate disclosure relating
23
     to this exposure dating back to the filing of its November 30, 2006 financial statements.
24
     355.    After the SEC took exception to the lack of subprime disclosure as set forth in a
25
     letter dated August 30, 2007, Morgan Stanley did not increase its level of disclosures in the
26
     financials for the Third Quarter 2007 Form 10-Q filed on October 10, 2007, despite the purported
27
     recognition of $1.9 billion in losses on its mezzanine CDS positions during the quarter, which was
28

1     not disclosed until November 7, 2007.

2         356.     Furthermore, the Company's 2007 interim financial statements for the Second and

3     Third Quarters, filed July 10, 2007 and October 10, 2007, respectively, lacked the required GAAP

4     disclosures regarding the Company's significant concentration in subprime-related securities. In

5     fact, in the Company's Form 10-Q filed on July 10, 2007, there was no reference to the word

6     "subprime or sub-prime" included within the entire filing at all. The Form 10-Q filed on October

7     10, 2007, (some 40 days after the SEC reprimand letter) contained only limited references to the

8     term "subprime" that appeared in the MD&A without reference to Company trading strategies,

9     exposure or positions held.

10         357.     Only 28 days later, Morgan Stanley issued a Form 8-K on November 7, 2007,

11     disclosing for the first time its faltering subprime positions and further disclosing a related $3.7

12     billion write-down for the two months ended October 31, 2007. Along with these initial disclosures

13     was the disclaimer by the Company that "these exposures will frequently change and could further

14     deteriorate." The "Subprime Analysis" included as part of the Form 8-K included disclosure that as

15     of August 31, 2007, the Company had continuing net exposure from its subprime positions of $10.4

16     billion. This huge exposure was never mentioned in the Second Quarterly 2007 financial statements,

17     or the Third Quarter 2007 financial statements, which were filed on October 10, 2007, just 27 days

18     before the November 7, 2007 loss announcement. Also, for the period ended October 31, 2007,

19     $7.8 billion of the Company's $10.4 subprime exposure was recorded as write-downs in the Fourth

20     Quarter; yet as of the filing of the Third Quarter financial statements, the Company's investors were

21     not even aware that this exposure existed.

22         **F.**     **Failure to Comply With Other GAAP Disclosure Requirements**

23         358.     SOP No. 94-6, *Disclosure of Certain Risks and Uncertainties* ("SOP 94-6") requires

24     disclosures to be made in financial statements regarding any vulnerabilities arising due to the fact

25     that the business is exposed to certain risks and uncertainties that might have a "severe impact" on

26     its future operations. SOP 94-6 defines a "severe impact" as a "significant financially disruptive

27     effect on the normal functioning of the entity." SOP 94-6 requires, among other things, disclosure

28     existing as of the date of those statements regarding the following:

1      a.      Nature of operations

2      b.      Use of estimates in the preparation of financial statements

3      c.      Certain significant estimates

4      a.      Current vulnerability due to certain concentrations

5      359.      At the end of the Third Quarter 2007, Morgan had remaining net exposure relating to its subprime positions of $10.4 billion; yet the Company violated GAAP by failing to disclose this significant exposure in the related SEC filings for that period. During the Fourth Quarter 2007, the Company took a $7.8 billion write-down related to these subprime positions. This write-down caused the Company to record pre-tax and net losses of ($5.8 billion) and ($3.6 billion), respectively, for the quarter.

360.      With respect to disclosures of an entity's vulnerability due to certain concentrations, SOP 94-6 indicates:

> Vulnerability from concentrations arises because an entity is exposed to risk of loss greater than it would have had it mitigated its risk through diversification. Such risks of loss manifest themselves differently, depending on the nature of the concentration, and vary in significance.

> Financial statements should disclose the concentrations described in [subsequent paragraph] if, based on information known to management prior to issuance of the financial statements, all of the following criteria are met:

> a.      The concentration exists at the date of the financial statements.

> b.      The concentration makes the enterprise vulnerable to the risk of a near-term severe impact.

> c.      It is at least reasonably possible that the events that could cause the severe impact will occur in the near term.

