> A process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> (1) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;
>
> (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and
>
> (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

367. Exchange Act Rules 13a-14 and 15d-14 require the Company's principal executive officer and principal financial officer to quarterly and annually certify the effectiveness of the Company's disclosure controls and procedures as of an assessment date within 90 days prior to the filing date of the report. Further, the Company is required to annually report on the effectiveness of its internal control over financial reporting. AS 2 states, in relevant part:

> A company subject to the reporting requirements of the Securities Exchange Act of 1934 (an "issuer ) is required to include in its annual report a report of management on the company' s internal control over financial reporting ... The report of management is required to contain management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether the company' s internal control over financial reporting is effective....

368. During the Class Period, Defendants misled investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting. Defendants Mack and Sidwell falsely represented that the Company "maintained effective internal control over financial reporting."

369. The Company's disclosure controls and procedures, and internal control over financial reporting were not effective throughout the Class Period. Defendants deliberately and recklessly misstated Morgan Stanley's exposure to subprime-related positions. As a result of

Defendants' failure to maintain effective disclosure controls and procedures and internal control over financial reporting, Morgan Stanley was not only able to delay recognizing material losses on its subprime-related positions, but also was able to avoid even disclosing that the Company had a massive subprime exposure, in violation of GAAP.

370. The Company's true financial condition and results of operations were further masked with false reassurances that the Company had an effective risk management process and adequate disclosures. Defendants' statements regarding the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting, and more specifically, the management and disclosure of risk, were materially false and misleading for the reasons set forth above.

## XI. ADDITIONAL SCIENTER ALLEGATIONS

### A. General Allegations of Scienter

371. Defendants Mack, Cruz, Daula, Sidwell and Kelleher, by virtue of their receipt of information reflecting the improper and fraudulent conduct described above and/or their failure to review information they had a duty to monitor, their actual issuance of materially false and misleading statements or their control over Morgan's materially false and misleading statements, and their associations with Morgan and each other, which made them privy to confidential proprietary information concerning Morgan, were active, culpable, and primary participants in the fraudulent scheme alleged herein. Defendants Mack, Cruz, Daula, Sidwell and Kelleher knew or recklessly disregarded the materially false and misleading nature of the information they caused to be disseminated to the investing public.

372. Defendants Mack, Cruz, Daula, Sidwell and Kelleher also knew or recklessly disregarded that the materially false and misleading statements and omissions contained in Morgan's public statements would adversely affect the integrity of the market for Morgan's common stock and would cause the price of Morgan's common stock to be artificially inflated. Defendants Mack, Cruz, Daula, Sidwell and Kelleher acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiffs and other members of the Class.

373. In addition to the foregoing allegations, the following facts support a strong

inference that Morgan and Defendants Mack, Cruz, Daula, Sidwell and Kelleher knew or recklessly disregarded that the challenged statements set forth herein were materially false and misleading when made.

374. Each of these Defendants was keenly aware of the deteriorating conditions in the U.S. subprime mortgage market and the effect of these conditions on the value of securities linked to these mortgages. As a consequence of the acquisition of Saxon Capital in December 2006, the collapse of numerous subprime mortgage originators in the first and second quarters of 2007 and the demise of banks and hedge funds whose strategies were based on capitalizing on mortgage backed securities, the Defendants knew that the mortgage market was under intense scrutiny by investors and that Morgan's exposures to the subprime market were key areas in which the investment community was focused. In fact, Defendants lied when asked direct questions about risk management and subprime exposure.

375. Defendants knew or recklessly disregarded, that the Company had billions of dollars of exposure to subprime mortgage defaults as a result of the CDS trading positions assumed by the Proprietary Trading Group by no later than May 2007, prior to the start of the Class Period, according to Zoe Cruz's own admissions. By no later than early July 2007, each of these Defendants knew or recklessly disregarded that a stress test commissioned by Defendant Cruz had demonstrated the potential catastrophic consequences of the Morgan's exposure to CDSs referencing subprime securities to the tune of $3.5 billion.

376. By August 2007, each of the Defendants either knew or recklessly disregarded that the Company's risk controls relating to the pricing and reporting of the Company's exposures to subprime were deficient, based on the "vocal" concerns expressed by Defendant Daula. Moreover, each of the Defendants were aware of or recklessly disregarded the SEC's request for greater clarity and transparency of the Company's U.S. subprime exposures by virtue of the letter directed to Defendant Sidwell on August 30, 2007.

377. Each of the Defendants either knew or recklessly disregarded that the Company's disclosures relating to subprime were wholly misleading and that there were billions of dollars in subprime exposure on the Company's balance sheet based on the intentional implementation of

alternative Level 3 valuation inputs to assign a more favorable fair value to the Proprietary Trading Group's CDS position, as reported in the Company's earnings conference call on September 19, 2007, and repeated in the Company's Third Quarter 2007 Form 10-Q.

378. The knowledge and/or extreme recklessness of the Defendants is evident also from their rapid firings and resignations following the disclosure to shareholders of the massive losses that Morgan would take. John Mack said on the earnings conference call on December 19, 2007, "the results we announced today are embarrassing for me, for our firm, this loss was the result of an error in judgment that occurred on one desk, in our Fixed Income area, and also a failure to manage that risk appropriately. Make no mistake, we've held people accountable. We're moving aggressively to make the necessary changes."

379. Indeed, while avoiding his own responsibility, Mack did indeed make changes by eliminating the persons whose failures, he pegged, for being directly responsible for Plaintiffs' losses, other than himself. The initial scapegoat was Howard Hubler who was fired on November 2, 2007. The recriminations continued as Morgan was forced to come clean about the scale of the losses. On November 30, 2007, Anthony Tufariello, Hubler's immediate supervisor, was fired. Zoe Cruz, was fired on November 29, 2007 as well. On that day, Neal Shear, once the second highest paid individual at the Company, was demoted; he would later resign in March 2008. David Sidwell, who had announced that he would retire at the end of the financial year, resigned early, on October 31, 2007, leaving Colm Kelleher, in his first appearance as CFO, to face angry investors about the Company's losses. Finally, the news that Thomas Daula would also be departing the Company was leaked on February 20, 2008, after the filing of the Company's 2007 Form 10-K, and Daula resigned in March 2008.

380. The chart below shows the individuals who were fired, demoted, or resigned in connection with the Company's disclosures of its losses:




381. Defendants Morgan, Mack and Sidwell also knew or recklessly disregarded that during the Class Period the Company had announced and was issuing to the public $1 billion worth of Fixed Rate Senior Notes ("Senior Notes") on or about October 30, 2007, which was one week prior to Defendants' disclosure of massive losses from U.S. subprime bets. Defendants Mack and Sidwell had signed the Registration Statement for the Shelf Offering related to these Notes, and they were aware or recklessly disregarded that the Company had issued an amended Prospectus on July 24, 2007 and a pricing supplement on October 30, 2007 to issue the Notes to investors. When the Notes were publicly issued in late October 2007, the Company and Mack and Sidwell knew or recklessly disregarded that Morgan's true financial condition and prospects had not been fairly presented in the Company's SEC filings, which were incorporated by reference into the Registration Statement and Prospectuses for the Notes. Morgan, Mack and Sidwell deliberately and recklessly

failed to update the financial condition and prospects of the Company prior to the Notes being offered because they wanted to raise approximately $1 billion through the Note offering before news of Morgan's massive subprime-related losses were disclosed to the public and to ratings agencies that had rated the Notes as "Aa3".

**B. John Mack**

382. Defendant Mack participated in the issuance of, signed and certified as accurate and complete as required by Sarbanes-Oxley, the Company's materially false and misleading SEC filings issued during the Class Period including, *inter alia*, the Company's Second and Third Quarter Form 10-Qs filed with the SEC. Throughout the Class Period, Defendant Mack also made a number of materially false and misleading statements regarding the Company's subprime exposure as well as the effectiveness of its risk monitoring procedures.

383. Morgan's acquisition and aggressive trading of risky subprime assets was fostered by Mack who implemented a business strategy that granted the "trader's option" to the Proprietary Trading Group and deliberately steered the Company to assume higher levels of risk. While the Company was increasing its exposure to risk, it was doing so without effective policies and controls to ensure that the Company's exposure of risk was accurately communicated to its investors in direct contrast to its public statements.

384. While Defendants told shareholders and investors that Morgan's growth and concomitant expanding risk was "disciplined and balanced," Mack actively changed the risk reporting structure within the Company. Specifically, in October 2005, Mack surreptitiously altered Defendant Daula's reporting line so that he reported directly to Mack's hand-picked Company Co-President and head of trading, Zoe Cruz, notwithstanding that Cruz's colleagues had panned her as recklessly assuming or disregarding risk. *See supra* Hagan ("'I'd be more than happy for Zoe [Cruz] to take more risk,' Pandit told a friend, 'if I felt comfortable that she understood the risk she'd be taking.'"). Further, Mack knew or was reckless in disregarding the fact that his alteration to the Company's risk controls was counter to the industry standard that risk control personnel's reporting chain should be independent of the business line.

385. Defendant Mack's reckless decision to have the chief risk manager report to the

same group trading manager has since been reversed. After the Company reported its $9.4 billion loss in Fourth Quarter 2007, Defendant Mack changed the ranks to require Morgan's Chief Risk Officer, Defendant Daula, to report to the CFO, instead of to the head of trading.

386. In an April 21, 2007 Shareholder Meeting, Defendant Mack singled out Cruz (and Daula) as being responsible for managing Morgan's risk exposure and reassured investors that Cruz and Daula's management of the Company's risk exposure boded well for the Company and investors. Thus, while Mack was encouraging Morgan to increase its risk appetite—while assuring investors that Morgan's risk assessment tools were effective – he deliberately altered the reporting structure to place a manager with debilitating conflicts of interest (as Cruz's compensation was based on the performance of ISG) in charge of ensuring that the Company complied with its stated risk exposure policies. Cruz effectively held sole authority for managing risks of trades that she was approving; thus, unbeknownst to shareholders and traders, the Company had no risk controls for a trading desk that was engaging in aggressive, high-risk trades that ultimately "bet the Company."

387. Defendant Mack's willingness to recklessly amass risk initially paid dividends as ISG reported record results throughout fiscal 2006, and through the first two quarter of fiscal 2007. The Company's positive statements about its ability to manage risk continued into the first and second quarters of 2007 which led to, *inter alia*, credit upgrades from S&P, which were based on Morgan's purported ability to distinguish itself from its Wall Street peers as problems continually erupted from the ongoing collapse of the subprime market.

388. However, while Mack and Morgan were touting the Company's disciplined growth, by at least May 2007, by her own admission, Cruz became aware of the potential catastrophic exposure Morgan faced by a collapse of the housing/credit markets. When (by July 2007) the results of Cruz's requested stress test results demonstrated that the Company could lose $3.5 billion from its subprime related exposure, such that she ordered the CDS position cut, disclosure of this potential subprime-related loss could have cost the Company a ratings downgrade from rating agencies thereby forcing the Company to raise hundreds of millions of dollars in additional capital. During the Third and Fourth Quarter 2007, the credit markets were tightening and panic was

ensuing as Wall Street titans like Citigroup and Merrill Lynch reported declines in profits and huge multi-billion-dollar losses from bad bets on securities underpinned by subprime mortgages.

389. Throughout most of fiscal 2007, until November 7, 2007, Defendant Mack and other Defendants deliberately and recklessly stated and implied that Morgan had largely skirted subprime mortgage losses that plagued the Company's rivals. Mack stood by silently as CEOs of Morgan's rival Wall Street companies were being ousted. Mack knew that cash was king as capital suddenly was hard to come by – even for Wall Street stalwarts like Morgan, and earnings volatility and ratings downgrades would have materially impaired Morgan's ability to operate.

390. As disclosed by the Company in its Third Quarter 2007 Form 10-Q, a one-notch downgrade by the Rating Agencies would have materially disrupted the Company's operations and would have required the Company to post an additional $588 million in collateral to counterparties. By deliberately failing to mark to market and record losses on its risky CDS positions and deliberately and recklessly avoiding disclosure of Morgan's multi-billion dollar subprime exposure, Mack quietly was able to negotiate a $5 billion capital infusion from China's CIC that prevented a capital void that would have severely disrupted the Company's ability to operate in the already roiling credit markets.

391. Cruz's stress test, demonstrating the potential debilitating effect of the CDS positions (that she approved), was not the only piece of information that Mack had access to regarding the Company's ensuing financial crisis during the Class Period. In a letter dated August 20, 2007, the SEC informed Defendants that Morgan's subprime-related disclosures were insufficient. Moreover, by August 2007, Daula – who was touted by Mack as being "one of the best overall risk managers" – was "vocally" warning Defendants that the pricing models used by Morgan to value assets were flawed and were not producing accurate results. Mack, along with the other Defendants, managed the day-to-day affairs of the Company through his CEO responsibilities and participation on Morgan's management committee. As reported in *The Wall Street Journal*, Mack also had been attending weekly risk-assessment meetings at least by October 2007 regarding "rumblings" of the Company's "$7.8 billion fourth-quarter write-down tied to bad CDO bets." Hagan's article in *New York Magazine* also stated that Mack got more directly involved, leading risk-management

meetings and investigating what went wrong as the impending losses from the CDS positions were growing. Moreover, during the December 19, 2007 conference call, Mack essentially admitted that the risks taken by the "one desk" with the subprime-related CDS positions were material to investors, and were taken with his knowledge, when he stated that, going forward, "I'm going to be and this firm is going to be much more cautious in some of these larger bets."

392. Despite all of the following: 1) receipt of the SEC's letter demanding additional subprime-related disclosures; 2) critical deterioration in the credit markets; 3) enormous reported subprime-related losses from Morgan's Wall Street peers; 4) participation in weekly credit assessment meetings regarding the multi-billion dollar Fourth Quarter 2007 write-down; 5) Daula's warnings and the reports of stagnated losses as demonstrated by Cruz's stress test; and 6) knowledge or reckless disregard of growing illiquidity from tightening credit markets; Mack publicly disclosed nothing about the extent of the Company's massive subprime exposure until unavoidable billions in write-downs could no longer be concealed because of leaks in the market regarding the CDS positions and the continuing demise of the subprime and credit markets, and most importantly, the continuing substantial decline in the ABX index.

393. Defendant Mack certified both the Second Quarter 2007 Form 10-Q and the Third Quarter 2007 Form 10-Q and knowingly and recklessly stated that the Company's internal controls had no material weaknesses and that each of the 10-Qs "fairly presents, in all material respects, the financial condition and results of operations of the Company."

394. Further, Morgan's attempt to paint its November 7, 2007, write-down as the result of a sudden realization that its U.S. subprime liabilities suddenly materialized is completely undermined by Cruz's actions beginning in May (unwinding some subprime positions and ordering a stress test on others) and continuing through the summer of 2007. Throughout the Class Period, Mack knew or recklessly disregarded that the overall impression created by Morgan's financial statements and earnings reports were not consistent with the business realities of the Company's financial condition and prospects. Moreover, for each of the 10-Qs for the second and third quarters of 2007, Mack signed a "Rule 13A-14(A) Certification of Chief Executive Officer," which was filed with the 10-Q, in which he certified that, along with Sidwell, he had "designed such disclosure

controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, **to ensure that material information relating to the registrant**, including its consolidated subsidiaries, **is made known to us by others within those entities, particularly during the period in which this report is being prepared.**" (Emphases added).

395. Mack had strong incentives – both economic and reputational -- to manipulate Morgan's true financial condition as his compensation was directly tied to the Company's performance. The majority of Mack's compensation was directly tied to the Company's performance through an incentive bonus that depended upon Morgan's performance. Mack's annual salary was $800,000, but over 98% of his compensation was received in year-end bonuses (restricted stock units and stock options) that depended upon Mack's performance and the Company's performance and progress towards its strategic goals. Mack held the distinction in years past as having received "the largest bonus awarded to a Wall Street CEO," as reported in USA TODAY, December 15, 2006.

396. Mack had publicly announced in 2005 the goal of doubling Morgan's pre-tax profits in five years and committed to substantially growing income and earnings by balancing a deliberate increased risk appetite for aggressive proprietary trading with increased risk controls. Mack knew or recklessly disregarded and liabilities resulting from multi-billion-dollar, high-risk CDS positions deliberately were not properly valued in accordance with GAAP so that the Company could meet analyst expectations during the Class Period. Defendant Mack and the other defendants recklessly hoped – against clear moribund signals -- that the subprime and CDO markets would rebound and that they could unwind Morgan's CDS positions, or buy time to find an investor to shore up the Company's capital needs.

**C. <u>David Sidwell</u>**

397. As Morgan's CFO, Defendant Sidwell participated in the issuance of, signed and certified the Company's materially false and misleading SEC filings as accurate and complete, as required by Sarbanes-Oxley. During the Class Period, Sidwell signed and certified the Company's Second and Third Quarter Form 10-Qs filed with the SEC, and throughout the Class Period, Sidwell conducted quarterly earnings conference calls with shareholders and investors and made a number

of materially false and misleading statements regarding the Company's subprime exposure as well as its risk-monitoring infrastructure.

398. As the Company's CFO, Sidwell was in charge of monitoring the Company's internal controls and reporting Morgan's risks, including the undisclosed adverse billion-dollar CDS positions during the Class Period. Sidwell assumed his CFO role at Morgan in March 2004, and therefore, he was keenly aware of Morgan's agreement to enter in the Cease and Desist Order with the SEC in November 2004, in which the Company agreed to cease and desist from committing or causing any future violations of the Exchange Act by maintaining adequate controls to ensure that Morgan valued its positions in accordance with GAAP and accurately stated its positions in the Company's books and records.

399. In an investment bank, it is part of the CFO's job to know what securities the company has in terms of its proprietary trading, because the CFO is responsible for obtaining the financing to purchase those securities. Therefore, Sidwell could not have been ignorant about the existence, size and nature of the CDS's without having been reckless in his ignorance.

400. Having singled out and publicly discussed during the September 19, 2007 conference call, the transfer of what we now know was the CDSs from Level 2 to Level 3, Sidwell either knew or was extremely reckless in not knowing that the reason that the fair value category of the CDSs was being changed, that the fair value of these CDSs was based on the ABX Index, and that they were *not* being recorded at fair value.

401. In addition to his years of experience as Morgan's CFO, Sidwell had 20 years of extensive experience as the former CFO of the investment bank division of JPMorgan Chase and as Controller of its predecessor, JP Morgan. Prior to his experience at JPMorgan Chase, Sidwell spent nine years with the public accounting firm, Pricewaterhouse Coopers, and he had served as a trustee of the International Accounting Standards Committee Foundation and was a member and Chair of the SEC Committee on Corporate Reporting of Financial Executives International. He also had in the past been a committee member of an advisory council of Emerging Issues Task Force of FASB. Sidwell also was tapped in October 2007 to be a member of the SEC Advisory Committee on Improvements to Financial Reporting. Defendant Sidwell drew upon his numerous years of

expertise in GAAP and financial reporting to guide Morgan through its adoption of Fair Value reporting in accordance with SFAS 157 in December 2006. Therefore, he was acutely aware of the Fair Value reporting requirements and had purportedly implemented them at the Company. During the Class Period, Sidwell knowingly and recklessly caused Morgan to issue and file financial statements and reports with the SEC that stated that the Company had implemented SFAS 157 and had prepared its financial statements in accordance with SFAS 157, when he knew or recklessly disregarded that Defendants had not complied with SFAS 157 for the Company's risky multi-billion-dollar bet on subprime-related securities.

402. Sidwell also served on Morgan's Management Committee through which he and other high-level executives, including Defendants Mack, Cruz and Daula, oversaw and controlled the Company's day-to-day activities and had ultimate responsibility for the control function over trading activities.

403. Even prior to the Class Period, Sidwell assured investors that Morgan was increasing its risk taking endeavors in a "disciplined and balanced way." Analysts seized on Sidwell's representations and touted the Company's success as based, in part, on "gradual[] increase" in the amount of trading risk. Moreover, in reporting earnings for the First Quarter 2007, Sidwell assured investors that while subprime had been a key focus in the market during early March 2007, the Company had managed its risk through a variety of hedging strategies and proprietary risk positions that had significantly contributed to Morgan Stanley's record trading results and income. The record income from First Quarter 2007 and further gains from subprime bets on CDSs were carried forward in Second Quarter and Third Quarter fiscal 2007 earnings reports, without additional necessary disclosures that related bets had soured and were projected to reverse course for record earnings and cause a record loss.

404. Sidwell also falsely assured investors that the Company had decreased Morgan's risk exposure in early 2007 to balance Morgan Stanley's level of risk with Defendants' view of potential market changes. This was all part of the total mix of information regarding Morgan Stanley leading into the Class Period. However, once the Class Period began, Sidwell knew or deliberately and recklessly disregarded that the Proprietary Trading Group's CDS positions had exposed the

Company to billions of dollars in losses because he participated on the Company's Management Committee along with Defendant Daula, the Company's CRO. As confirmed by CW 5, Controllers created daily summaries of trading positions and marks from the Company's traders that were provided up the channel of authority at Morgan to Daula and Sidwell and other managers.

405. Sidwell knowingly and recklessly made material misrepresentations concerning the Company's ability to weather the subprime meltdown during the Class Period. Indeed, at the beginning of the Class Period, during a June 20, 2007 Second Quarter earnings call with analysts, Sidwell served as the spokesperson for the Company assured the market that the Company "certainly did not lose money in [the subprime] business" during the second quarter of 2007. Sidwell's comments were made after Cruz (starting in May 2007) began cutting, and selectively advising Morgan customers to eliminate, subprime-related positions and had ordered Daula to conduct a stress test on Morgan's positions. Sidwell was familiar with the Company's stress testing, and he commented on the Second Quarter 2007 earnings call that stress testing scenarios helped him and others "manage less liquid risk" as the Company had increased risk exposure during the latter half of Second Quarter to "balance the level of risk with our view of market opportunities…."

406. Thus, while Sidwell was assuring analysts and the market that the Company had not suffered from any marks in the mortgage area from "betting the wrong way" and "did not lose money in [the subprime] business," Morgan executives (including Cruz) were simultaneously trying to unwind the Company's exposure to subprime losses and had ordered an analysis of the Company's subprime exposure, including the Proprietary Trading Group's big bet on subprime-related CDSs. Sidwell made no mention of these facts, or the Company's multi-billion-dollar exposure resulting from risky subprime CDS positions on the Second Quarter 2007 earnings conference call.

407. Further, the SEC's August 30, 2007 letter to Sidwell put him and the Company on further notice that the SEC considered Morgan's disclosures about its subprime exposure to be inadequate. Moreover, an article appearing in the *Financial Times* (on December 21, 2007) disclosed that "[b]y August [2007], Mr. Daula was very vocal in saying that there were no proper

pricing models for [subprime related] . . . trades, that positions were not being properly measured, and that the history traders used in their models was not a reliable guide." Despite the SEC's direct request to Sidwell for more transparency and Daula's "vocal" warnings, Morgan's Third Quarter 10-Q (filed 40 days after the SEC's letter was issued) – which was signed by Sidwell – failed to provide investors with any detail concerning: i) Morgan's exposure to potentially unavoidable multi-billion-dollar losses from the Global Proprietary Group's trade; ii) Cruz's frantic divestment of subprime-related exposure beginning in May; iii) the results of Cruz's stress test; or iv) Daula's warnings.

408. Rather than increase Morgan's transparency, after receiving the SEC letter, Sidwell knew or recklessly disregarded that the Company was attempting to conceal fair value losses on Morgan's subprime exposures by using Level 3 inputs to arrive at more favorable valuations, when the Level 2 inputs that had been used all along yielded unacceptable losses. The use of those Level 3 inputs over Level 2 inputs – which violated GAAP – was motivated not only by Sidwell's desire to conceal losses from the Proprietary Trading Group's trade but also by earnings expectations for the Company. The Company reported financial figures just barely within Wall Street's expected range solely by using Level 3 inputs to value the CDS position and ignoring inputs from the ABX Index. Without the manipulation of fair value and deliberate disassociation of the CDS positions from the ABX Index, Morgan would have been forced to record $4.4 billion of losses on the CDS positions, would have missed its earnings targets by a large margin and would have reported a loss for the first time in the Company's history.

409. Defendants failed to respond timely to the SEC's request for additional subprime disclosures, until November 27, 2007 (after Sidwell had retired) and well after the Company had begun to publicly disclose the aggressive multi-billion-dollar CDO subprime bet that had exposed the Company and its investors to billions in losses.

410. During the Third Quarter 2007 Conference Call, Sidwell falsely stated that his "goal" for the call was "to be as clear as possible" as to how the "many challenging market dynamics" had impacted Morgan's results. Sidwell acknowledged that the credit markets had deteriorated considerably during the course of the Company's Third Quarter and that "increased

volatility, significant spread widening, lower levels of liquidity, and reduced price transparency at all parts of the capital structure" had affected lending markets, the effectiveness of hedging strategies, subprime mortgage markets, including the CDS market, and other structured credit products. He further stated that the "credit environment" had significantly impacted Morgan's results in lending and credit sales and trading. Sidwell provided granular detail of how markdowns to loans and commitments had led to approximately $940 million in mark-to-market losses during the quarter and that EPS from such losses was approximately $0.33 per share. He also gave details regarding $480 million in other losses, but he deliberately and recklessly failed to mention that Defendants' mark-to-market of the subprime-related CDS position had generated **$1.9 billion** in *recognized* losses during Third Quarter.

411. On the Third Quarter 2007 earnings conference call, Sidwell knowingly and recklessly omitted any reference to: i) reclassification of subprime-related CDS liabilities from Level 2 to Level 3; ii) the subprime-related exposure to billions of dollars in losses; or iii) the devastating results of Cruz's stress test. He further deliberately omitted to reference the true motivation behind the improper reclassification of assets and liabilities, which was to meet earnings projections and allow the Company to quietly obtain a capital infusion before blasting shareholders and investors with news of billions in losses from risky subprime CDS bets.

412. Sidwell falsely and recklessly stated that the Company's "assets and liabilities are recorded at fair value." Sidwell also publicly claimed that Defendants used ***observable*** market data to value its assets and liabilities, which he knew was materially false and misleading as he and other Defendants knowingly and recklessly failed to record the $13.2 billion long CDS position at fair value as dictated by the decline in the benchmark ABX indices, which was the most significant observable input to value the CDS positions in Third Quarter 2007.

413. Although providing detailed information on the conference call regarding the percentage of assets and liabilities classified as Level 2 and Level 3, and stating that liabilities in Level 3 had increased to approximately 3% of total liabilities, as compared to 2% in Second Quarter 2007, Sidwell knowingly and recklessly did not disclose that the increase in Level 3 liabilities was in connection with the Proprietary Trading Group's CDS position and that the increase in Level 3

liabilities and purported "fair" valuation related to the undisclosed $1.9 loss mark-to-market loss; thereby rendering these statements materially false and misleading as well. Sidwell also falsely stated that the major components of Level 3 are the "same" as disclosed in Second Quarter 2007. The magnitude and nature of the undisclosed $1.9 billion write-down and contemporaneous reclassification of billions of dollars of related subprime liabilities, especially in light of Sidwell's other disclosures on the conference call and in the Form 10-Q, demonstrates that Sidwell's omissions of material information regarding the CDS positions were deliberate and were made to create an overall impression that was not consistent with the business realities of the Company's financial condition and prospects. Moreover, for each of the 10-Qs for the second and third quarters of 2007, Sidwell signed a "Rule 13A-14(A) Certification of Chief Financial Officer," which was filed with the 10-Q, in which he certified that, along with Mack, he had "designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, **to ensure that material information relating to the registrant,** including its consolidated subsidiaries, **is made known to us by others within those entities, particularly during the period in which this report is being prepared.**" (Emphases added).

414. Defendant Sidwell also certified both the Second Quarter 2007 Form 10-Q and the Third Quarter 2007 Form 10-Q, as required by Sarbanes-Oxley, and knowingly and recklessly falsely confirmed that the Company's internal controls had no material weaknesses and that each of the 10-Qs "fairly presents, in all material respects, the financial condition and results of operations of the Company." Sidwell knew or recklessly disregarded that these statements and certifications were materially false and misleading when made.

415. Sidwell directly benefited from misrepresenting Morgan's true financial condition. His compensation was tied to the Company's performance, and although Sidwell had announced his intention to resign effective at fiscal 2007 year end, he relinquished his CFO position on October 11, 2007, which was the day after the Third Quarter 2007 Form 10-Q was filed with the SEC. Sidwell retired from employment with Morgan on October 31, 2007, according to Morgan's 2008 Proxy (filed with the SEC on February 27, 2008). Therefore, Morgan's compensation committee considered only his and the Company's performance for the first three quarters of the fiscal year

2007 in deciding Sidwell's bonus. Based on Sidwell's "helping develop the Company's strategic growth plan and communicating it to the investment community" during the first three quarters of fiscal 2007, Morgan's compensation committee awarded Sidwell a bonus of ***$13 million***. Because Sidwell retired before the grant date of fiscal year-end incentive compensation, Sidwell was able to obtain his entire fiscal 2007 bonus in cash, instead of an equity award.

**D. <u>Zoe Cruz</u>**

416. While investors were being assured that Morgan Stanley's risk from subprime exposure was contained, as detailed in *New York Magazine*, in May 2007, Cruz claimed that she had personally become concerned about the Company's exposure to the entire mortgage business and subprime losses and began ordering the unwinding Morgan's mortgage-related exposure before the Class Period even began in May 2007. Cruz also claims to have informed some of Morgan's clients – but not Morgan's shareholders – of an impending collapse of the mortgage and housing markets and urged the Company's clients to exit positions to limit their exposure to mortgage related positions.

417. Cruz further acknowledged that her concerns led her to order Daula to run stress tests on the Proprietary Trading Group's positions at this same point in time. Cruz purportedly received the results of the stress test on July 4, 2007, according to her own account of the timing. At that time, Defendant Daula informed Cruz that the stress analysis suggested that Morgan could lose ***$3.5 billion*** on the Proprietary Trading Group's CDS positions.

418. Despite having specific knowledge of Morgan Stanley's multi-billion dollar exposure to subprime losses, Cruz kept quiet and allowed the Company to file its Second Quarter 2007 Form 10-Q with the SEC on July 10, 2007, without any disclosures regarding the CDS positions or potential subprime-related multi-billion-dollar losses or her order to Daula to cut the position. Moreover, less than one month ***after*** Cruz ordered the Proprietary Trading Group's CDS positions to be cut, Morgan Stanley held a conference call with analysts to discuss the Company's second quarter 2007 results. During the call, Sidwell, as the spokesperson for the Company, failed to mention the massive loss uncovered by the stress test ordered by Cruz weeks earlier. As a result, Cruz had actual knowledge that these statements were materially false and misleading when made.

419. On the Third Quarter 2007 conference call, Defendant Kelleher reported that an additional $2 billion in capital had been allocated to the ISG, which was under Cruz's control. Thus, while Cruz was ordering the Company to cut its exposure to subprime losses, Cruz knew that Morgan's investors were being led to believe that all was well within the Company. Cruz also knowingly and recklessly stood idly by as Morgan made material omissions in the Third Quarter 2007 earnings release and Third Quarter 2007 Form 10-Q regarding the Company's $1.9 billion write-down from the CDS positions – caused by the Proprietary Trading Group of the ISG division that she managed and controlled – or the Company's $10.4 billion subprime exposure.

420. Throughout the summer of 2007, Cruz "underplayed the extent of the losses [at Morgan]," although according to clients, she was very bearish on subprime and very concerned. *See supra* Hagan ("'Cruz was clearly a bear and clearly extremely concerned, and she called me every couple of weeks,' says one of her former clients, Stanley Druckenmiller, a veteran hedge-fund manager.").

421. Throughout the Class Period, Cruz received weekly updates from Daula on the Company's risk position and was well aware that Morgan's risk reporting structure was not publicly disclosed. Thus, setting aside any specific knowledge of defects in Morgan's risk assessment protocols and the Company's exposure to loss, Cruz's job responsibilities required her to be personally aware of material transactions within her department such as the massive bet placed on U.S. subprime by the Proprietary Trading Group. In addition, unbeknownst to investors, Defendant Daula, the Company's CRO, reported directly to Cruz. Cruz had unfettered access to this material adverse information at any time she wanted it. Cruz's specific knowledge of Morgan's subprime exposure (via the results of the stress test and Daula's reports) is corroborated not only by her own account of events, but also by external markets factors, such as the eroding ABX index, subprime losses by Morgan Stanley's peers, increasing defaults and a deteriorating housing market.

422. Also in July 2007, Cruz was aware or recklessly disregarded that credit rating downgrades and credit watch reviews for RMBS and ABS CDOs signaled that mezzanine and high-grade ABS CDO tranches were also going to be subject to downgrades and write-downs. Morgan Stanley's own analysts publicly projected in a July 16, 2007 research report that write-downs could

"bleed into parts of the A stack." Morgan's own report further stated that there had been 1,342 downgrades of subprime RMBS as of July 16, 2007, compared to only 36 such downgrades by Moody's in all of 2006. Thus, in addition to her own suspicions, Cruz had at her disposal and recklessly disregarded key indicators at the outset of the Class Period that the Proprietary Trading Group's big bet on subprime CDSs was ill fated and would cause imminent cataclysmic losses in her ISG division if marked to fair value as required by GAAP. These suspicions converted into actual knowledge by her own admission by no later than July 4, 2007. Cruz not only left the position in place after her orders to cut it were ignored, but she also knowingly and recklessly caused Morgan to disclose materially false and misleading reports regarding the financial results of the ISG and the management of increased high-risk trading to shareholders and investors.

423. Mack has since pinned Morgan's financial woes on Cruz. *See* "The colossus brought to its knees," *The Daily Mail*, Sept. 19, 2008 ("Then came the credit crunch. Morgan's lost $10 billion on the mortgage markets and critics called for him [Mack] to be sacked. Instead, ever ruthless, ***Mack blamed his chief henchman, Zoe Cruz 'Missile', and removed her instead***.") (emphasis added).

424. In addition to her actual knowledge of the fraudulent misstatements, Cruz was motivated to boost the Company's reported performance because the majority of her multi-million compensation was received in the form of year-end incentive compensation. Cruz also was motivated to misrepresent Morgan's true financial condition to avoid being fired, which is exactly what happened to her when the truth was revealed.

**E. <u>Tom Daula</u>**

425. As Morgan's Chief Risk Officer, Defendant Daula was responsible for all risk-related disclosures issued by the Company, including risk-related disclosures concerning Morgan's Proprietary Trading Group and the Company's proprietary trades. Daula was one of the chief spokespersons for assuring investors that Morgan risk monitoring exposure was adequate. For example, in a power point presentation by Daula to investors (dated February 14, 2006), titled "Risk Management at Morgan Stanley An Overview," Daula outlined the procedures Morgan supposedly had in place to monitor trading risks. Daula's presentation was intended to, and did in fact, assure

investors that the Company's growth was disciplined and within the bounds of acceptable risk.

426. Moreover, in an April 21, 2007 Shareholder Meeting, Mack singled out Daula (and Cruz) as being responsible for managing Morgan's risk exposure and reassured investors that Cruz and Daula's management of the Company's risk exposure boded well for the Company and investors. Thus, setting aside any specific knowledge of defects in Morgan's risk assessment protocols and the Company's exposure to loss, Daula's job responsibilities required him to ensure Morgan's risk assessment functions were sufficient, functioning properly and did not conflict with public disclosures being made about risk assessment protocols.

427. Notwithstanding Daula's responsibilities as Morgan's Chief Risk Officer, at the very outset of the Class Period and months before Defendants disclosed Morgan's massive subprime-related losses, Daula was personally aware that the Proprietary Trading Group's CDS positions potentially exposed the Company to ***$3.5 billion*** in losses as he himself had performed a stress test that Cruz had directed him to run in May 2007. Defendant Daula also provided weekly updates to Cruz on the Company's risk exposure, at least each week from July 4, 2007 until the end of the Class Period, and Daula had actual knowledge that Morgan's undisclosed subprime exposure had grown to $10.4 billion as of August 31, 2007.

428. Moreover, published reports revealed that beginning in August 2007, "Daula was very vocal in saying that there were no proper pricing models for [sub-prime related] . . . trades, that positions were not being properly measured, and that the history traders used in their models was not a reliable guide." Daula's concerns and the true dire state of the Company's internal controls and pricing models were not disclosed to investors during the Class Period as the Company falsely reported that risks were being taken in a balanced and disciplined manner. Daula served on the Company's management committee and had a duty to ensure that the Company accurately reported its financial results, condition and prospects, which Daula knew or recklessly disregarded, was not being done during the Class Period.

**F. <u>Colm Kelleher</u>**

429. Defendant Kelleher, assumed the role as Morgan's CFO on October 11, 2007, although he was not slated to take over the position until the end of fiscal 2007 (November 30,

2007) when Defendant Sidwell was supposed to resign. Sidwell relinquished the CFO position to Kelleher on October 11, 2007, which was the day after Morgan filed its materially false and misleading Third Quarter 2007 Form 10-Q with the SEC. Kelleher assumed the CFO position at a time of financial crisis at Morgan, and he made a number of materially false and misleading statements regarding Morgan's financial results and subprime exposure during the Class Period.

430. Kelleher also was a member of Morgan's Management Committee during the Class Period and participated in decisions and risk management at the highest levels of the Company. According to the Deutsche Bank analysts, Kelleher's background included fixed income sales and structuring and an early career with the accounting firm, Arthur Andersen. The analysts stressed that Kelleher, in expressing his philosophy of risk management, had stressed "that there cannot be valuation issues if there is going to be efficient risk management." He also stated that one of his first moves was to "find alternative means to prove valuations." Therefore, Kelleher also had the background that enabled him personally to understand that the CDS position at the end of Third Quarter 2007 was improperly valued in order to manage earnings and avoid reporting a loss.

431. Kelleher held meetings with analysts in October 2007, after which analysts at Deutsche Bank reported that they had taken away "comfort that the 3Q07 shortfall stemmed from bad execution vs. bad systems and that, with more normal markets, performance should mostly recover." They further reported that the Company's problems "were attributed less to risk control than to poor trading, a good portion of which should recover with better markets." Kelleher also apparently reported to the Deutsche Bank analysts that he had "shadowed the outgoing CFO for the past five months." Therefore, Defendant Kelleher acknowledged that he was privy to the information reviewed by Defendant Sidwell during the entire Class Period, including the false and misleading statements in the Second and Third Quarter 2007 Form 10-Qs and the accounting manipulations through which the CDS position improperly was valued after being reclassified to Level 3 from Level 2 to manage earnings and buy time for the Company to find a capital infusion.

432. Kelleher told the Deutsche Bank analysts that risk management had played out as expected during Third Quarter and "does not need changing." As a result, the analysts reported that "our read is that Morgan thought it more important to limit its losses than risk any more of its

earnings or capital during the August turmoil. If so, we feel a touch better about its risk management and slightly better that its results can improve more directly with better markets." Kelleher's statements to the analysts, which were repeated to the market at large as he knew and intended, were materially false and misleading and deliberately and recklessly misrepresented the losses and risk management systems at the Company, which as stated by Defendant Daula were riddled with problems from nonworking models and lack of ability to properly measure trading positions by no later than August 2007, several months ***before*** Kelleher made such statements.

433. In addition, Kelleher participated in the Company's Third Quarter 2007 earnings conference call and made a number of materially false and misleading statements. Defendants Kelleher and Sidwell volleyed coverage of the Company's financial performance back and forth during the call, and Kelleher falsely stated that Sidwell had "covered the primary drivers of the decrease" in revenue from fixed income sales and trading during Third Quarter, when in fact, Sidwell and Kelleher each knew and both failed to disclose the ***$1.9 billion*** write-down to the long CDS position during Third Quarter 2007. On the call, Kelleher and Sidwell provided granular detail regarding losses generated from mark-to-market loan commitments and related $940 million in losses and a $726 million write-down, which demonstrates that the exclusion of any information regarding the $1.9 billion write-down was deliberate and reckless.

434. Kelleher also told analysts during the Third Quarter 2007 earnings conference call that he was going to provide them with "enough analytic metrics to help [them] model future scenarios, based upon [their] overall market assumptions." Kelleher deliberately and recklessly failed to disclose the most significant metrics regarding the Company's $10.4 billion subprime exposure, and he falsely attributed the decrease in revenues from fixed income sales and trading to general, unspecified "market conditions."

435. On November 7, 2007, after Morgan announced a $3.7 billion decline in its subprime related assets, Kelleher held his first solo conference call with analysts during which he tried to present Morgan's loss as a surprise. Notwithstanding Kelleher's attempt to present the loss as unexpected, Kelleher and other Morgan senior executives (including the Individual Defendants) knew or recklessly disregarded as early as July 2007 that Morgan was exposed to billions of dollars

in subprime related losses. Kelleher also had participated in the Third Quarter 2007 earnings conference call and therefore also was aware that the Company had secretly written off $1.9 billion from the CDS position, and he further was aware that the liabilities from the long CDS position were deliberately understated to manage earnings and that the valuation of the long CDS position had ignored the observable input represented by the decline in the benchmark ABX index during the same time period.

436. Kelleher directly benefited from misrepresenting Morgan's true financial condition because his compensation was directly tied to the Company's performance. In explaining the compensation awarded to Kelleher in 2007, the 2008 Proxy (filed with the SEC on February 27, 2008) stated that the compensation Committee considered Mr. Kelleher's "accomplishments as Head of Global Capital Markets and his transition into the CFO role, including helping the Company to address issues relating to the disruption in the mortgage securities market during the second half of the year" and awarded Kelleher over ***$11.36 million*** in cash and other incentive compensation for 2007.

## XII. <u>LOSS CAUSATION</u>

437. Plaintiffs and Class members were damaged as a result of Defendants' fraudulent conduct as set forth herein. During the Class Period, Defendants knowingly and recklessly engaged in a scheme to deceive the market by issuing a series of materially false and misleading statements (and omitting material facts) relating to, *inter alia*: the magnitude and nature of increased risk in Morgan's proprietary trading; the adequacy of the Company's risk management controls; the Company's ability to produce record results with a purported balanced approach to risk, the limited nature of the Company's exposure to subprime-related losses; the Company's adherence to GAAP (including Morgan's stated practice of reporting assets at fair value); the true purpose behind the Company's reclassification of assets and liabilities from Level 2 to Level 3 in the Third Quarter 2007; the adequacy and nature of the losses and write-downs taken in Third Quarter 2007; the adequacy of the losses and write-downs taken and disclosed on November 7, 2007; the circumstances leading to the Company's sub-prime-related write-downs and related material losses in Third and Fourth Quarter 2007; and the Company's purported ability to outperform its Wall

Street peers in the prevailing economic environment in 2007.

438. As a direct result of the Defendants' scheme, misrepresentations, and omissions of material facts, the price of Morgan's common stock was artificially inflated throughout the Class Period.

439. Class members unwittingly and in reliance upon Defendants' materially false and misleading statements and/or omissions purchased Morgan's common stock at artificially-inflated prices. But for the Defendants' material misrepresentations, omissions and fraudulent acts, Plaintiffs and other Class members would not have purchased Morgan's stock at all, or would not have purchased it at the artificially-inflated prices at which it traded during the Class Period. As Defendants' material misrepresentations and omissions were gradually revealed to investors and shareholders through a series of partial corrective disclosures, Morgan's stock fell precipitously as the artificial inflation caused by the Defendants' conduct was removed from Morgan's stock price.

440. The declines in the Company's stock price between November 1, 2007 and the end of the Class Period, including, but not limited to, the declines summarized below, are directly attributable to the market absorbing information correcting the Defendants' fraudulent misrepresentations and omissions and/or the materialization of risks concealed by Defendants from Morgan's investors and shareholders.

441. Plaintiffs and other members of the Class suffered substantial economic losses as the price of Morgan's stock fell in response to the issuance of partial corrective disclosures and/or the materialization of risks concealed by the Defendants from Morgan's investors and shareholders. The following corrective disclosures caused Morgan's stock to drop, thereby damaging investors, are representative, not exclusive, of the partial corrective disclosures and/or the materialization of concealed risks that led to Plaintiffs' and other putative Class members' damages for which relief is sought in this matter.

**A. The Events Leading Up to and The Company's Initial Revelations About Its Subprime Exposure on November 7, 2007**

442. Between November 1 and November 7, 2007, first rumors, then speculation, and finally, on November 7, 2007, confirmation by the Company of large losses relating to previously-

undisclosed exposures to U.S. subprime markets caused Morgan's stock price to fall from $67.26, the closing price on October 31, 2007 to $51.19, the closing price on November 7.

443. On Thursday, November 1, 2007, Mike Mayo, an analyst at Deutsche Bank predicted that Morgan could face large losses due to exposures from CDOs. In part, this speculation was fueled by information leaking into the analyst community by the departures of traders from the Proprietary Trading Group, combined with existing turmoil in the subprime market, all of which suggested that Morgan had a serious problem on its hands.

444. On Friday, November 2, 2007, the Defendants fired Howard Hubler. Although there was no public announcement of Hubler's firing, information about his firing fueled additional rumors and speculation in the market about Morgan's exposure to subprime losses.

445. On November 6, 2007, David Trone, an analyst with Fox-Pitt Kelton Cochran Caronia Waller, issued a report downgrading the rating on Morgan's stock based on the "likelihood that it will take significant write-downs on ABS-CDOs and other mortgage exposures." Fox-Pitt Kelton Cochran Caronia Waller predicted Morgan's "forthcoming write-down could be around $4 bil [sic]" but stated that the analysts "wouldn't be surprised to see $6 bil [sic] in total write-downs…" Trone wrote, "We suggest an outright avoidance until either management discloses more specific exposure data and it proves smaller than we thought, or they actually take writedowns big enough to get beyond this." At 12:35 p.m. the same day, Mike Mayo, the analyst that had launched rumors of a Morgan Stanley writedown the previous week, predicted a write down of $3 to $4 billion, but ascribed the writedown to Morgan's holdings of CDOs.

446. As the market absorbed the information revealed to the public between November 1 and November 6, 2007, Morgan Stanley's common stock fell from its closing price of $67.26 on October 31, 2007, to close at $54.51 on November 6, 2007, a decline of 18.96 %.

447. Before the markets opened on November 7, 2007, the *Wall Street Journal* published an article titled, "Storm May Hit Morgan Stanley After Its Calm --- Write-Downs Projected By Two Analysts," and which appeared in print on the morning of November 7, 2007, and reported that two analysts were projecting write-downs from Morgan based on an "educated guess" (the "November 7, 2007 WSJ Article"). According to the November 7, 2007 WSJ Article:

> Of all the blue-chip Wall Street securities firms, Morgan Stanley seemed one of the least likely to get thumped by the subprime- mortgage crisis. The firm is a bit player in underwriting the securities known as collateralized-debt obligations that have rocked Merrill Lynch, Citigroup and others, ranking a distant No. 10. So why are some on Wall Street starting to sweat about Morgan Stanley's exposure to this business? Two analysts are projecting the firm may take a fourth-quarter write-down of $3 billion to $6 billion. The estimates by analysts David Trone of Fox-Pitt, Kelton and Mike Mayo of Deutsche Bank AG contributed to Morgan Stanley stock's falling $1.08, or 1.94%, yesterday in New York Stock Exchange trading to $54.51 a share. Mr. Trone projected the possible write-downs at $4 billion to $6 billion, Mr. Mayo $3 billion to $4 billion. While the firm may not have underwritten as many CDOs, which are securities backed by pools of assets such as mortgages, Morgan Stanley may have been involved in transactions with other firms that left it with exposure to CDO risks, market participants say. Such proprietary trading with the firm's own money already cost the firm $480 million on money-losing quantitative stock trading in the third quarter, with $390 million in losses occurring on a single day in August, according to regulatory filings. Asked by a CNBC reporter Monday about possible fourth-quarter write-downs, Morgan Stanley Chief Executive John Mack indicated he expected numerous firms would report such hits because market prices have declined. But he wouldn't address specifics about Morgan Stanley.

448. On the evening of November 7, 2007, after the close of the markets, Morgan issued a press release disclosing significant declines in subprime-related exposures and a staggering $3.7 billion write down for the two-month period ended October 31, 2007.

449. Since the initial analyst speculation of Morgan's losses, the Company's share price had fallen 23.9% from $67.26 from the close on October 31, 2007 to $51.19 on November 7, 2007, the date of the Company's disclose of its losses, reducing the Company's market capitalization by $17.03 billion.

450. In announcing that Morgan held an additional $6 billion in net subprime exposure on its balance sheet, Kelleher responded whether this additional exposure should be viewed as a potential for an additional $3.9 billion after-tax writedown at the end of the quarter. Kelleher responded:

> I mean, you can think about it in that way. Look, I mean, $6 billion net exposure, what we've done in this disclosure is to give the exposures rather than the balance sheet balances. $6 billion is assuming zero recovery, 100% write-off -- sorry -- 100%defaults, zero recovery. That is an incredibly extreme place to be. Now, I'm not going to predictive about whether that's likely or not. But, ultimately, if you're going to say in extremist, from the-- sort of an exact point of view, what would be the worst case scenario, it would be $6 billion. But you're having to assume 100% default rates and zero recovery.

451. What Kelleher failed to disclose is that the trend in the ABX Index, as of November

7, 2007, pointed to a virtual certainty of further writedowns and that the so-called "worst case" scenario identified on the call was already unfolding. Furthermore, Kelleher failed to disclose that Morgan's had no models or risk controls, as recognized by Defendant Daula after the end of the Class Period, to properly value these positions, and that these problems would continue to imperil Morgan's performance going forward.

## B. Firings and Demotions, and Final Disclosure of the Company's True Financial Condition

452. On November 29, 2007, Defendant Mack fired Zoe Cruz and demoted Neal Shear, in connection with their conduct that resulted in Morgan's losses. Anthony Tufariello, global head of securitized products at Morgan Stanley, was also fired. The firing of Cruz and Tufariello, and the demotion of super star trader like Shear further revealed the extent of the risk management problems within Morgan and its reduced prospects for growth going forward. As analysts at Punk, Ziegel and Company reported the following day, "this shake-up continues the management instability at this firm which has lasted for four years now. This is clearly quite negative. The firm will never make headway toward developing consistent earnings growth if the players on the team keep shifting and the strategies being employed are constantly shifting." On December 3, 2007 and December 4, 2007, analysts from Deutsche Bank and Credit Suisse, respectively, further downgraded the Company's prospects for the quarter. Between November 7, 2007 and December 4, 2007, these additional revelations about Morgan's failures, further eroded confidence that the Company's losses would be limited.

453. On December 19, 2007, Morgan disclosed that the total writedown of subprime and other mortgage-related exposures for the Fourth Quarter 2007 as $9.4 billion, of which $7.8 billion was attributed to the long CDS position. Defendant Mack finally admitted what the market had been absorbing since the Company's announcement on November 7, 2007, which is that Morgan's losses were the result, in part, from an aggressive subprime bet, the "failure to manage that risk appropriately" and the concealment of such by the knowing and/or reckless conduct of its senior executives. According, to Mack, "[m]ake no mistake, we've held people accountable."

454. While the Defendants staved off a hammering of the Company's stock price with

contemporaneous news of a $5 billion cash infusion from China's CIC, which investors favorably responded to by pushing the stock up 7% to close at $50.58, the effect of Morgan's true financial condition and earnings prospects being revealed since the initial disclosure on November 7, 2007 was dramatic.

455. Between November 7, 2007 and December 18, 2007, Morgan's stock price had fallen from $51.19 to $48.07, a further 6% decline, representing an additional market capitalization loss of approximately $3.30 billion.

## XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: THE FRAUD ON THE MARKET DOCTRINE

456. The market for Morgan's securities was open and efficient at all relevant times for the following reasons (among others):

- The Company's securities met the requirements for listing, and were listed and actively traded on the NYSE;
- As a regulated issuer, Morgan filed periodic public reports with the SEC;
- Morgan regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- The market reacted to public information disseminated by Morgan;
- Morgan was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public market place;
- The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Morgan's securities; and
- Without knowledge of the misrepresented or omitted material facts, Plaintiffs and the other members of the Class purchased or otherwise acquired Morgan's registered securities between the time Defendants made the material misrepresentations and omissions and the time the fraudulent scheme was being disclosed, during which time the price of Morgan's securities was inflated by Defendants' misrepresentations and omissions.

457. As a result of the foregoing, the market for Morgan's common stock promptly

digested current information regarding Morgan from all publicly available sources and reflected such information in Morgan's securities prices. Under these circumstances, all purchasers and acquirers of Morgan's securities during the Class Period suffered similar injury through their purchase or acquisition of Morgan's securities at artificially inflated prices and a presumption of reliance applies.

## XIV. INAPPICABILITY OF SAFE HARBOR

458. As alleged herein, the Defendants acted with scienter because at the time that they issued public documents and other statements in Morgan's name, they knew or with extreme recklessness disregarded the fact that such statements were materially false and misleading or omitted material facts. Moreover, the Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

459. As set forth in detail throughout this Complaint, the Defendants, by virtue of their control over, and/or receipt of Morgan's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to artificially inflate Morgan's financial results. The Defendants created, were informed of, participated in and knew of the scheme alleged herein to distort and suppress material information pertaining to Morgan's financial condition, profitability and present and future prospects of the Company. With respect to non-forward looking statements and omissions, the Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

460. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. None of the statements pleaded herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be materially false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary

statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

461. In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or with extreme recklessness disregarded the fact that forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Morgan who actually knew or with extreme recklessness disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## XV. CLASS ACTION ALLEGATIONS

462. Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased Morgan common stock during the Class Period (from June 20, 2007 to December 19, 2007, inclusive) and who suffered damages as a result of their purchases (the "Class"). Excluded from the Class are: (1) the Company and the Individual Defendants; (2) members of the immediate family of each of the Individual Defendants; (3) the subsidiaries or affiliates of the Company or any of the Defendants; (4) any person or entity who is, or was during the Class Period, a partner, officer, director, employee or controlling person of the Company or any of the Defendants; (5) any entity in which any of the Defendants has a controlling interest; and (6) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

463. The members of the Class are so numerous that joinder of all members is

impracticable. As of the date of this Complaint, there were approximately 1.1 billion shares of Morgan's common stock outstanding. While Plaintiffs do not know the exact number of Class members, Plaintiffs believe that there are, at minimum, thousands of members of the Class who purchased Morgan's common stock during the Class Period.

464. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

465. Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by the Defendants' acts as alleged herein;
- Whether the SEC filings and other public statements published and disseminated by the Defendants to the investing public and purchasers of Morgan's securities during the Class Period omitted and/or misrepresented material facts about Morgan's financial condition, profitability, risks of investing in the Company, effectiveness of its controls or present and/or future prospects of the Company;
- Whether the Defendants omitted to state and/or misrepresented material facts about the financial condition, profitability, risks of investing in the Company, effectiveness of its controls or present and/or future prospects of the Company;
- Whether the Defendants acted willfully or with extreme recklessness in omitting to state and/or misrepresenting material facts about the financial condition, profitability, risks of investing in the Company, effectiveness of its controls or present and/or future prospects of the Company;
- Whether the market price of Morgan's common stock during the Class Period was artificially inflated due to the material non-disclosures and/or misrepresentations complained of herein; and
- Whether the members of the Class have sustained damages, and, if so, what is the proper measure thereof.

466. Plaintiffs' claims are typical of the claims of the members of the Class. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that are adverse or antagonistic to the Class.

467. A class action is superior to other available methods for fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the Defendants' wrongful conduct. Furthermore, there will be no difficulty in the management of this litigation as a class action.

## XVI. COUNTS

### COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants except Lynch, referred to as "Rule 10b-5 Defendants")**

468. Plaintiffs repeat and reallege each and every allegations in the foregoing paragraphs of this Complaint as if fully set forth herein. This claim is asserted against all Rule 10b-5 Defendants.

469. During the Class Period, the Rule 10b-5 Defendants: (a) knowingly and recklessly deceived the investing public, including Plaintiffs, as alleged herein; (b) artificially inflated the market price of Morgan's common stock; and (c) caused Plaintiffs and the Class to purchase or otherwise acquire Morgan Stanley common stock at artificially-inflated prices.

470. Each of the Rule 10b-5 Defendants, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), made untrue statements of material facts and/or omitted to state material facts necessary to make the statements made by the Rule 10b-5 Defendants not misleading, and/or substantially participated in the creation of the alleged misrepresentation, which operated as a fraud and deceit upon Plaintiffs and the Class, in an effort to maintain the artificially-inflated price of Morgan Stanley's common stock during the Class Period. The Rule 10b-5 Defendants' false and misleading statements (and omissions of material facts) are set forth in Sections VIII and IX, *supra*.

471. As a result of their making and/or substantially participating in the creation of affirmative statements to the investing public, the Rule 10b-5 Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

472. The Rule 10b-5 Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, made or substantially participated in the creation/dissemination of, untrue statements of material fact as set forth herein, or with extreme recklessness failed to ascertain and disclose truthful facts, even though such facts were available to them.

473. The facts alleged herein give rise to a strong inference that each of the Rule 10b-5 Defendants acted with scienter. Each of the Defendants knew or with extreme recklessness disregarded that the Class Period statements set forth in Sections VIII and IX, *supra*, were materially false and misleading for the reasons set forth herein.

474. The Rule 10b-5 Defendants carried out a deliberate scheme to misrepresent the value of Morgan Stanley's assets, the risks the Company's investors were being exposed to and the effectiveness of Morgan Stanley's controls.

475. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Morgan's securities was artificially inflated throughout the Class Period. Unaware that the market price of Morgan's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Rule 10b-5 Defendants, or upon the integrity of the markets in which Morgan's common stock traded, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or in the absence of material adverse information that was known, or with deliberate recklessness disregarded, by the Defendants but not disclosed in their public statements, Plaintiffs purchased or acquired Morgan's common stock at artificially-inflated prices. As a direct and proximate result of Rule 10b-5 Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of Morgan's common stock during the Class Period, when the inflation in the price of Morgan's common stock was gradually removed as the truth regarding Rule 10b-5 Defendants' conduct was revealed causing the price of Morgan's common stock to decline and thereby resulting in economic losses to Plaintiffs and the Class.

476. By reason of the foregoing, the Rule 10b-5 Defendants violated Section 10(b) of the

Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiffs and the Class for damages suffered in connection with their transactions in Morgan's common stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act (Against the Individual Defendants)

477. Plaintiffs repeat and reallege each and every allegations in the foregoing paragraphs of this Complaint as if fully set forth herein. This claim is asserted against the Individual Defendants.

478. Morgan Stanley is primary violator of Section 10(b) and Rule 10b-5, promulgated thereunder.

479. The Individual Defendants acted as controlling persons of Morgan within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By reason of their positions as officers and/or directors of Morgan, their ability to approve the issuance of statements, their ownership of Morgan's securities and/or by contract. As such, the Individual Defendants had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of the Company as set forth herein. The Individual Defendants were provided with or had unrestricted access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence, and during the Class Period did exercise their power to control and influence, the conduct giving rise to the violations of the federal securities laws alleged herein. The Individual Defendants prepared, or were responsible for preparing, the Company's press releases and SEC filings and made statements to the market in SEC filings, annual reports, press releases, news articles and conference calls. The Individual Defendants controlled Morgan Stanley and each of its employees.

480. By virtue of their positions as controlling persons of Morgan, and by reason of the conduct described in this Count, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for controlling primary a violator of the federal securities laws.

481. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XVII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, including preliminary and permanent injunctive relief, as follows:

A. Determining that this action is a proper class action, and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding preliminary and permanent injunctive relief in favor of Plaintiffs and the Class against all defendants and their counsel, agents and all persons acting under, in concert with or for them;

C. Restitution of investors' monies of which they were defrauded;

F. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' conduct set forth herein, in an amount to be proven at trial, including interest thereon;

G. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

H. Such other and further relief as the Court may deem just and proper.

**XVIII. JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: November 24, 2008

LABATON SUCHAROW LLP

By: /s/ Jonathan M. Plasse
Jonathan M. Plasse
jplasse@labaton.com
Richard T. Joffe
rjoffe@labaton.com
Jesse Strauss
jstrauss@labaton.com
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

BARROWAY TOPAZ KESSLER MELTZER & CHECK, LLP

By: /s/ David Kessler
David Kessler (admitted pro hac)
dkessler@btkmc.com
Sharan Nirmul (admitted pro hac)
snirmul@btkmc.com
Lauren Wagner Pederson (admitted pro hac)
lpederson@btkmc.com
Richard A. Russo, Jr. (admitted pro hac)
rrusso@btkmc.com
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

Lead Counsel and Counsel for Lead Plaintiff State-Boston Retirement System

# Exhibit A

**CERTIFICATION OF AGNETA WILHELMSON KÅREMAR IN SUPPORT OF FJÄRDE AP-FONDEN'S MOTION FOR CONSOLIDATION, FOR ITS APPOINTMENT AS LEAD PLAINTIFF, AND FOR THE APPROVAL OF ITS SELECTION OF COUNSEL**

Fjärde AP-Fonden ("AP4" or "Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1. I, Agneta Wilhelmson Kåremar, am Administrative Director of AP4. I have reviewed the Amended Complaint and authorized its filing by Barroway Topaz Kessler Meltzer & Check, LLP.

2. AP4 did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3. AP4 is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Attached in Schedule A are AP4's transactions in Morgan Stanley (NYSE: MS) securities during the Class Period.

5. AP4 has, within the three year period preceding the date hereof, sought to serve as a representative party in federal securities class actions against Citigroup, Inc and Wachovia Corporation.



6. AP4 will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20 day of November, 2008.

**Fjärde AP-Fonden**

By: ______________________
Agneta Wilhelmson Kåremar
*Administrative Director*

**SCHEDULE A**

| Date | Purchase or Sale | Type of Securities | Number of Securities | Price of Securities |
|---|---|---|---|---|
| 8/8/2007 | Purchase | Com Stk | 46,000 | 65.9497 |
| 12/17/2007 | Purchase | Com Stk | 72,063 | 49.6498 |