> Concentrations, including known group concentrations, described below require disclosure if they meet the criteria of [preceding paragraph]. (Group concentrations exist if a number of counterparties or items that have similar economic characteristics collectively expose the reporting entity to a particular kind of risk.) Some concentrations may fall into more than one category.

> a.      Concentrations in the volume of business transacted with a particular customer, supplier, lender, grantor, or contributor. The potential for the severe impact can result, for example, from total or partial loss of the business relationship. For purposes of this SOP, it

is always considered at least reasonably possible that any customer, grantor, or contributor will be lost in the near term.

b.      Concentrations in revenue from particular products, services, or fund-raising events. The potential for the severe impact can result, for example, from volume or price changes or the loss of patent protection for the particular source of revenue.

c.      Concentrations in the available sources of supply of materials, labor, or services, or of licenses or other rights used in the entity's operations. The potential for the severe impact can result, for example, from changes in the availability to the entity of a resource or a right.

d.      Concentrations in the market or geographic area [footnote omitted] in which an entity conducts its operations. The potential for the severe impact can result, for example, from negative effects of the economic and political forces within the market or geographic area. For purposes of this SOP, it is always considered at least reasonably possible that operations located outside an entity's home country will be disrupted in the near term.

361.   Further, the Company's significant concentration in subprime-related securities represented a material contingency which was required to be disclosed in the Company's condensed interim financial statements. APB No. 28, Interim Financial Reporting ("APB 28 ), states:

Contingencies and other uncertainties that could be expected to affect the fairness of presentation of financial data at an interim date should be disclosed in interim reports in the same manner required for annual reports. Such disclosures should be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial. (Footnote omitted.)

362.   With respect to the mezzanine CDS derivative positions which accounted for the majority of the loss recorded by Morgan Stanley during the third and fourth quarters of 2007, MS violated SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities,* which requires that, for derivative instruments not designated as hedging instruments, disclosure shall indicate the purpose of the derivative activity.  Defendants failed to disclose the purpose of the mezzanine CDS positions until the December 19, 2007 Earnings Conference call, at which time the Company's subprime trading strategy was cryptically disclosed.  By that point, however, it was too late for investors, as $7.8 billion in write-downs had already been recognized.

363.   Additionally, the Company violated the disclosure requirements of SFAS No. 5 and FIN No. 45, *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including*

*Indirect Guarantees of Indebtedness of Others.* SFAS No. 5 requires disclosure of the nature of a loss accrual made pursuant to the standard not to be misleading. FIN No. 45 reinforces that guarantees accounted for as derivatives under SFAS No. 133 have remained subject to the disclosure provisions in of SFAS No. 5, and the disclosures required in this Interpretation are meant to provide users of financial statements with more detailed and useful information about guarantees that are accounted for as derivatives. If, as the November 7, 2007 press release implied, the Third Quarter Form 10-Q filed on October 10, 2007, contained undisclosed write-downs of $1.9 billion related to the subprime positions, detailed disclosure of the nature of the amount and source of the write-down in the Third Quarter Form 10-Q was required by this GAAP standard.

### G.   Defendants Failed to Maintain Adequate Disclosure Controls and Procedures and Internal Controls over Financial Reporting

364.   In the SEC imposed cease-and-desist order against the Company discussed earlier, the SEC found that Morgan had overvalued certain high-yield bonds and aircraft assets by failing to properly value theses assets as of the current measurement dates. As part of this order, the SEC also concluded that Morgan's internal controls failed to ensure that its assets were valued in accordance with GAAP and that certain recordkeeping requirements were violated. The same violations exist with the Company's failure to value its CDS positions in accordance with GAAP.

365.   Morgan Stanley's internal controls failed to ensure that material assets and liabilities were valued in accordance with GAAP. These materially deficient internal controls allowed Morgan to issue financial statements that were materially false and misleading and not in accordance with GAAP. The SEC defines "disclosure controls and procedures" as controls and other procedures of an issuer that are designed to ensure:

> that information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported, with the time periods specified in the Commissions rules and forms...

366.   Internal control over financial reporting is defined in Public Company Accounting Oversight Board ("PCAOB ) Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with An Audit of Financial Statements* ("AS 2"), as follows, in relevant part: